IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACY CORPORATION OF AMERICA/   )    Consolidated
ASKARI CONSOLIDATED LITIGATION      )    C.A. No. 16-1123 RGA

THIS DOCUMENT RELATES TO
C.A. No. 17-870 RGA

## AMENDED COMPLAINT

Plaintiffs Kaveh Askari, Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. (collectively, "Plaintiffs,") allege the following against defendants Pharmacy Corporation of America ("PCA"), Gregg Weishar ("Weishar"), Paul Jardina ("Jardina") and David Froesel ("Froesel," together with Weisher and Jardina the "Manager Defendants," together with PCA, the "Defendants"):

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment, breach of contract and related claims arising out of Defendants' breach of an agreement and attempt to strip Plaintiffs of their membership interests in a company for little or no consideration. OncoMed Specialty, LLC ("Specialty") was the product of pharmacist Kaveh Askari's ("Askari") life's work and he was Corporate Plaintiffs' (as defined herein) majority shareholder. Plaintiffs entered into an agreement with PCA for a three-phased purchase by PCA of Plaintiffs' interest in Specialty. At closing, PCA would pay a nominal amount ($7,800,000 less advisory fees) for 37.5% of Plaintiffs' Specialty membership interests. On dates three years and five years after closing, PCA was to pay the Plaintiffs for the balance of their Specialty shares, in accordance with a formula based on earnings before interest, tax, depreciation and amortization ("EBITDA").

2.      The agreements that formed the basis of the transaction contained certain provisions that were intended to prevent PCA from manipulating the business in a manner that would deprive Plaintiffs of the value of their membership interests.  Thus, all Major Decisions that had a substantial financial impact on the company—including the increase in secured debt—required a vote of 75% of the membership interests.  The agreements also provided for a cap of $16,500,000 of the Net Debt of the company.

3.      In direct contravention of these agreements, PCA—a minority unitholder in Specialty—orchestrated substantial loans to the company, without any legitimate business purpose, for the purpose of driving up the Net Debt, which in turn drove down the purchase price for the second phase of PCA's purchase of Plaintiffs' membership interests—precisely the behavior the protections in the agreement were designed to avoid.   On December 6, 2013, PCA purported to purchase 30.5% of Plaintiffs' membership interests for $1.00.

4.      On August 2, 2017, mere months after trying to take 30.5% more of the Plaintiffs' units for just $1, KKR & Co. L.P. ("KKR"), one of the country's largest private equity firms bought PCA for $1.4 billion in cash and debt.  While Plaintiffs got nothing for PCA's purported purchase of one-third of their membership interests in Specialty, PCA's crown jewel, PCA's unitholders were going to be paid a 17% premium on their units under the KKR acquisition. Upon information and belief, Specialty represents 50% or more of PCA's value and generates all of its profit.

## PARTIES

5.      Plaintiff Askari is a citizen of the State of New York.  He is the direct or indirect owner of a majority of the shares in the Corporate Plaintiffs.

6.      Plaintiffs Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. (the "Corporate Plaintiffs") are Delaware corporations and collectively own a 62.5% membership interest in Specialty.

7.      Defendant PCA is a California corporation with a principal place of business at 1901 Campus Place Louisville, Kentucky.  On information and belief, PCA is a wholly owned subsidiary of PharMerica Corporation ("PMC"), a publicly traded provider of institutional, specialty home infusion, and oncology pharmacy services in the United States.

8.      On information and belief, Defendant Gregg Weishar ("Weishar") is a citizen of Kentucky.  Weishar is the Chief Executive Officer of PMC and is a member of the Board of Managers of Specialty.

9.      On information and belief, Defendant Paul Jardina ("Jardina") is a citizen of Kentucky.  Jardina has been and is Specialty's President and Chief Executive Officer and member of the Board of Managers of the Specialty.

10.      On information and belief, Defendant David Froesel ("Froesel") is a citizen of Kentucky.  Froesel was, until on or about September 30, 2016, the Chief Financial Officer of PMC and a member of the Board of Managers of Specialty.

## JURISDICTION

11.      Plaintiffs bring this complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

3

12.     PCA is subject to the personal jurisdiction of this Court as a result of its consent to jurisdiction and venue.  Additionally, defendants Weishar, Jardina and Froesel are subject to jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109 because they serve as managers of Specialty.  This suit relates to the business of Specialty and violations by these defendants of a duty to Specialty's members under the Operating Agreement.

## FACTUAL ALLEGATIONS

### Specialty Pharmaceuticals & Specialty Pharmacies

13.     Specialty is a specialty pharmacy, meaning that it has the technical capability to distribute specialty pharmaceutical products.  Specialty pharmaceutical products are complex medications used in therapies for the treatment of chronic, high-cost, or rare diseases, including cancer.  Specialty pharmaceuticals are harder to prepare, maintain, deliver, administer and monitor than typical drugs, and they require closer supervision of the patient's overall therapy.  Prescription drug revenue in the United States exceeded $340 billion in 2014, and more than $106 billion of that revenue is attributable to the sale of so-called specialty pharmaceuticals.

14.     The most common categories of specialty pharmaceuticals are (i) office-administered injectable products; (ii) self-administered injectable products; (iii) clinic/office-administered infusible products; and (iv) select oral agents.  While oral oncology medications can be administered at home, infusible and most injectable oncology medications typically must be administered in a hospital or doctor's office.

15.     Not every pharmacy is able to prepare and deliver specialty pharmaceuticals to doctors and hospitals for use in oncological therapy.  The pharmacists who work in specialty pharmacies must be very experienced and highly trained.  Only specialty pharmacies with trained pharmacists are specially licensed to distribute specialty pharmaceuticals.

4

16.     Specialty pharmacies that are designated by pharmaceutical manufacturers to dispense all types of oncology specialty pharmaceuticals, including the most restricted, are referred to as "high-touch" specialty pharmacies.  Thanks to the skills and hard work of Askari, Specialty is a high-touch specialty pharmacy.

**The Early History of Sina Drug/OncoMed**

17.     In 2002, Askari founded a small specialty pharmacy known as Sina Drug Corp ("Sina"), in Manhasset, New York.  Sina began doing business as OncoMed Pharmaceutical Services ("OncoMed").

18.     From 2003 until approximately 2006, OncoMed sold various types of specialty pharmaceuticals, including compounded infusible and injectable medicines for oncology and human growth hormone.  In approximately 2006, Askari decided to narrow the scope of OncoMed's specialty pharmacy services to oncology specialty medicines.

19.     Success came quickly for OncoMed.  By January 2008, operating solely from its small Manhasset facility, OncoMed had achieved annual revenues of approximately $60,000,000.00.

20.     On the heels of this success, Askari decided that OncoMed should become an oncology specialty pharmacy provider that would manage all aspects of a patient's oncology pharmaceuticals, including distribution, dispensing, and drug therapy management.  Under Askari's leadership, OncoMed was the first specialty pharmacy to market a high-touch, oncology-focused solution, whereby the specialty pharmacy compounded and dispensed all specialty medications necessary to treat patients under the direct supervision of specially trained oncology pharmacists.

21.     To help expand its business, in 2008 OncoMed built a state-of-the-art compounding facility in Great Neck, New York, which became the "hub" of OncoMed's future specialty pharmacy locations.

22.     To accommodate OncoMed's growing patient base, OncoMed opened several local "spoke" pharmacies, with the main pharmacy in Great Neck as their hub. The "spoke" pharmacies dispensed prescriptions of medications with short half-lives (for which long-distance shipment was impractical), prescriptions subject to regulations that require the dispensing pharmacy to be located within a particular state, and prescriptions that were more appropriately dispensed outside of the Great Neck hub facility for other reasons.

23.     In 2007, the F.D.A. approved Revlimid, the first oral oncology pharmaceutical, for use in the U.S. Revlimid is a Limited Distribution Drug ("LDD"). LDDs are medications that are distributed to a very limited number of high-touch specialty pharmacies and wholesalers.

24.     OncoMed was given the right to distribute Revlimid in 2008. At that time, OncoMed also began dispensing oral oncology specialty pharmaceuticals, thereby establishing OncoMed's footing as a regional high-touch oncology specialty pharmacy. OncoMed thus became a true "one-stop" specialty pharmacy for all oncology services—infusible, injectable and oral.

25.     As a result of OncoMed's high-level pharmacy operations model, in June 2010 the Joint Commission Accreditation, Health Care ("JCAHO") gave OncoMed a full thirty-six month accreditation. OncoMed became the first JCAHO-accredited independent oncology specialty pharmacy in the United States.

26.     By 2012, OncoMed was one of the largest independent specialty pharmacies in the United States with a stellar reputation across the board in specialty oncology service lines. A

large number of doctors and hospitals relied upon OncoMed to compound their oral and infusible oncology pharmaceuticals. With its core pharmacy operations staff and procedures in place at OncoMed's Great Neck hub facility, under Askari's leadership, OncoMed was poised to take its one-stop oncology specialty pharmacy services model to a national level.

**PMC Approaches OncoMed and Proposes a Three-Year National Expansion Plan**

27.     In or about mid-2011, Askari and Burt Zweigenhaft ("Zweigenhaft"), the owner of a minority interest in Corporate Plaintiffs, solicited offers to purchase an interest in OncoMed from companies that could provide the platform necessary to bring OncoMed's service model to a national level.

28.     In approximately August 2012, Defendant Weishar, then PMC's Chief Executive Officer, met with Askari and told him that PMC had a keen interest in joining forces with OncoMed to assist in bringing its unique business model to a national level. To that end, Weishar proposed that PMC purchase a significant interest in OncoMed.

29.     In approximately January 2013, PCA, through Weishar, began its in-depth review of the scalability of OncoMed's business model. Due diligence and negotiation for the transaction took place throughout 2013. At that time, PMC was operating approximately 98 pharmacies in 45 states. PCA represented that its plan was to use PMC's pharmacy network to grow OncoMed's ability to distribute specialty oncology pharmaceuticals in order to maximize OncoMed's revenue and profits through its national platform.

30.     The structure of the contemplated transaction provided for PCA to purchase a minority interest in OncoMed (which was to become the new entity—Specialty—that was to be formed) in phase one, and then buy out Plaintiffs' remaining interest in two subsequent phases three and five years after closing using a calculation that was based on Specialty's EBITDA.

PCA provided Plaintiffs with its three-year expansion plan for Specialty (the "Plan"). The Plan projected future earnings based upon expansion of the existing business model, which included infusible, injectable and oral oncology specialty pharmaceuticals. The Plan projected that Specialty's future revenues and profit would grow at the rate of 35% per year, with a profit margin of 9.5% a year. This projection was based in large part upon OncoMed's historical performance with infusible and injectable oncology medications.

31.     Under the Plan, the Great Neck facility was to continue to serve as the "hub" to pharmacies throughout the United States.

32.     The Plan contemplated that PCA would make certain limited loans to the Specialty entity that was to be formed—for the purpose of expanding the business network—a term loan of $6.5 million and a working capital loan of no more than $10 million. The parties agreed that the combined loans would not exceed $16.5 million. This cap of $10 million was a material requirement that was necessary to protect the value of Plaintiffs' interest in Specialty and ensure that it was not illusory and was memorialized in subsequent transaction documents.

**The Transaction**

33.     On October 10, 2013, a series of agreements were executed in order to effectuate PCA's purchase of a minority interest in Specialty (the "Transaction") including, inter alia, (a) Plan of Business Reorganization (by which the businesses then operating as OncoMed were rolled into the Plaintiffs for sale to PCA which transaction included creating the new Specialty entity); (b) a membership Interest Purchase Agreement (the "MIPA"), pursuant to which PCA purchased a minority share of Specialty; (c) an employment agreement for Keveh Askari (the "Askari Employment Agreement"); (d) Amended and Restated Operating Agreement of Specialty (the "Operating Agreement"); and (e) certain Loan Agreements.

8

34.     Pursuant to the MIPA, on December 6, 2013, Plaintiffs sold a minority equity interest (37.5%) in the newly organized Specialty to PCA.

**The Loan Agreement**

35.     The Transaction contemplated that PCA or its affiliates would lend money to Specialty for the purpose of expanding the business network.  The Loan Agreement provided that PCA would make only two loans to Specialty:  a term loan of $6,500,000 (the "Term Loan") and a working capital loan of up to $10,000,000 (the "Working Capital Loan").  These loans, together referred to as the Net Debt in Article I of the Operating Agreement, were not to exceed $16,500,000, combined.

**The Operating Agreement**

36.     The Operating Agreement gave Defendants the right to manage Specialty but also contained important protections for the Plaintiffs, including blocking rights with respect to certain "Major Decisions."  Section 5.8 of the Operating Agreement requires the consent of members holding at least 75% of Specialty's membership interests for any "Major Decisions," which include, inter alia

> (b) causing (A) the sale, pledge, lease, or other disposition of all or any substantial portion of the assets of [Specialty] or Subsidiaries (other than sales of inventory in the ordinary course of business), or (B) the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of [Specialty] or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement);
> (c) enter into any Related-Party Transaction that is not specifically authorized pursuant to Section 5.9[.]
> * * *

37.     The only debt "contemplated in the Loan Documents" was the Term Loan in the amount of $6,500,000, and the Working Capital Loan, which was not to exceed $10,000,000.

9

38.     The Operating Agreement also provided for PCA to purchase the rest of Plaintiffs' membership interests in Specialty in two phases over a five-year period.  Specifically, pursuant to Section 9.1(a), "at any time following the 36-month anniversary of the Effective Time [PCA] had the right, but not the obligation, to purchase up to 30.5% of the membership interests in Specialty owned *direct or indirectly by Askari* and all of the membership interests owned by Burt Zweigenhaft" (the "First Call Right") (emphasis added).

39.     Plaintiff Askari was a signatory "Selling Shareholder" to the MIPA, and his ownership interests are specifically identified for staged buyout in Section 9.1 of the Operating Agreement, an agreement and arrangement specifically contemplated by and ancillary to the MIPA. Consequently, Plaintiff Askari has standing to sue individually for breach of this provision.

40.     After the Transaction closed, Plaintiffs collectively owned a 62.5% membership interest of Specialty and PCA owed a 37.5% interest.  Plaintiff Askari owned, directly or indirectly, 49% of Plaintiffs' 62.5% membership interest and Zweigenhaft owned 13.75%.

41.     Thus, on the 36-month anniversary of the effective date of the Transaction, PCA had the right to purchase a maximum of an additional 28.65% membership interests in Specialty: 13.75% of the membership interests from Zweigenhaft and up to another 14.9% of the membership interests from Askari (which represents 30.5% of his 49%).  In all events, the maximum PCA could own if it exercised the Frist Call Right was 66% of the membership interest, and the remaining 34% would still be owned by Plaintiffs, through shares owned directly or indirectly by Askari.

42.     Regardless of whether it exercised the First Call Right, Section 9.1(b) of the Operating Agreement obligated PCA to purchase all of the membership interests owned by Plaintiffs as of the "60-month anniversary of the Effective Date" (the "Second Call").

43.     The Operating Agreement set out the formula by which the purchase price for these buyouts must be calculated.   Pursuant to Section 9.2(a) such purchase price

> shall be an amount equal to (A) (i) the product of (x) the trailing twelve (12) months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net Debt of [Specialty], less (iii) the purchase price for any acquisition of assets, business or Person by [Specialty], unless such amount is included in the calculation of Net Debt multiplied by (B) the Percentage Interests of [Specialty] being purchased.

44.     Article I of the Operating Agreement defined "Net Debt" as "an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by [Specialty] to the PharMerica Member or its Affiliates under the Working Capital Loan . . . [i.e., an amount up to $10,000,000] minus (iii) the amount of Specialty's] cash and cash equivalents." Accordingly, for purposes of calculating the buyout purchase price, Net Debt is capped at no more than $16.5 million minus Specialty's cash and cash equivalents.

45.     Pursuant to Section 5.8 of the Operating Agreement, any increase in Specialty's secured indebtedness constitutes a Major Decision and requires Plaintiffs' prior consent.

46.     Section 11.1(b) of the Operating Agreement prohibited any amendments or modifications to this purchase price formula set forth in Article IX without the consent of "all Economic Interest Owners and the Members."

**The Askari Employment Agreement**

47.     Pursuant to the Askari Employment Agreement, Askari was to remain in charge of pharmacy operations after the sale for a minimum of three years, the timeframe of both the initial growth and expansion reflected in the Plan and the exercise date of the First Call Right.

11

48.     Section 2(b) of the Askari Employment Agreement provided that Askari "shall be based in the Great Neck, New York office of Specialty" and that "[a]ny relocation [by Askari] to an office outside of a reasonable radius [sic] of Great Neck, New York will require the consent of Executive [Askari]."

49.     Keeping the hub of the operations in Great Neck was an important part of the Plan because Askari and another pharmacist at the Great Neck hub held all the required state pharmacy licenses for the Specialty business.

50.     Under the Askari Employment Agreement, Specialty could terminate Askari "solely for Cause[,]" which was narrowly defined Section 4(b) of the Employment Agreement.

51.     The purpose of including the "for cause" provision was not financial, as Askari's salary was guaranteed even if he was terminated.  Rather, it was to ensure that Askari would control Specialty's day-to-day Pharmacy Operations for at least the initial three-year expansion period contemplated by the parties leading up to the first call right.  Askari's involvement was critical if Specialty was to grow revenue and profits in accordance with the Plan.  In fact, the only reason Plaintiffs agreed to a phased buyout of their shares was that, by driving growth, Askari could have a direct impact on how much PCA would ultimately pay for the business he had spent a lifetime creating.

**PCA Attempt to Steal Plaintiffs' Membership Interests in Specialty**

PCA Abandons the Plan

52.     Instead of appointing a CEO to run Specialty, Defendants appointed Bob Bestvina ("Bestvina"), a non-pharmacist with no relevant experience in day-to-day pharmacy operations, let alone with oncology specialty pharmaceuticals, as Specialty's interim Facility Manager.

53.     In direct opposition to the operations of Specialty's core profitable business model, Bestvina directed that all pharmacy operations throughout Specialty be decentralized. Bestvina then stopped all plans to expand the pharmacy operations including any plans to open new pharmacies in key locations and any plans to expand Specialty's infusible and injectable prescription base to a national level.

PCA Fires Askari

54.     From December 6, 2013 until early May 2014, Askari continued to serve as Specialty's Vice Chairman and Chief Clinical Officer.  During that time, despite Bestvina's actions, Askari consistently attained his monthly top and bottom line budgeted target levels as set forth in the agreed upon Plan and increased sales by 50%.  In reaching those goals, Askari continued to build all areas of Specialty's services, including the high-profit injectable, infusible and oral oncology specialty pharmaceuticals.  Nonetheless, in May 2014, only five months after the sale was completed, PCA summarily dismissed Askari from his executive position without cause.  PCA refused to pay Askari as contemplated in the Askari Employment Agreement, insisting with no basis in law or fact that he execute a general release.

55.     Immediately thereafter, PCA informed Ellen Scharaga, Specialty's Operations Manager and Askari's most important collaborator, that "effective immediately" she would no longer have any direct responsibility for Pharmacy Operations and, in June 2014, Scharaga's position was eliminated altogether.  In July 2014, Specialty fired Scott Feigeles, Specialty's Chief Pharmacist.  Until they were fired, Askari and Feigeles were the two pharmacists in charge of overseeing and supervising Specialty's infusible and injectable services at the Great Neck "hub" facility.  In the months that followed PCA continued to gut the Great Neck pharmacy staff,

including the senior pharmacy technicians with significant experience in infusible and injectable compounding.

56.     At the end of 2014, PCA stopped selling the high-profit infusible and injectable services, including compounding, and then announced that Specialty was being moved to Louisville, Kentucky, far away from Specialty's traditional markets and the established hub of the successful hub-and-spoke model.  As a result, at the end of the first quarter of 2015 Specialty's profit margin decreased by approximately 50%.  This decrease in profit margin is ongoing due to the fact that PCA has inexplicably stopped selling highly profitable injectable and infusible and compounded oncology medications.

57.     As these events unfolded, Askari (still the indirect majority owner of Specialty) frequently objected to PCA's actions and their anticipated (and now confirmed) negative impact on Specialty's EBITDA.  As a result of Askari's complaints, in approximately April 2014, Askari and PCA began discussions about an early buyout of Askari's interest in Specialty.  In connection with those discussions, on or about April 17, 2015, Jardina provided Askari with a document calculating an estimated price for Askari's membership interest (the "Projection Sheet").

58.     At that time, Jardina advised that "[t]he EBITDA projections are a bit lower than the original projections that you and Burt agreed to as part of PharMerica's purchase of Specialty. . . ."  Jardina's Projection Sheet made significant assumptions regarding the buyout. In particular, the Projection Sheet valued Specialty at approximately $24,500,000, of which Askari indirectly owned 49%.  Notably, in calculating the buyout price the Projection Sheet assumed a debt amount of approximately $16,000,000— $500,000 below the maximum amount of permitted debt.  The Projection Sheet assumed the $16,000,000 amount would be stable

14

through 2016, the date of the initial buyout, and assumed no debt for the years 2017 through the end of 2018 (the date of the second buyout).

59.     Ultimately, the parties were unable to agree upon a valuation for an early buyout and negotiations ended.

60.     In approximately May 2015, Jardina held a telephone conference with Askari concerning the status of Specialty.  During that call, Askari repeated his concerns about the loss of the profitable infusible/injectable lines and management's willful disregard of any obligation to maximize Specialty's profitability.

61.     Askari also objected to the use of Specialty's working capital in a way that appeared to increase revenue while lowering profit margins, which was contrary to the strategy that formed the basis of the parties' transaction and which negatively impacted EBITDA. Specialty's management was purposely piling on debt in order to drive Specialty's EBITDA down and lower the buyout price PCA would have to pay the Plaintiffs for the first (and probably also the second) buyout.

The First Amended Note

62.     On or about June 5, 2015, after the early buyout negotiations had failed, without any notice to Plaintiffs, and without their approval (as required for a Major Decision), the Manager Defendants authorized Specialty to execute an Amended and Restated Revolving Note (the "First Amended Note") that, in violation of the express terms of the Purchase Agreement and Operating Agreement, purported to give PCA the ability to increase Specialty's working capital debt to approximately $30,000,000 dollars, which was secured by Specialty's assets.

63.     This purported working capital debt increase was not necessary for the operation of Specialty, but rather was made solely to enable PCA to claim that the "Net Debt" exceeded

$35,000,000 on the date of the First Call Right.  In fact, PCA advanced purported working capital loans to Specialty at the extraordinary rate of $2 million every thirty days in order to reach the amount of $35,100,000 in loans that it claimed constituted "Net Debt," far in excess of the maximum permissible amount of Net Debt as of the date of the first buyout period.  Askari repeatedly demanded an explanation for the increased debt, but the Manager Defendants refused to answer him despite the fact that he was still the indirect majority owner of Specialty.

64.     Nearly one month later, on or about June 30, 2015, PCA forwarded a copy of the First Amended Note to Askari's counsel with no explanation and without a request for his consent.  Neither Askari nor Plaintiffs ever consented to such a loan increase or the material increase in the lien on Specialty's assets.

PCA Negotiates Early Buyout in Bad Faith

65.     In approximately April 2016, Askari again entered into discussions with PCA in an effort to effectuate an early buyout of his 49% indirect ownership interest in Specialty.  On or about May 30, 2016, in connection with those discussions, PCA valued Specialty at $48,000,000 for the purposes of the buyout of the Plaintiffs' 62.5% interest.  PCA then improperly subtracted $32,000,000 in debt from the purchase price calculation.

66.     By letter dated, June 3, 2016, Askari, through his attorney, objected to PCA's inclusion of the improperly inflated working capital debt in the calculation of the purchase price and informed PCA that the unauthorized debt constituted an equity contribution in Specialty because it was not permitted under any of the documents governing the operation of Specialty. Askari further reminded PCA that Section 9.1(a) of the Operating Agreement gave PCA the right to purchase up to 30.5% of the membership Interest owned directly or indirectly by Askari. Askari's indirectly owned membership Interest is 49% of Specialty (by virtue of his 78.4%

16

ownership of the Corporate Plaintiffs). Thus, PCA would be entitled to purchase 30.5% of Askari's 49% membership Interest which represents 14.95% of Specialty's total membership interests.

67. In response, PCA sent an email disputing Askari's interpretation of Section 9.1 of the Operating Agreement and PCA's violation of the Major Decisions clause in the Operating Agreement. PCA claimed that it would achieve an approximately 80% ownership interest in Specialty after the First Call Right, leaving Askari with an approximately 20% indirect ownership interest in Specialty. In that case, PCA would have absolute control of Specialty under the Operating Agreement and would no longer be subject to the Plaintiffs' blocking rights.

68. Contrary to PCA's assertion, the First Call Right in the Operating Agreement only provides PCA the right to own a maximum of 66% of the membership interests of Specialty. Even if PCA exercised the First Call Right, Plaintiffs would retain control 34% of the membership interest and all Major Decisions—including the decision to borrow additional money—would be subject to Plaintiffs' blocking right.

69. On or about June 22, 2016, as a result of PCA's bad faith negotiations, Plaintiffs, withdrew from early buyout negotiations and reiterated their objections to PCA's breaches of the Operating Agreement.

The Second Amended Loan Agreement

70. In order for Plaintiffs to determine whether there were any legitimate business reasons for Defendants' larding of Specialty's balance sheet with impermissible secured debt— which Plaintiffs had not approved—Plaintiffs demanded an inspection of Specialty's books and records pursuant to Section 6.1 of the Operating Agreement. Despite due demand, Specialty failed and refused to make the books and records available to Plaintiffs.

17

71.     Instead, on October 6, 2016, attorneys representing Specialty, PCA and PMC sent an email to Askari's attorney indicating that Defendants had once again amended the Loan Agreement, further encumbering Specialty's assets and potentially driving down any purchase price, all without the Plaintiffs' consent as required under the Operating Agreement.  The email gave no business rationale for borrowing more money.

72.     Pursuant to this new amendment to the Loan Agreement (the "Second Amended Loan Agreement"), the Manager Defendants caused the Working Capital Loan to be increased by another $34,000,000, which in turn allowed them to increase the "Net Debt" to be subtracted from the Purchase Price to $70,500,000.  Like the initial unauthorized increase in the working capital debt, this second increase was impermissible and in violation of the Operating Agreement and violated, among other provisions, the Major Decisions protection.  The effect and indeed the purpose of the purported second increase was to completely offset the value of the purchase price for the Second Call of the Plaintiffs' interests in Specialty.

73.     On October 7, 2016, Plaintiffs objected to the Second Amendment to the Loan Agreement and reiterated that Specialty was not permitted to increase the debt without Plaintiffs' consent, and thus any additional monies purportedly lent Specialty constituted a contribution to the capital of Specialty's common equity, of which Plaintiffs owned 62.5%.

74.     Upon information and belief, the real purpose of these purported loans was to ensure that Plaintiffs would not receive any value for their membership interests and rendered the contract illusory.  Indeed, that is exactly what happened.

**PCA Attempts to Purchase 44.25% of Plaintiffs' Membership Interests for $1**

75.     On December 7, 2016, 36 months after the Effective Time, PCA sent Plaintiffs a notice purporting to exercise its right to acquire 44.25% of the Plaintiffs' interests in Specialty for $1.00. Plaintiffs promptly rejected the notice and returned PCA's one dollar ($1.00) check.

76.     At the time PCA purportedly exercised the First Call Right on December 7, 2016, the 12-month trailing EBITDA figure for the period December 2015 through November 30, 2016 utilized by PCA was $1,846,053. Subsequently, when the profit and loss statements for Specialty were released for the calendar year 2016, EBITDA mysteriously jumped to $4,682,000.00 for the first quarter of 2017. Thus, miraculously in only one quarter EBITDA increased by nearly $3,000,000 following PCA's purported exercise of the First Call Right, further demonstrating Defendants' intentional manipulation of EBITDA. Notably, the 2017 first quarter EBITDA would annualize conservatively to approximately $20,000,000.

77.     Although Plaintiffs are still the majority unitholder of Specialty, because PCA failed to exercise the First Call Right in accordance with the Agreement, on August 2, 2017, mere months after purporting to acquire a majority interest in Specialty, private equity powerhouse KKR purchased PCA for $1.4 billion. Specialty is PCA's highest performing business and its crown jewel. Upon information and belief, it represents 50% or more of PCA's value and 100% of PMC and its affiliate's profit. Thus, the membership interests PCA tried to buy from the Plaintiffs just a few months earlier for $1 were actually worth hundreds of millions of dollars.

## COUNT I
### (Declaratory Judgment)

78.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

79.     This is a justiciable dispute between the parties because PCA purported to exercise its First Call Right to purchase 30.5% of the membership interests in Specialty owned directly or indirectly by Plaintiff Askari and all the membership interests owned directly or indirectly by Zweigenhaft, for a total purchase of an additional 44.25% of the membership interests in Specialty.

80.     PCA's exercise of the First Call Right is not valid because pursuant to Section 9.1(a) the maximum percentage of membership interests PCA can acquire at the First Call Right is 28.65%, which represents 30.5% of the 49% membership interests owned directly or indirectly by Askari (*i.e.*, 14.95% of the total membership interests in Specialty) and 13.75% of Specialty's membership interests owned directly or indirectly by Zweigenhaft.

81.     PCA's exercise of the First Call Right also was not valid because it failed to pay the purchase price for Plaintiffs' membership interests pursuant to the formula set forth in Section 9.2(a) of the Operating Agreement because it calculated the purchase price using a Net Debt amount that exceeds the Net Debt cap of $16,500,000.00 set forth in the Operating Agreement and Loan Agreement.  The purchase price formula set forth in the Operating Agreement is not subject to amendment without the consent of all Economic Interest Owners and Members, which was not received.

82.     Any purported increase of the Net Debt is not valid because it constitutes a Major Decision under Section 5.8 of the Operating Agreement requiring the prior affirmative consent of 75% of the membership interests.  Plaintiffs did not consent to any increase in the Net Debt or to the First or Second Amended Loan Agreements.

## COUNT II
### (Breach of Contract against PCA in the alternative to Declaratory Judgment)

83.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

84.     Plaintiffs and PCA are parties to the Operating Agreement.

85.     At all relevant times, PCA owned 37.5% of the membership interests of Specialty and Plaintiffs owed 62.5%.

86.     Pursuant to the Operating Agreement, the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of Specialty or Subsidiaries, except as contemplated by the Loan Documents (which set a maximum amount of debt and secured loans), is a Major Decision requiring the prior affirmative consent of 75% of the membership interests.

87.     Pursuant to the Operating Agreement, the Net Debt is "an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by [Specialty] to the PharMerica Member or its Affiliates under the Working Capital Loan . . . [*i.e.*, an amount up to $10,000,000] minus (iii) the amount of Specialty's] cash and cash equivalents."

88.     Pursuant to the Loan Agreement, the Working Capital Loan is an amount up to $10,000,000.00.

89.     Seventy-five percent the membership interests has not approved the Major Decision of increasing the maximum amount of debt and secured loans.

90.     Pursuant to Section 9.2(a) of the Operating Agreement, the purchase price for the membership interests "shall be an amount equal to (A) (i) the product of (x) the trailing twelve (12) months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net Debt of [Specialty], less (iii) the purchase price for any acquisition of assets, business or Person by [Specialty],

21

unless such amount is included in the calculation of Net Debt multiplied by (B) the Percentage Interests of [Specialty] being purchased."

91.     At the time of PCA's purported exercise of the First Call Right Specialty's cash and cash equivalents were approximately $4,000,000.  Therefore, the maximum amount of Net Debt that can be used to calculate the purchase price at the exercise of the First Call Right is $12,500,000.00 (i.e., $6,500,000 (Term Loan) plus $10,000,000 (Working Capital Loan) minus $4,000,000 (cash and cash equivalents)).

92.     PCA breached the Operating Agreement by using a Net Debt of $70,500,000 to calculate the purchase price of Plaintiffs' membership interests when it purported to exercise its First Call Right and failed to pay the contractually agreed upon purchase price.

93.     Pursuant to Section 11.1(b), no changes or modification to the purchase price can be made without Plaintiffs' consent.

94.     Plaintiffs have not consented to any changes or the modifications of the purchase price.

95.     As a direct and proximate cause of PCA's multiple intentional and material breaches of the Operating Agreement, Plaintiffs have been damaged in an amount to be determined at trial.

### COUNT III
### (Breach of Contract against the Manager Defendants)

96.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

97.     The Manager Defendants were members of Specialty's Board of Managers and were bound by the Operating Agreement and had duties and responsibilities thereunder.

98.     Pursuant to the MIPA, the Operating Agreement and the Loan Agreement, the amount of the Working Capital Loan is limited to the principal amount of $10,000,000.

99.     Pursuant to the Operating Agreement, the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of Specialty or Subsidiaries, except as contemplated by the Loan Documents (which set a maximum amount of debt and secured loans), is a Major Decision requiring the prior affirmative consent of 75% of the membership interests.

100.    Pursuant to the Loan Agreement, the Working Capital Loan is an amount up to $10,000,000.00.

101.    Seventy-five percent of the membership interests has not approved the Major Decision of increasing the maximum amount of debt and secured loans.

102.    The increases in the loan amount as reflected in the First and Second Amendment constituted a Major Decision within the meaning of Section 5.8 of the Operating Agreement and required the prior affirmative consent of 75% of the membership interests.  Both increases in loans were secured and required a material increase in the size of the asset pledge and created a larger debt on Specialty's assets.  Neither loan increase was authorized by the Loan Documents as they were both in excess of the $10,000,000.00 limit set therein.

103.    In breach of the Operating Agreement, the Manager Defendants Weishar, Jardina and Froesel improperly authorized the First Amendment to the Loan Agreement and Weishar and Jardina improperly authorized the Second Amendment to the Loan Agreement and the related promissory note amendments without obtaining the prior consent of the Plaintiffs as required these Major Decisions.

104.    This constitutes a material and intentional breach of the Operating Agreement and was done to serve the interests of the individual defendants and their employers, PCA and PMC, rather than the interests of Specialty's members.

105.    As a result of the Manager Defendants' breach, the Net Debt of the company was grossly inflated, which in turn rendered Plaintiffs' membership Interest's virtually worthless as evidenced by the fact that PCA purported to buy out Plaintiffs' shares for a single dollar, rather than the millions of dollars they were worth.

106.    As a direct and proximate cause of the Manager Defendants' intentional and material breach, Plaintiffs have been damaged in an amount to be determined at trial.

### COUNT IV
**(Breach of Covenant of Good Faith and Fair Dealing against all Defendants)**

107.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

108.    Plaintiffs and PCA are parties to the Operating Agreement.  Every contract imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.

109.    As members of the Board of Managers of Specialty, the Manager Defendants are bound by the Operating Agreement, including the covenant of good faith and fair dealing.

110.    Even if it is determined that Plaintiffs' consent was not required to effectuate the First and Second Amendments to the Loan Agreement, Defendants could not enter into those transactions to undermine the purchase price paid for Plaintiffs' membership interests at the First and Second Calls without violating the covenant of good faith and fair dealing.

111.    Indeed, the parties did not intend to allow those in control of Specialty to take unilateral actions to manipulate Specialty for purposes of depressing the purchase price to be paid Plaintiffs.

112.    Defendants acted in bad faith by increasing the Working Capital Loan to Specialty to seven times the amount agreed upon in the Loan Agreement without any justification, so that Plaintiffs' membership interests would be worthless at the time of the First Call Right and to enable PCA to acquire them for $1.00.

113.    Defendants have wrongfully and intentionally breach the duty of good faith and fair dealing by denying Plaintiffs the benefit to which they are entitled to under the Operating Agreement.

114.    As a direct and proximate cause of Defendants' intentional and material breach of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for an order of judgment granting the following relief:

A.    On Count I for Declaratory Judgment, a judgment declaring that:

1.    there was no valid and binding exercise of the First Call Right and any purported purchase of by PCA of Plaintiffs' membership interests in Specialty is null and void;

2.    the Plaintiffs own 62.5% of the membership interests in Specialty;

3.    the maximum number of membership interests that PCA can purchase at the First Call Right is 28.65%. (14.95% of the total membership interests in Specialty owned directly or indirectly by Plaintiff Askari and 13.75% owned directly or indirectly by Zweigenhaft);

4. the maximum amount of Net Debt that can be used to calculate the Purchase Price for either the First Call or Second Call is $16,500,000.00, unless 75% of the membership interests consent to increase the Net Debt; and

5. any purported loans pursuant to the First and Second Loan Agreements do not increase the Working Capital of Specialty for the purpose of calculating Net Debt because these loans were not approved by 75% of the membership interests.

B.   On Count II against PCA for breach of contract, damages in an amount to be determined at trial.

C.   On Count III against the Manager Defendants for breach of contract, damages in an amount to be determined at trial.

D.   On Count IV against Defendants for breach of the covenant of good faith and fair dealing, damages in an amount to be determined at trial.

E.   The costs and disbursements of the action, including reasonable attorneys' fees and experts' fees, costs and expenses.

F.   Pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

_____
Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
*Attorneys for Plaintiffs*

OF COUNSEL:

Brian C. Dunning
Sari E. Kolatch
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 586-5800
bdunning@ctswlaw.com
skolatch@ctswlaw.com

September 20, 2017