**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

PHARMACY CORPORATION OF      :
AMERICA,      :
     :
               Plaintiff,      :
     :
      v.      :      C. A. No. 16-1123-RGA-MPT
     :
KAVEH ASKARI, et al.      :
     :
             Defendants.      :

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

On September 20, 2017 Kaveh Askari ("Askari"), Onco360 Holding I, Inc.,

Onco360 Holding II, Inc., and Onco360 Holdings III, Inc. ("Onco360 I-III")(collectively

"Plaintiffs") filed this declaratory judgment action through an Amended Complaint ("Am.

Comp."), against Pharmacy Corporation of America ("PCA") and Greg Weishar, Paul

Jardina, and David Froesel's collectively, the ("Managers") (collectively "Defendants").[1]

The Am. Comp. alleges breach of contract to the Operating Agreement, breach of the

implied covenant of Good Faith and Fair Dealing, and seeks a declaration of certain

findings and damages.[2]

Pending before the court is Defendants' motion to dismiss pursuant to FED. R.

CIV. P. 12(b)(6) Counts I, II, III, and IV of the Am. Comp. filed on August 16, 2017 for

---

[1] D.I. 53 Am. Comp. at 22-25.  Reference to the Am. Comp. throughout this
Report and Recommendation is to the page numbers of this pleading.
[2] *Id.*

failure to state a claim upon which relief may be granted.[3]  This court has original jurisdiction under 28 U.S.C. § 1338(a) as this matter relates to contracts.  This Report and Recommendation is issued pursuant to 28 U.S.C § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  For the reasons stated below, it is recommended that Defendants' motion be denied.

## II.    BACKGROUND[4]

### A.    Parties

Plaintiff Askari, a citizen of the State of New York, is a pharmacist in the field of oncology, and the indirect owner of the majority of shares in OncoMed Speciality, LLC ("Specialty") through his direct interests in Onco360 I-III.[5]  Plaintiffs Onco360 I-III are Delaware corporations and collectively own 62.5% of Specialty.[6]  Defendant PCA is a California corporation with its principle place of business in Louiseville, Kentucky and is a wholly-owned subsidiary of PharMerica Corporation ("PMC").[7]  Defendant Gregg Weishar is a citizen of Kentucky, the Chief Executive Officer of PMC, and a member of the Board of Managers of Specialty.[8]  Defendant Paul Jardina is a citizen of Kentucky and the President, Chief Executive Officer, and member of the Board of Managers of Specialty.[9]  Defendant David Froesel is a citizen of Kentucky and, until September 30, 2016, was the Chief Financial Officer of PMC and a member of the Board of Managers

---

[3] D.I. 55 Motion to Dismiss.
[4] In addition to the parties' briefs, factual information is taken from the Am. Comp.
[5] D.I. 53 at 1, 3.
[6] *Id.* at 3.
[7] *Id.*
[8] *Id.*
[9] *Id.*

of Specialty.[10]

**B.    Statements of Facts**

In 2002, Askari founded a small specialty pharmacy in Manhasset, New York and operated the business under the name OncoMed Pharmaceutical Services ("OncoMed").[11]  Due to the success of his oncology medicine business, Askari decided that the company should become an oncology speciality pharmacy provider.  During this time period, Askari opened a centralized compounding facility in Great Neck, New York and several pharmacies to accommodate the growing patient base.[12]  By 2012, Askari's business was one of  the largest independent specialty pharmacies in the United States with a sound reputation in special oncology services.[13]

In 2011, Askari, with the other current interest holders in OncoMed, solicited offers from interested companies, who had the ability to bring the OncoMed's services model to a national level, to purchase a substantial interest in OncoMed.[14]  In 2012, Weishar met with Askari and advised that PMC had a strong interest in purchasing an interest in OncoMed.[15]  This purchase would allow PMC and OncoMed to join forces and enable Askari to expand his successful operation to a national level.[16]

PCA represented that its plan was to use PMC's pharmacy network to grow OncoMed's power to distribute oncology pharmaceuticals throughout the United

---

[10] *Id.*
[11] *Id.* at 5.
[12] *Id.* at 6.
[13] *Id.*
[14] *Id.* at 7.
[15] *Id.*
[16] *Id.*

3

States.[17]  The contemplated transaction (the "Transaction") provided for PCA to purchase a minority interest in OncoMed from Plaintiffs.[18]  Over time, PCA would purchase the remaining majority interest held indirectly by Askari through Onco360 I-III, and other interest holders, in a two-staged buyout.[19]  Tier I and II buyouts were based on trigger dates that obligated PCA to purchase the remaining interest at three and five years after the close of the Transaction.[20]

On October 10, 2013, a series of agreements were executed to finalize the Transaction[21] whereby PCA purchased a 37.5% interest in Specialty for $7.80 million with the future obligation to buy a full interest in Specialty.[22]  The documents of the Transaction included, inter alia, (1) Plan of Business Reorganization, (2) Membership Interest Purchase Agreement (the "MIPA"), (3) Amended and Restated Operating Agreement of Specialty (the "Operating Agreement"), and (4) certain Loan Agreements.[23]  Of particular importance, the Loan Agreements were drafted "to provide debt financing to fund the Company's [Specialty] expansions in line with the Plan [Transaction] as negotiated by the parties."[24]  The executed Loan Agreements contained Term and Working Capital Loans.[25]  The Loan Agreements provide for a Term Loan of $6.5 million and Working Capital Loan of $10 million,[26] resulting in an

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 8.
[21] *Id.* at 1.
[22] *Id.* at 8.
[23] *Id.*
[24] D.I. 57, Ex. E Declaration of Chris Kelley at 16.
[25] D.I. 53 at 9.
[26] *Id.*

aggregate loan limit of $16.5 million.

The combined loan limit of $16.5 million played a critical role in Article I of the

Operating Agreement because of its impact on calculating Net Debt.[27]  The Loan

Agreements state that:

> "Net Debt" shall mean an amount equal to (i) 6.5 million Term Loan
> plus (ii) the amount of debt owed by the Company [Specialty] to the
> PharMerica member or its Affiliates under the Working Capital Loan
> (as defined in the Loan Documents (as defined in the Purchase
> Agreement)) minus (iii) the amount of the Company's cash and
> cash equivalents.[28]

Net Debt is the Term Loan plus the Working Capital Loan of Specialty minus

cash and cash equivalents.  As discussed below, the Working Capital Loan is

defined in the Purchase Agreement (MIPA), which authorizes a loan limit of $10

million.  Thus, Specialty was authorized under these agreements to have a Net

Debt of $16.5 million.[29]  The importance of the Net Debt loan limit of $16.5 million

is evident by its interplay in calculating the purchase price PCA must payPlaintiffs

in the Tier I and II buyouts.[30]  The Operating Agreement explicitly defines the

formula in Section 9.2(a) and provides that the purchase price:

> shall be an amount equal to (A) (i) the product of (x) the trailing
> twelve (12) months of EBITDA and (y) the Valuation Multiplier, less
> (ii) the Net Debt of [Specialty], less (iii) the purchase price for any
> acquisition of assets, business or by Person [Specialty], unless
> such amount is included in the calculation of Net Debt multiplied by
> (B) the Percentage Interests of [Specialty] being purchased.[31]

---

[27] *Id.*
[28] D.I. 57 at 21.
[29] The $10 million Working Capital Loan plus the $6.5 million Term Loan.
[30] D.I. 53 at 11.
[31] *Id.*

5

Simply put, the purchase price to be paid in the Tier I and II buyouts equals EBITDA times the EBITDA multiplier minus the Net Debt of Specialty. Net Debt and how it is calculated are fundamentally material because Net Debt operates as an offset resulting in a lower purchase price.  The Net Debt cap of $16.5 million and, specifically, the cap on the Working Capital Loan of $10 million, are material to the contract and the Parties, because they protect the value of Plaintiffs' interest in Specialty from artificial devaluation.[32]  Thus, the cap on Net Debt is a contracted mechanism to prevent an unfair offset of the purchase price, while providing a safe means to allow the Parties to expand the business through an avenue to capital.

The Transaction between the Parties authorized Defendants under the Operating Agreement the right to broadly manage all aspects of the business operations of Specialty.[33]  The Operating Agreement provided important protections from Defendants' broad rights.[34]  Plaintiffs held blocking rights on certain management decisions ("Major Decisions") per Section 5.8 of the Operating Agreement.[35]  This section, in defining Major Decisions, provides:

> causing (A) the sale, pledge, lease, or other disposition of all or any substantial portion of the assets of [Specialty] or Subsidiaries (other than sales of inventory in the ordinary course of business), or (B) the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of Specialty or Subsidiaries, *except as contemplated by the Loan Documents (as defined by the*

---

[32] Artificial devaluation, for example, could occur by incurring excessive loans to manipulate the formula.

[33] D.I. 53 at 9.

[34] *Id.*

[35] D.I. 57 at 21.  Under Section 5.8, Major Decisions may not be authorized without 75% approval.

*Purchase Agreement).*[36]

Thus, Defendants had managerial power to incur loans so long as the loans did not exceed the amount "contemplated" by the Loan Agreements "as defined in the Purchase Agreement."[37] The only amount of debt contemplated by the Loan Documents" is the Term Loan of $6.5 million and the Working Capital Loan of $10 million.[38] Under the Purchase Agreement, the loan limits within the Loan Documents are memorialized.[39] In effect, Net Debt is capped at $16.5 million, and, any increases above that amount, constitute a Major Decision under Section 5.8 which requires Plaintiffs' consent.[40] Therefore, the Parties contemplated a Working Capital Loan limit of $10 million and a Net Debt cap of $16.5 million.

Around June 5, 2015, after a Section 9.1(a) early buyout negotiation failed because the parties could not agree as to the value of Specialty, Defendants, without notice or approval of Plaintiffs, authorized Specialty to execute an Amended and Restated Revolving Note ("First Amended Note").[41] The First Amended Note purports to give Defendants the right increase the Working Capital Loan limit from $10 million to approximately $32 million.[42] Plaintiffs did not consent to this amendment. Plaintiffs

---

[36] *Id.* (emphasis added).

[37] *Id.*

[38] D.I. 53 at 9.

[39] D.I. 57 at 19. The Purchase Agreement defines the "Working Capital Loan Commitment" as $10 million, the "Working Capital Loan Limit" to mean the Working Capital Loan Commitment, and the "Working Capital Loan" to mean "the meaning ascribed in the recitals ["<u>up to</u> the aggregate principal amount of 10,000,000"].

[40] D.I. 53 at 20 (stating that Section 5.8 requires a 75% interest holder approval for all Major Decisions).

[41] *Id.* at 15. Plaintiffs assert the parties' disagreement over the valuation of Specialty resulted from Defendants' bad faith by suppressing EBITDA.

[42] *Id.*

contend the authorization and execution of the First Amended Note violates the Major Decision Clause of the Operating Agreement, because Defendants increased Working Capital Loans above $10 million, resulting in higher indebtness.[43]

Defendants argue that this modification was a not a Major Decision since management did not "grant[] or incur[] any lien, security interest, or other similar encumbrance on the Company's assets."[44] They further reason the modification "simply increased the borrowing limit of the Working Capital Loan," and thereby, changed the loan limit contemplated by the original Loan Documents.[45] In effect, Defendants contend that the Operating Agreement empowers them to unilaterally change the Working Capital Loan limits of Specialty without violating the Major Decisions clause, and thereby allows an increase in Working Capital Loans without Plaintiffs' consent. Plaintiffs stress this "tortured interpretation" of the Operating Agreement is wrong because it makes their interest worthless and their protections in the deal illusory.[46]

In April 2016, after the execution of the First Amended Note, Plaintiffs and Defendants attempted to negotiate an early buyout.[47] The effect of the First Amended Note on the buyout was reverberating. Defendants valued Specialty, under Section 9.2(a) of the Operating Agreement, at $48 million for Plaintiffs' 62.5% interest.[48]

_____

[43] *Id.* at 21-22; see also D.I. 62. at 11-12 (arguing the amendments increased the secured indebtedness of Specialty).
[44] D.I. 56 at 11.
[45] D.I. 53 at 15.
[46] D.I. 62 at 11-12 (noting "a unilateral change to one of the inputs in that formula would render Section 11.(b)'s bargained for consent right illusory").
[47] D.I. 53 at 16.
[48] *Id.* Defendants subsequently applied a Net Debt of $32 million to calculate a purchase price of $16 million.

Plaintiffs contend Defendants improperly subtracted $32 million in Net Debt to calculate the purchase price.[49]  Plaintiffs responded to the offer by noting the debt was unauthorized, and Defendants were only allowed to purchase 30.5% of Askari's 49% interest and the full interest of another interest holder.[50]  Combined these two interests constituted 62.5%, and PCA could not purchase that amount.  As a result, Plaintiffs withdrew from the negotiations and reiterated their objections to the "inflated debt" and interest percentage sought to be purchased.[51]  On October 6, 2016, counsel for PCA and PCM notified Plaintiffs that Defendants, again, amended the Loan Documents, allowing for an additional $34 million increase in debt.[52]  Specialty, purportedly, could borrow $70.5 million and subtract that figure as Net Debt from the valuation of the company in the two-phased buyout.  Plaintiffs objected on October 7, 2016.  Defendants did not respond to their objection.[53]

On December 7, 2016, with Tier I triggered, Defendants notified Plaintiffs that they were exercising their Tier I right to buy 44.25% of interest in Specialty and sent a check (the "Consideration") for one dollar ($1.00).[54]  Plaintiffs returned the check.[55]  Thus, within a few months, Defendants valuation of the company changed from $16 million for 62.5% to $1 dollar for 44.25%, a significant reduction in the valuation of Specialty.  Plaintiffs contend that Defendants miscalculated the purchase price by

---

[49] *Id.* at 16.  Plaintiffs maintain that the proper Net Debt is $16.5 million, making the purchase price at $32 million, not $16 million.

[50] *Id.* at 16-17.

[51] *Id.* at 17.

[52] *Id.* at 18.

[53] *Id.*

[54] *Id.* at 19.

[55] *Id.*

improperly using an inflated Net Debt amount and improperly attempting to purchase 44.25% of Specialty when they were only entitled to a maximum purchase of 28.65%.

## III. LEGAL STANDARD.

### A. Motion to Dismiss for Failure to State a Claim.

Fed. R. Civ. P. 12(b)(6) governs a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. The purpose of a motion under Rule 12(b)(6) is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case.[56] "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."[57] A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[58] While the court draws all reasonable factual inferences in the light most favorable to a plaintiff, it rejects unsupported allegations, "bald assertions," and "legal conclusions."[59]

---

[56] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[57] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotations and citations omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.").

[58] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (citing *Burlington*, 114 F.3d at 1420).

[59] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *see also Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citations omitted) (rejecting "unsupported conclusions and unwarranted inferences"); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged.").

To survive a motion to dismiss, a plaintiff's factual allegations must be sufficient to "raise a right to relief above the speculative level . . . ."[60] Plaintiffs are therefore required to provide the grounds of their entitlement to relief beyond mere labels and conclusions.[61] Although heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged.[62] A claim has facial plausibility when a plaintiff pleads factual content sufficient for the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[63] Once stated adequately, a claim may be supported by showing any set of facts consistent with the allegations in the complaint.[64] Courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record when reviewing a motion to dismiss.

## IV.    ANALYSIS

A complaint for breach of contract adequately pleads a claim for relief if it alleges facts that support the following elements:  the existence of a contract, whether express or implied; a breach of an obligation imposed by that contract; and resultant damages to

---

[60] *Twombly*, 550 U.S. at 555 (citations omitted); *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

[61] *See Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[62] *Twombly*, 550 U.S. at 570; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) ("In its general discussion, the Supreme Court explained that the concept of a 'showing' requires only notice of a claim and its grounds, and distinguished such a showing from 'a pleader's bare averment that he wants relief and is entitled to it.'") (quoting *Twombly*, 550 U.S. at 555 n.3).

[63] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[64] *Twombly*, 550 U.S. at 563 (citations omitted).

the plaintiff.[65]

Plaintiffs' Am. Comp. undisputedly contains one of these three elements. It alleges the existence of contracts, such as the Operating Agreement and MIPA, executed between the Parties.[66] As a result, the first element for breach of contract has been adequately pled. The remaining issues are whether Plaintiffs assert adequate facts supporting elements two and three: Defendants' breach of an obligation imposed by the Operating Agreement and damages resulted from the breach.

A complaint for breach of the implied covenant of good faith and fair dealing adequately pleads a claim for relief if it alleges facts supporting the following: a specific implied contractual obligation; a breach of that obligation; and resultant damages.[67] Plaintiffs' Am. Comp. contains one of these three elements since it alleges the existence of an implied contractual obligation, specifically the Covenant of Good Faith and Fair Dealing in Delaware.[68] Therefore, the first element of the implied contract claim is adequately pled by Plaintiffs. The remaining issues are whether sufficient facts are alleged to support that Defendants breached their obligations, and whether damages resulted from the breach of an implied covenant between the Parties.

A.    **Individual Standing of Askari.**

**Direct Beneficiary/Third Party Beneficiary**.

As a preliminary matter, a review of the individual standing of a plaintiff to enforce

---

[65] *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 390 (3d Cir. 2016), *quoting VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[66] D.I. 53 at 8.
[67] *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572 (D. Del. 2007).
[68] D.I. 53 at 24; *see also* D.I. 62 at 15 (stating that under "Delaware law, a covenant of good faith and fair dealing is implied in every contract.").

direct claims for breach of a contract under Delaware law is required. Generally, "only parties to a contract and intended third-party beneficiaries may enforce an agreement's provision."[69] The Operating Agreement is the contract alleged as breached by Defendants. There is no dispute that Onco360 I-III, as signatories of the Operating Agreement, are parties to the Operating Agreement and possess direct standing to enforce its provisions. Askari is not a signatory to the Operating Agreement and his direct standing is at issue,[70] specifically whether Askari, as a individual plaintiff, asserted facts sufficient to establish him as a party to the contract or as a third-party beneficiary. If not, then Askari lacks standing.

Generally, a party to a contract is a signatory of the agreement. There are exceptions to the general standard of being a signatory to gain direct party standing, such as, the operation of incorporation by reference.[71] Askari maintains that he is a direct party to the Operating Agreement through incorporation by reference, or, at a minimum, as a third-party beneficiary to the contract.[72] Askari claims that the MIPA's incorporation by reference of the Operating Agreement and/or the Operating

---

[69] D.I. 56 at 5 (citing *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions L.L.C.*, 15-280-SLR, 2017 WL 1217207, at *3 (D. Del. 2017)).

[70] D.I. 56 at 5.

[71] *See Kuroda v. SPJS Holdings, LLC*, C.A. No. 4030-CC, WL 4880659, at *12 (Del. Ch. Nov. 30, 2010)(stating "specifically, courts have recognized several theories under which a non- signatory to a contract may nonetheless be bound by an arbitration provision contained in the agreement, including: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; (5) third-party beneficiary; and (6) equitable estoppel.").

[72] D.I. 62 at 8-10 (arguing that Askari has direct standing to sue); *see also* D.I. 62 at 10-11 (contending that "even if Askari is found not to have standing to assert the claims . . . these interlocking contracts demonstrate that Askari is an intended third-party beneficiary of the Operating Agreement.")

Agreement's incorporation by reference of the MIPA are sufficient to make him a party

the Operating Agreement.[73]  Therefore, either situation, Askari maintains, authorizes

him to bring a direct claim to enforce the Operating Agreement in his individual capacity.

Under Delaware law, to incorporate the provisions of one document into another,

"an explicit manifestation of intent is required."[74]  Askari argues that an explicit

manifestation of intent exists between the parties because the MIPA contained an

incorporation by reference provision.  The MIPA states "this 'Agreement' means this

[MIPA], together with the Schedules and Exhibited hereto."[75]  Exhibit E of the MIPA is a

draft form of the Operating Agreement.  The parties acknowledged "that each of the

other parties (which includes Askari) has standing to enforce any of the provisions of the

Agreement (which by definition includes the Operating Agreement)."[76]  This language is

sufficient to meet the standards of *Wolfson* and *Textron* to plead a manifestation of

_____

[73] *Id.*

[74] *Wolfson v. Supermarkets Gen. Holdings Corp*, No. Civ. A. 17041, 2001 WL 85697, at *5 (Del. Ch. Jan. 23, 2001)(emphasizing that "express language that clearly effects such an incorporation" is required to incorporate one contract's provision into another.  *See also Textron, Inc. v. Acument Global Tech., Inc.*,C.A. No 10C-07-103 JRJ CCLD, 2014 WL 2903060, at *19 fn. 237 (Del. Super. Mar. 25, 2014)(quoting *State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951) "[w]here a contract is executed which refers to another instrument *and makes the conditions of such other instrument* a part of it, the two will be interpreted together as the agreement of the parties.")(emphasis added).  This case further notes that "*mere reference* to a separate document, *without more*, does not operate to incorporate said document into the contract.")(emphasis added); *See Realty Growth Investors v. Counsel of Unit Owners*, 435 A.2d 450 (Del. Supr. 1982) and *Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A. 2d 450 (Del. Ch. 1967), *aff'd.* 239 A. 2d 629 (Del. Supr. 1968).

[75] D.I. 62 at 9 ("this Agreement, the Company's Disclosure Schedules, the Exhibits referred to herein, and the documents delivered pursuant hereto contain the entire understanding of the parties.").

[76] D.I. 62 at 9.

intent for incorporation by reference[77] because the MIPA contains "express language that clearly effects such an incorporation" of Exhibit E.[78]

Although Askari pleads sufficient facts to allege incorporation by reference, Defendants argue that no incorporation by reference exists as a matter of law, because Exhibit E was an incomplete and unexecuted draft of the Operating Agreement at the time of the execution of the MIPA,[79] and therefore, its terms cannot be incorporated by reference into the MIPA.[80] In support, they rely on *Skouras v. Admiralty Enterprises,* which found that a document may only be incorporated into another agreement by reference, if the referenced document is in "existence at the time" of the agreement and the incorporated document is sufficiently identified.[81] Defendants note that Exhibit E at the time of execution of the MIPA, was an unfinished draft, and had not been signed by the parties.[82] Therefore, Defendants assert that the Operating Agreement may not be incorporated by reference because it fails to meet a requirement of *Skouras*: it must exist at the time of incorporation. As a result, Defendants contend that Askari does not have individual standing. The court agrees that the MIPA's incorporation of reference of the Operating Agreement through Exhibit E fails to meet the *Skouras* requirement, and

---

[77] *Id.* at 8-11.
[78] *Wolfson* at *5.
[79] D.I. 66 at 2.
[80] *Id.*
[81] *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 678, fn 3 (Del. Ch. 1978). (stating in fn 3 that "the strict requirements for incorporating by reference an otherwise independent document are that such document be in existence when the incorporating document is executed and that the document to be incorporated is referred to so as to reasonably identify it.").
[82] D.I. 66 at 2. (maintaining that Exhibit E was a draft agreement that PCA, the Company and other members clearly intended to enter "at a later date.").

does not provide Askari standing.

Askari further argues that he is a party to the Operating Agreement because this agreement incorporates the MIPA by reference, to which he is a signatory.[83] The Operating Agreement in Section 13.2 states "this Agreement together with the documents expressly referred to herein . . . constitutes the entire agreement"[84] and the Operating Agreement specifically references the MIPA.[85] Such language is a manifestation of intent sufficient under *Wolfson* and *Textron* because it is an express provision which incorporates the MIPA into the Operating Agreement.[86]

Additionally, the *Skouras* requirement is satisfied because the MIPA existed when the Operating Agreement incorporated it by reference. Therefore, Askari pleads sufficient facts which support that the Operating Agreement incorporates the MIPA by reference, providing him standing to sue. Defendants' motion to dismiss for Askari's lack of standing should be denied.

### B. Whether Counts II-III Should Be Dismissed.

### Count II: Breach of the Operating Agreement by PCA.

Plaintiffs claim that PCA breached the express terms of the Operating Agreement in Count II of the Am. Comp.[87] Since the first element of breach of contract is adequately pled, an examination of whether Plaintiffs allege sufficient facts to show that

---

[83] D.I. 62 at 10 (contending that "the Operating Agreement itself specifically acknowledges that the MIPA is part of the agreement between the parties.").

[84] *Id.*

[85] *Id.*

[86] *Wolfson v. Supermarkets Gen. Holdings Corp.* No. Civ. A. 17041, 2001 WL 85697, at *5 (Del. Ch. 2001).

[87] D.I. 53 at 21-22.

PCA breached the express terms of the Operating Agreement, with damages resulting from the breach, is required.

The Am. Comp. explicitly provides: "PCA breached the Operating Agreement by using a Net Debt of $70,500,000 to calculate the price of Plaintiffs' membership interest when it purported to exercise First Call Right and failed to pay the contractually agreed upon price."[88] Plaintiffs' primary argument for breach of a contractual obligation is that PCA improperly calculated the purchase price for Plaintiffs' interest in Specialty by using an excessive Net Debt figure.[89] In response, Defendants maintain that Count II should be dismissed because the unambiguous language of the Operating Agreement contradicts Plaintiffs' allegation that the Net Debt applied was excessive.[90] The Net Debt above the original Working Capital Loan limit, Defendants urge, was properly executed and authorized by a managerial amendment to the Loan Documents. Plaintiffs counter that any amendment to the Working Capital Loan limit must be consistent with and is controlled by Section 5.8 of the Operating Agreement, the Major Decisions clause.[91] Section 5.8 of the Operating Agreement requires a 75% interest approval and the amendments were made without meeting this requirement.[92]

Plaintiffs urge that Defendants' amendments of the Working Capital Loan limit, effectively an approval for increased spending, fall under Section 5.8 as an increase in

---

[88] *Id.* at 22.
[89] D.I. 62 at 11-12 ("the Amended Complaint . . . properly states a breach of contract claim against PCA because PCA calculated the Purchase Price . . . using an improperly inflated Net Debt, in violation of the terms of the Operating Agreement.").
[90] D.I. 56 at 8.
[91] D.I. 62 at 12. Plaintiffs maintain that the effect of the amendments are an increase in secured indebtness, and therefore, a Major Decision requiring their consent.
[92] D.I. 52 at 9.

secured indebtedness, and, thus, is a Major Decision.[93]  Plaintiffs sufficiently pled facts to state a claim that Defendants violated Sections 5.8 of the Operating Agreement through the amendments.[94]  Plaintiffs further allege the amendments are major decisions, and Defendants violated the Major Decision clause by amending the notes without the consent of 75% of the interest holders.  Plaintiffs also contend that Defendants' breach reduced the value of their interest in Specialty to a lower amount as evidenced by Defendants' offer of consideration.  Plaintiffs claim that, but for the unauthorized and improper Net Debt figure applied by Defendants in bad faith, their interest is likely worth millions.[95]  As a result, Plaintiffs pled sufficient facts to support elements two and three for breach of contract consistent with Rule 8.

### Count III:  Breach of the Operating Agreement by Managers.

Plaintiffs claim that Defendants, specifically the Managers, breached the terms of the Operating Agreement in Count III of the Am. Comp.,[96] by amending the Loan Documents on two occasions, to increase the Working Capital Loan.  Plaintiffs maintain that the amendments violate Section 5.8 of the Operating Agreement because the Managers increased the Working Capital Loan limit without a 75% interest holder approval.[97]

Plaintiffs further contend that the amendments are invalid and the original,

---

[93] *Id.* at 12.
[94] *Id.*
[95] D.I. 53 at 21-22.
[96] *Id.* at 22-24.
[97] D.I. 62 at 12-15.

unamended Loan Documents control the rights of the Parties.[98]  Such bad faith conduct,

Plaintiffs argue, reduced the purchase price of their interest below what it actually was if

the Working Capital Loan limit remained at $10 million.  In light of these contentions,

Plaintiffs plead sufficient facts for a breach of contract claim against the individual

Managers of PCA and PCM.  Count III of the Am. Comp. adequately states a claim

upon which relief may be granted.

**C.     Whether Count IV, Covenant of Good Faith and Fair Dealing, Should Be Dismissed.**

Plaintiffs contend that Defendants breached the covenant of Good Faith and Fair

Dealing in Count IV of the Am. Comp.[99]  Under Delaware law, all contracts have an

implied covenant of Good Faith and Fair Dealing.[100]  The covenant requires parties to

the contract to refrain from "arbitrary and unreasonable conduct which has the effect of

preventing the other party to the contract from receiving the fruits of the bargain."[101]

Parties who engage in arbitrary and unreasonable conduct breach the implied covenant

of good faith and fair dealing.[102]

Plaintiffs allege in the Am. Comp. that Defendants amended and increased the

Working Capital Loan "solely for the improper purpose of rendering Plaintiffs'

membership interest worthless, thereby denying the benefit of the bargain and violating

---

[98] D.I. 53 at 24 (claiming the amendments to be a "material and intentional breach of the Operating Agreement").

[99] *Id.* at 24-25.

[100] D.I. 62 at 15; *see HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp 617, 621 (D. Del. 2006).

[101] D.I. 62 at 16; *see Dunlap v. State Farm Fire & Cas. Co.* 878 A.2d 434, 442 (Del. 2005).

[102] *Id.*

19

the implied covenant."[103]  Specifically, the Am. Comp. contends that Defendants were obligated not to manipulate Net Debt for an invalid purpose, and they breached their duty of good faith and fair dealing by increasing the Working Capital Loan limit to "seven times the amount agreed to in the Loan Documents without any justification including any business need for the excess Working Capital."[104]  Plaintiffs contend this breach denied them the benefit of their bargain by dramatically reducing their interest in Specialty.[105]  Such alleged conduct, Plaintiffs maintain, constituted an improper action.[106]  As a result, Plaintiffs pled sufficient facts alleging a breach of the Implied Covenant of Good Faith and Fair Dealing.

### D.  Whether Count I Should Be Dismissed.

The allegations contained in Counts I-IV, if proven, Plaintiffs argue, would establish that "no valid and binding exercise of the First Call Right"[107] occurred and "any purported purchase of [sic] by PCA of Plaintiffs' interest in Specialty is null and void."[108]  As noted previously, Plaintiffs maintain they own 62.5% of Specialty.[109]  They further claim that Defendants are only entitled to purchase 28.65% of Plaintiffs' interest on the First Call Right; the Net Debt is limited to $16.5 million, unless 75% of the interest

---

[103] D.I. 62 at 16.  *See also* D.I. 53 at 25 stating "Defendants have wrongfully and intentionally breached the duty of good faith and fair dealing by denying Plaintiffs the benefit to which they are entitled under the Operating Agreement."

[104] D.I. 62 at 25.  Plaintiffs further argue that even if the Major Decisions clause is not implicated, and thus, consent is not required, Defendants still violated the implied covenant because the action was taken for an improper purpose.

[105] D.I. 62 at 16.

[106] *Id.* at 17.

[107] D.I. 53 at 25.

[108] *Id.*

[109] *Id.*

holders amended that limit; and absent a 75% approval, any purported increase of Working Capital Loans was invalid.[110]  These contentions along with the facts contained in the Am. Comp. form the bases for Plaintiffs' Declaratory Judgment Action, which adequately state a claim.

## V.    RECOMMENDATION DISPOSITION.

Consistent with the findings herein, it is recommended that:

Defendants' motion to dismiss the Am. Comp.(D.I. 55) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served a copy of this Report and Recommendation.  The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is available on the Court's website, located at http://www.ded.uscourts.gov.

Dated:  May 7, 2018                          _____Mary Pat Thynge_____
                                                      UNITED STATES MAGISTRATE JUDGE

---

[110] *Id.* at 25-26.