IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KAVEH ASKARI, et al.,

    Plaintiffs,

v.

PHARMACY CORPORATION OF
AMERICA, et al.,

    Defendants.

Civil Action No. 16-1123-RGA

## MEMORANDUM ORDER

The Magistrate Judge has filed a Report and Recommendation (D.I. 76), which recommends Defendants' motion to dismiss (D.I. 55) be denied. Defendants filed an objection (D.I. 77), and Plaintiffs have filed a response in opposition to Defendants' objection. (D.I. 80). I review the objection to the Report and Recommendation *de novo*. *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). For the reasons that follow, I overrule Defendants' objection (D.I. 77) and adopt the Magistrate Judge's Report and Recommendation in whole.

### I. BACKGROUND

Two related cases have been consolidated under the above case number. The first was filed by Pharmacy Corp. against Plaintiff Askari, claiming a breach of a contractual non-compete provision in the "Membership Interest Purchase Agreement" of October 13, 2013. (No. 16-1123, D.I. 1). Plaintiff Askari and others subsequently filed a complaint of their own. (No. 17-870). The cases were consolidated, and Plaintiffs have more recently filed an Amended Complaint, seeking a declaratory judgment and claiming breach of contract. (No. 16-1123, D.I. 53). Defendants in the Amended Complaint are Pharmacy Corporation of America and Greg

1

Weishar, Paul Jardina, and David Froesel (collectively, the "Managers"). Defendants moved to dismiss the Amended Complaint (D.I. 55), which I referred to the Magistrate Judge. The Magistrate Judge duly issued a Report and Recommendation (D.I. 76), and it is Defendants' objection that I now review.[1]

According to the Amended Complaint, Plaintiff Askari, through his ownership of majority shares in Plaintiffs Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc., collectively own a majority of shares in a specialty pharmaceutical company called OncoMed Specialty, LLC. ("Specialty"). (D.I. 53 ¶¶ 5-6). Askari founded a small specialty pharmacy ("Sina") that subsequently began to do business as OncoMed. (*Id.* ¶ 17). OncoMed led a successful regional business as a highly sought out and in demand "one-stop" oncology pharmacy able to provide oral, infusible, and injectable pharmaceuticals to patients. (*Id.* ¶¶ 23-25). In a quest to increase OncoMed's business reach, Askari began to solicit offers from corporations able to provide a platform for expansion on a national level. (*Id.* ¶ 27).

Plaintiffs and Pharmacy Corporation of America entered into an agreement whereby Pharmacy Corporation of America would expand Plaintiffs' specialty pharmaceutical services through its own nationwide network. (*Id.* ¶ 29). This transaction was structured so that Pharmacy Corporation of America would first purchase a minority interest in OncoMed, with subsequent buyout phases of Plaintiffs' remaining interest, three years and five years after the closing. (*Id.* ¶ 30). After the transaction was complete, the new entity would be known as "Specialty."[2] (*Id.*). As part of the transaction, the parties agreed the Pharmacy Corporation of America would lend Plaintiffs a term loan of $6.5 million and a Working Capital Loan of $10 million, pursuant to the

---

[1] The lead case is Civil Action No. 16-1123-RGA. All citations to docket items refer to it.

[2] Because the briefing uses the name "Specialty" to refer to the company once known as "OncoMed," starting from the point after the contemplated agreement was entered into between Plaintiffs and Defendants, I will do the same. .

2

Operating Agreement (D.I. 63-3, Exh. 3), for a total of $16.5 million. (D.I. 63 ¶ 32). These loans together formed the "Net Debt." (*Id.* ¶ 43). The "Net Debt" was contemplated by both parties to be included in the formula used to determine the purchase price by which the Defendants would purchase the remaining interests in Specialty from Plaintiffs. (*Id.*)

Plaintiffs argue that the Working Capital Loan had a limit of $10 million, pursuant to the Operating Agreement's reference to the Loan Agreements. (D.I. 53 ¶¶ 32, 35). Plaintiffs further claim that Defendants raised the Working Capital Loan limit two times over the course of the five years before the final complete buyout of Plaintiffs' interests in Specialty. First, the Defendants raised the limit to $30 million, and then to $64 million. (*Id.* ¶¶ 62, 72). The resulting "Net Debt" from these two changes became $70.5 million. Plaintiffs claim the Defendants then used this $70.5 million value in the formula to calculate a purchase price of $1, clearly well below Specialty's valuation of approximately $24.5 million. (*Id.* ¶ 58). These changes, Plaintiffs allege, violated Section 9.2(a) of the Operating Agreement because the Loan Agreements set a limit to the Working Capital Loan at $10 million. (*Id.* ¶ 81).

Plaintiffs allege this conduct also violated Section 5.8 of the Operating Agreement. (*Id.* ¶ 82). Section 5.8 provides that any action or conduct considered to be a "Major Decision" requires approval by Members of the company holding at least 75% of the membership interests. (D.I. 63-3, Exh. 3 at 21). "Major Decisions" is defined in relevant part as, the "granting or incurrence of any lien, … security interest or other similar encumbrances on all or any substantial portion of the assets of the Company…, except as contemplated by the Loan Documents…." (*Id.*) In sum, Plaintiffs allege the Defendants violated the Operating Agreement by improperly raising the limit on the Working Capital Loan, and by making these changes without obtaining affirmative consent from 75% of the membership interest holders, including

3

Plaintiffs. (D.I. 53 ¶¶ 81-82). In addition, Plaintiffs allege Defendants breached the Operating Agreement by using a Net Debt value of $70.5 million to calculate the purchase price, rather than the purchase price agreed upon by both parties memorialized in the Operating Agreement. (*Id.* ¶ 92).

Further, Plaintiffs allege that Defendants' actions "undermine[d] the purchase price," were in bad faith, and thus breached the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 110, 112). The Plaintiffs claim that Defendants raised the limit on the Working Capital Loan for the sole purpose of driving down the purchase price they would have to pay to Plaintiffs, denying the Plaintiffs the benefit of the agreement. (*Id.* ¶ 112-113).

## II. LEGAL STANDARDS

In conformance with D. Del. LR 72.1(b), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," 28 U.S.C. §636(b)(1)(C), and the "judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

## III. DISCUSSION

Defendants object to the Magistrate Judge's two conclusions, that Plaintiff Askari has individual standing in this case, and that Defendants' motions to dismiss Plaintiffs' claims should be denied. (D.I. 77 at 3-4).

### a. Objection 1

Defendants object to the Report and Recommendation's finding that Plaintiff Askari, as an individual, had standing to sue for breach of the Operating Agreement. (*Id.* at 4). It is

4

undisputed that Plaintiff Askari was not a signatory to the Operating Agreement, and thus Defendants argue he cannot sue for breach as a non-party. (*Id.*). Under Delaware law, "only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 248 F.Supp. 3d 570, 575 (D. Del. 2017). The Report and Recommendation, however, found that Askari did have "party" standing to sue for breach of the Operating Agreement because the Operating Agreement incorporates by reference the Membership Interest Purchase Agreement. (D.I. 76 at 16). Plaintiff Askari was a signatory to the Membership Interest Purchase Agreement, an agreement between all parties that outlined the terms of the purchase and sale of interests in Specialty. (D.I. 1-3, Exh. A at 9). Based on his standing in relation to the Membership Interest Purchase Agreement, Plaintiff Askari argues he has standing to bring a direct claim to enforce the Operating Agreement. (D.I. 76 at 14).

The Amended Complaint alleges that "a series of agreements" were executed on October 10, 2013, as part of one transaction. The agreements included the "[M]embership Interest Purchase Agreement" and the "Amended and Restated Operating Agreement of Specialty." (D.I. 53, ¶ 33). Section 13.2 of the Operating Agreement states, "[T]his Agreement together with the documents expressly referred to herein...constitutes the entire agreement." (D.I. 63-3, Exh. 3 at 35). Further, the Operating Agreement refers to the Membership Interest Purchase Agreement at various points in the document, including in the Recitals. (*See id.* at 1; *see also id.* at 7). The Magistrate Judge found these references to the Membership Interest Purchase Agreement were sufficient to show a manifestation of intent to incorporate the Membership Interest Purchase Agreement into the Operating Agreement. (D.I. 76 at 16). I agree with the Magistrate Judge.

5

Delaware law allows incorporation by reference between agreements only if there is an "explicit manifestation of intent" to incorporate one document into another. *Wolfson v. Supermarkets Gen. Holdings Corp.*, 2001 WL 85679, at *5 (Del. Ch. Jan. 23, 2001). When one contract incorporates by reference a second contract, "the two contracts will be read together as a single contract." *Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *12 (Del. Ch. Dec. 7, 2012). Multiple contracts that are "part and parcel of a larger contractual relationship" should be read together. *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143 (Del. 2010).

Defendants argue that the Operating Agreement's "mere reference" to the Membership Interest Purchase Agreement, "without more, does not incorporate the latter agreement into the former by reference." *Wolfson*, 2001 WL 85679, at *5. But Section 13.2 of the Operating Agreement is the "more." The Membership Interest Purchase Agreement is not merely referenced in the Operating Agreement, but rather it falls under the category of "documents expressly referred to herein," that "constitute the entire agreement." (D.I. 63-3, Exh. 3 at 35). The language from Section 13.2 in the Operating Agreement is sufficient to show the parties intended for the documents referenced in the Operating Agreement to become a part of the Operating Agreement.

Defendants argue alternatively, that even if the Operating Agreement were to incorporate the Membership Interest Purchase Agreement, there is no authority to support the principle that Plaintiff Askari thereby obtains the "party" status necessary to enforce the provisions of the Operating Agreement. (D.I. 77 at 6). There are cases where a non-signatory to an agreement can be bound by a contract which it has not signed. *See, e.g., Hadley v. Shaffer*, 2003 WL 21960406

(D.Del. Aug. 12, 2003) (non-party bound by forum selection clause). I do not see why someone who can be sued for breach is not also someone who is able to institute a suit for breach.

In the alternative, Plaintiff Askari argues he is a third-party beneficiary to the Operating Agreement and, thus, has standing on this basis to bring claims as an individual. (D.I. 62 at 10-11). The Magistrate Judge did not reach this issue. I too conclude that an analysis of whether Plaintiff Askari is a third-party beneficiary is not necessary. Because I have concluded that the Magistrate Judge was correct to find that the Operating Agreement incorporates by reference the Membership Interest Purchase Agreement, Plaintiff Askari has standing to bring claims to enforce the provisions of the Operating Agreement.

### b. Objection 2

#### i. Count Two against Pharmacy Corporation of America for breach of contract

In the objection to the Magistrate Judge's finding that Plaintiffs' claims are adequately pled, Defendant Pharmacy Corporation of America first argues that Plaintiffs' allegations of a $10 million Working Capital Loan limit are unfounded. (D.I. 77 at 7). Defendants point to the language of the Operating Agreement, which describes "Net Debt" in relevant part to include, "the amount of debt owed…under the Working Capital Loan (as defined in the Loan Documents (as defined in the [Membership Interest] Purchase Agreement))…." (D.I. 63-3, Exh. 3 at 7). While the Defendant is correct that a limit of $10 million is not specified in the Operating Agreement, the language makes clear that the Working Capital Loan value is subject to definition in both the Membership Interest Purchase Agreement (D.I. 1-3, Exh. A) and the Loan Agreement (D.I. 63-4, Exh. 4). The Loan Agreement defines the "Working Capital Loan Limit" as the "Working Capital Loan Commitment," which is defined as $10 million (D.I. 63-4, Exh. 4 at A-17). Thus, considering the language of the relevant provision of the Operating Agreement,

7

Plaintiffs have sufficiently alleged the Working Capital Loan had a limit of $10 million, pursuant to the Loan Agreement.

Plaintiffs' allegations in Count Two are based on the claim that Defendant Pharmacy Corporation of America breached the Operating Agreement by attempting to purchase Plaintiffs' interests in Specialty at an improperly low price. (D.I. 53 ¶ 92). Plaintiffs contend that because Defendants did not adhere to a $10 million limit of the Working Capital Loan in the calculation of the Net Debt, Defendant Pharmacy Corporation of America breached the agreed upon purchase price. (*Id.*) The Magistrate Judge, concluding that Plaintiffs' claim of a Working Capital Loan limit of $10 million was adequate, found Plaintiffs' claim of breach of the Operating Agreement to be sufficiently pled. Because I agree with the Magistrate Judge that Plaintiffs have adequately alleged the limit on the Working Capital Loan to be $10 million, I also agree that Plaintiffs' allegation of breach of contract is sufficient to state a claim.

### ii. Count Three against the Managers for breach of contract[3]

Defendants also object to the Magistrate Judge's conclusion that the Managers breached the Operating Agreement by failing to obtain approval for the loan increase amendments they instituted. (D.I. 77 at 8). The Defendant Managers argue that their increase of the Working Capital Loan limit was not a "Major Decision" as defined in the Operating Agreement, and thus did not require approval and consent from members of Specialty holding at least 75% of the membership interests. (*Id.*). Section 5.8 of the Operating Agreement requires approval from members holding at least 75% of the interests in Specialty before the Managers can "gran[t] or

---

[3] The Managers are sued for breach of contract. I am somewhat dubious that a non-signatory, non-party is a proper defendant in a breach of contract complaint. "As a general rule, so far as personal liability on corporate contracts is concerned, officers of corporations are in the same position as agents of private individuals and are not liable on corporate contracts as long as they do not act and purport to bind themselves individually." *Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *10 (Del. Super. Ct. July 31, 2006) (quoting *Brown v. Colonial Chevrolet Co.*, 249 A.2d 439, 441 (Del. 1968)). But the issue has not been raised, so I need not explore it further.

8

incu[r] [any] lien, mortgage, charge, pledge, security interest, or other encumbrance..." (D.I. 63-3, Exh. 3 at 21). These above-mentioned actions are defined as "Major Decisions." (*Id.*)

Defendants argue the loan increase amendments were not "Major Decisions" because the amendments did not "grant" or "incur" a new loan or security interest. (D.I. 77 at 8). Rather, Defendants argue, the amendments changed the terms of a loan previously granted in the signed Operating Agreement. (*Id.*). Plaintiffs argue these amendments constitute a "Major Decision" because the amendments added additional loans to the Agreement. (D.I. 80 at 9). Further, Plaintiffs argue this action by the Defendant Managers was a breach of Section 5.8 because the Defendant Managers did not obtain the necessary approval. (*Id.*).

The Magistrate Judge found that Plaintiffs pled sufficient facts for a breach of the Operating Agreement. (D.I. 76 at 19). I agree with this conclusion. The pleading stage is not the time to decide whether an increase in the limit of a security interest previously granted in the Operating Agreement is a "Major Decision," or is not. It is a factual allegation that sufficiently claims a breach of the Operating Agreement, and I cannot say at this time that it is clearly contrary to the Operating Agreement's definitions. Thus, I agree with the Magistrate Judge that Plaintiffs' claims in Count Three may go forward.

### iii. Count Four against all Defendants for breach of the covenant of good faith and fair dealing

Finally, Defendants object to the Magistrate Judge's conclusion that Plaintiffs have adequately claimed a breach of the implied covenant. (D.I. 77 at 10). Defendants contend that this doctrine must be applied narrowly, and cannot apply "when the contract addresses the conduct at issue." (D.I. 56 at 16; *Nationwide Emerging Managers, L.L.C. v. Northpointe Holdings, LLC*, 112 A.2d 878, 896 (Del. 2015)). Plaintiffs, however, argue that the Defendants breached the implied covenant because they raised the Working Capital Loan limit for the sole

9

purpose of driving down the purchase price. (D.I. 53 ¶ 112). Plaintiffs claim that Defendants raised the limit with no justification, rendering the Plaintiffs' interests almost worthless. (*Id.*)

At this pleading stage, I think Plaintiffs have sufficiently alleged a breach of the implied covenant. At a later stage, Defendants could hypothetically prove that the increase in the loan was not a "Major Decision," and that the limit for the Working Capital Loan was not $10 million. Assuming for the sake of discussion that Defendants were able to prove they did not breach the express terms of the Operating Agreement, Plaintiffs could still argue that Defendants raised the limit for a specific bad faith reason, to drive down the purchase price of Plaintiffs' interests. For this reason, the claim for breach of the implied covenant may stand on its own, separate from the breach of contract claims. Thus, I agree with the Magistrate Judge's finding that Plaintiffs have sufficiently stated a claim for breach of the implied covenant.

### iv. Count One for declaratory judgment

Finally, Defendants object to the Magistrate Judge's finding that Plaintiffs have sufficient factual bases for the declaratory judgment action (Count One) to state a claim. (D.I. 76 at 21). Defendants' argument is that because Plaintiffs do not sufficiently allege substantive claims, the claim for declaratory judgment should also be dismissed. (D.I. 77 at 10 n. 9 (citing *Jones v. ABN Mortg. Grp., Inc.*, 606 F.3d 119, 125 n.5 (3d Cir. 2010)). Because I conclude Plaintiffs have sufficiently alleged the substantive claims, Plaintiffs have adequately stated a claim for declaratory judgment.

## IV. CONCLUSION

For the reasons discussed above, Defendants' objections (D.I. 77) are **OVERRULED**. The Report and Recommendation (D.I. 76) is **ADOPTED**. Defendants' motion to dismiss (D.I.

55) is **DENIED**.

Entered this 8 day of August, 2018.

*Richard G. Andrews*
United States District Judge