# **<u>EXHIBIT 9</u>**

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| PHARMACY CORPORATION OF AMERICA/ ASKARI CONSOLIDATED LITIGATION | Consolidated C.A. No. 16-1123 RGA |

## EXPERT REPORT OF RICHARD A. MORTIMER, PH.D.
## NOVEMBER 18, 2019

# TABLE OF CONTENTS

I.    OVERVIEW ...................................................................................................1

    A.   Qualifications ...........................................................................................1

    B.   Background and Assignment ....................................................................2

    C.   Documents and Information Relied Upon .................................................5

II.   SUMMARY OF FINDINGS ..........................................................................5

III.  ANALYSIS AND OPINIONS .......................................................................6

    A.   A Forward-buy Strategy in the Presence of Price Increases Can
        Increase Profitability and Earnings ..........................................................9

        1.   A forward-buy strategy is a common business strategy
              employed by companies for the purpose of increasing
              profitability and earnings ..................................................... 9

        2.   A simple example illustrating how a forward-buy strategy
              can increase profitability and earnings .................................... 11

        3.   OncoMed's decision to borrow additional working capital
              for the purpose of executing a forward-buy strategy had a
              positive impact on its profitability and EBITDA...................... 13

    B.   Calculation of PCA's But-for Purchase Price for the First and Second
        Buyouts .................................................................................................13

        1.   The purchase price for the interest in OncoMed in the First
              Buyout would have been negative had the working capital
              loan remained at $10 million ................................................ 15

        2.   The purchase price for the interest in OncoMed in the
              Second Buyout would have been substantially lower had
              the working capital loan remained at $10 million ..................... 17

        3.   The total amount that Mr. Askari would have received in
              the but-for world would have been less than the total
              amount received by Mr. Askari in the First and Second
              Buyouts in the actual world ................................................... 19

## I.      OVERVIEW

### A.      Qualifications

1.      My name is Richard A. Mortimer.  I am a Principal at Analysis Group, Inc., a consulting firm that provides expertise in economics, finance, healthcare analytics, and strategy.  I received my B.A. in Economics from Johns Hopkins University in 1993 and my Ph.D. in Economics from the University of California at Berkeley in 2001.

2.      I have worked and published in a number of areas including healthcare policy and economics, and I have extensive experience evaluating the economics of pharmaceuticals.  My work has been published in a number of peer-reviewed academic journals.  I have consulted for numerous clients and have also testified in a number of matters.  In my healthcare litigation-related work, I have conducted economic and statistical analyses of damages, market definition, liability, and class certification.  Much of this work has focused on the economics of pharmaceuticals and the entities involved in the distribution and administration of drugs in the U.S., including: drug manufacturers, wholesalers, pharmacies, payors (such as insurers, health plans, government entities and consumers), and providers (such as hospitals, physician practices, and long-term care facilities).  In this work, I have evaluated a broad range of questions, including in cases involving disputes regarding the valuation of companies in acquisitions.  A copy of my curriculum vitae, including a list of all publications I have authored in the previous four years and a list of my testimony in the past four years, is attached as Appendix A.

3.      I am being compensated in this matter at a rate of $730 per hour, including any testimony.  Others working under my supervision and direction have assisted me in this matter.  My compensation is not, in any way, contingent upon the substance of my opinions or the outcome of this case.

1

4.      This report summarizes the opinions I have formed to date.  I may update, refine, or revise my opinions, if necessary, based on further review and analysis of information provided to me subsequent to the filing of this report, or at the instruction of Counsel or the Court.

### B.      Background and Assignment

5.      On October 10, 2013, Pharmacy Corporation of America ("PCA") entered into the Membership Interest Purchase Agreement (the "MIPA") with Mr. Kaveh Askari, Mr. Burt Zweigenhaft, and companies collectively owned (directly or indirectly) by Mr. Askari and Mr. Zweigenhaft, including OncoMed Specialty, LLC ("OncoMed"), Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc., for the purpose of purchasing 37.5 percent interest in OncoMed for $7,800,000.[1]  OncoMed was a specialty pharmacy that specialized in selling infusible, injectable, and oral oncology pharmaceuticals and providing related services.[2] In connection with this purchase, on December 6, 2013, PCA entered into a Loan Agreement with OncoMed and its affiliated and subsidiary companies pursuant to which PCA committed to provide OncoMed with a term loan in the amount of $6.5 million, as well as certain advances "up to the aggregate principal amount" of $10 million.[3]

6.      Also, on December 6, 2013, PCA entered into an Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement") with OncoMed, Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc., pursuant to which PCA was to manage the operations of OncoMed (through appointed members of a Board of Managers)

---

[1]      PC-ASK 010089-156, at 089, 097, 150; PC-ASK 046434-488, at 435.

[2]      Second Amended and Supplemental Complaint, *Pharmacy Corporation of America/Askari Consolidated Litigation*, In the United States District Court for the District of Delaware, C.A. No. 16-1123 RGA, February 14, 2019 ("Mr. Askari's Complaint"), at pp. 3-6; PC-ASK 046434-488, at 435.

[3]      PC-ASK 026939-7022, at 6939.

and acquire the remaining interest in OncoMed in two phases.[4]   In particular, the Operating

Agreement provided that at any time on or after December 7, 2016, PCA would have the right, but

not the obligation, to purchase "up to 30.5% of the Membership Interests … owned directly or

indirectly by Kaveh Askari … and up to all of the Membership Interests owned directly or

indirectly [by] Burt Zweigenhaft."[5]  Further, according to the agreement, within 60 days of the 60-

month anniversary of the effective date of the agreement (*i.e.*, within 60 days of December 6,

2018), PCA was obligated to purchase "all of the remaining Membership Interests" owned by Mr.

Askari and Mr. Zweigenhaft.[6]   The purchase price for the two phases of the purchase of interests

in OncoMed was determined based on a formula specified in the Operating Agreement.[7,8]

---

[4]   PC-ASK 046434-488, at 435, 454, 465.

[5]   PC-ASK 046434-488, at 435, 465.

[6]   PC-ASK 046434-488, at 435, 465.

[7]   In particular, according to the Operating Agreement, the purchase price was equal to "(A) (i) the product of (x) the trailing twelve (12) months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net Debt of [OncoMed], less (iii) the purchase price for any acquisition of assets, business or Person by [OncoMed], unless such amount is included in the calculation of Net Debt, multiplied by (B) the Percentage Interests of [OncoMed] being purchased." The Valuation Multiplier was determined based on OncoMed's trailing 12 quarters of EBITDA as follows: if EBITDA was less than $12 million the Valuation Multiplier would equal 6, if EBITDA was between $12 million and $16 million, the Valuation Multiplier would equal 8, and if EBITDA was greater than $16 million, the Valuation Multiplier would equal 10. The Net Debt was defined as "an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by [OncoMed] to [PCA] or its Affiliates under the Working Capital Loan (as defined in the Loan Documents (as defined in the Purchase Agreement)) minus (iii) the amount of [OncoMed's] cash and cash equivalents." PC-ASK 046434-488, at 441, 444-445, 466.

[8]   The Operating Agreement also states that "[i]n the event that following the date of this Agreement [PCA] or its Affiliates acquires a business that provides specialty pharmacy services to cancer patients, the purchase price for the Membership Interest as calculated pursuant to Section 9.2(a) shall be increased by an amount equal to (A) (i) the product of (a) the trailing twelve (12) months of [EBITDA] of such business generated by the sale of limited distribution specialty oncology drugs that are also sold by [OncoMed] or any of its Subsidiaries and (b) the valuation multiplier of EBITDA originally used by [PCA] or its Affiliates in connection with the purchase price paid for the acquisition of such business, less (ii) the portion of the purchase price originally paid for such business attributable to limited distribution specialty oncology drugs that are also sold by [OncoMed] or any of its subsidiaries, multiplied by (B) the Percentage Interests of [OncoMed] being purchased." The Operating Agreement defined "limited distribution specialty oncology drug" as a "drug manufactured specifically to treat cancer and is only distributed by a limited number of specialty pharmacies pursuant to a distribution agreement with a drug manufacturer." PC-ASK 046434-488, at 466.

3

7.      I understand that on December 7, 2016, PCA informed Mr. Askari and Mr. Zweigenhaft that PCA elected to purchase for $1 "(i) the Membership Interests of [OncoMed] representing 30.5% Percentage Interests in [OncoMed] directly or indirectly owned by Kevah [sic] Askari and (ii) all of the Membership Interests directly or indirectly owned by Burt Zweigenhaft"[9] (the "First Buyout"). PCA also informed Mr. Askari and Mr. Zweigenhaft that, following the transaction, Mr. Askari's indirect interest in OncoMed would be reduced from 49 percent to 18.5 percent, Mr. Zweigenhaft's indirect interest in OncoMed would be reduced from 13.5 percent to 0 percent, and PCA's interest in OncoMed would increase from 37.5 percent to 81.5 percent.[10] According to Mr. Askari's Complaint, Mr. Askari alleges that the low purchase price offered by PCA for the First Buyout was a consequence of PCA's actions that resulted in lower profit margins and increased debt (in breach of the Loan Agreement).[11]

8.      Following the 60-month anniversary of the effective date of the Operating Agreement, PCA determined that it owed $18,854,499 for the purchase of the remaining 18.5 percent interest in OncoMed (the "Second Buyout").[12]

9.      I have been asked by Counsel for PCA to review PCA's purchase price calculations for the First and Second Buyouts and to evaluate the implications of PCA's "forward-buy" strategy and its impact on OncoMed's Net Debt and EBITDA (*i.e.*, earnings before interest, tax, depreciation, and amortization) used for the purchase price calculations.

---

[9]     ASKARI_0020748-751, at 748.

[10]    ASKARI_0020748-751, at 750.

[11]    Mr. Askari's Complaint, at pp. 9, 13-15, 17-18.

[12]    More precisely, although PCA initially determined that it owed $22,319,884 for the remaining interest, on January 29, 2019, PCA informed Mr. Askari and Mr. Zweigenhaft that due to the Direct and Indirect Remuneration fee recoupments made by Pharmacy Benefit Managers (PBMs) the purchase price of the remaining interests was $18,854,499. January 29, 2019 Letter from Pharmacy Corporation of America to Kaveh Askari and Burt Zweigenhaft, at pp. 1-2; Mr. Askari's Complaint, at pp. 19-20.

C.      **Documents and Information Relied Upon**

10.      In undertaking my analyses, I have relied on my own research and experience, as well as information from a variety of sources including: Mr. Askari's Complaint, materials produced by the parties in this litigation, and publically available sources.  The documents, materials, and other information I have relied upon in conducting my analysis and forming my opinions are listed in Appendix B.


II.      **SUMMARY OF FINDINGS**

11.      I find that OncoMed's Net Debt, and in particular its working capital loan that exceeded $10 million, did not negatively impact the overall buyout payment.  Instead, OncoMed's working capital loan in excess of $10 million appears to have funded a forward-buy strategy that, in the presence of rising pharmaceutical costs, allowed OncoMed to keep its cost of goods sold in 2016 and 2018 lower than it otherwise would have been had OncoMed not engaged in forward buying.  Specifically, OncoMed was able to purchase additional inventories of drugs at lower prices (forward buy) and sell those drugs later, thereby avoiding the additional expense they would have incurred if they had acquired the drugs after the price increases.  The lower cost of goods sold contributed to higher earnings for OncoMed, including a higher EBITDA.  Both the working capital loan and EBITDA are inputs into the valuation calculation for the First and Second Buyouts.  Therefore, the effects of reducing OncoMed's working capital loan on both Net Debt and EBITDA need to be taken into account when determining the but-for purchase prices for the First and Second Buyouts had the working capital loan never exceeded $10 million.

12.      OncoMed's working capital loan used in the calculation of the purchase price for the First Buyout on December 7, 2016 was $28.6 million, exceeding $10 million by $18.6 million.

5

Based on the evidence produced in this case, I estimate that a portion of this additional working capital was used to forward buy pharmaceutical products that resulted in cost savings of about $695,000 in 2016.  Absent the increase in working capital beyond $10 million, OncoMed's EBITDA for the trailing twelve months ending November 30, 2016 would have decreased by that same amount, resulting in a negative valuation of OncoMed at the time of the First Buyout and a but-for purchase price for the 44 percent interest in OncoMed of -$1,113,036.  While this purchase price is larger than the actual purchase price calculated at the higher working capital loan amount, it is nevertheless still negative and would not have resulted in a higher First Buyout payment to Mr. Askari.

13.     Further, I estimate that the $18.6 million in additional working capital used for OncoMed's forward-buy strategy over the period 2015 to 2016 resulted in approximately $1.6 million in cost savings in 2018 alone.  In the absence of the additional $18.6 million in working capital, OncoMed's EBITDA would have decreased by an equivalent amount, and resulted in a but-for purchase price for the Second Buyout of 18.5 percent interest in OncoMed of $15,112,811.  This but-for purchase price for the Second Buyout is at least $2,893,527 (or 16 percent) *less* than the actual Second Buyout amount.  Thus, it is my opinion that the total amount received by Mr. Askari for his interest in OncoMed specialty pharmacy in the actual world was higher than the total amount Mr. Askari would have received in the but-for world where OncoMed's working capital loan did not exceed $10 million.

## III.     ANALYSIS AND OPINIONS

14.     Based on the materials reviewed to date, I understand that OncoMed, while being managed by PCA, engaged in a so-called forward-buy strategy, whereby OncoMed purchased

pharmaceutical inventory in excess of immediate demand prior to anticipated price increases.[13]  I also understand that PCA advanced certain working capital to OncoMed for the purpose of executing the forward-buy strategy.[14]  Finally, I understand that the amount of working capital advanced by PCA to OncoMed under the working capital loan exceeded $10 million, and that Mr. Askari alleges that the valuation of the First Buyout was inappropriately reduced as a result of the working capital loan exceeding $10 million.[15]  The amount due under the working capital loan is an input to the valuation calculations for both the First and Second Buyouts; however as I demonstrate below, the impact of the loan exceeding $10 million must also account for any positive impact on EBITDA of the forward buy strategy that was financed using the loan.

15.     A forward-buy strategy is a common strategy used by companies facing potential increases in the price of the products they purchase.  It allows them to purchase products prior to the price increase, thereby mitigating the impact of the price increase on the cost of their purchases.  This, in turn, results in costs of goods sold for the company that are lower than they would have been in the absence of the forward-buy strategy, increasing their profitability and resulting in higher earnings (*e.g.*, EBITDA) than they otherwise would have achieved.  Using a simple example, I illustrate how a pharmacy can increase its profitability and earnings in the presence of increasing drug prices by purchasing pharmaceutical products earlier, storing them in inventory, and avoiding costs that would have been incurred had the purchases been made after the price

---

[13]   *See, e.g.*, "Onco360 Revolver Request 6-9-15.pdf" attached to the June 9, 2015 email "RE $7m funding.msg"; "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx".

[14]   "Forward Buy by Quarter.xlsx"; "Revolver activity.xlsx".

[15]   ASKARI_0020748-751, at 751; Mr. Askari's Complaint, at p. 20. Based on the documents I reviewed, the working capital loan first exceeded $10 million on June 10, 2015 after Kevin Ellsworth, VP and CFO of OncoMed, requested an advance of $7 million to "forward buy inventory for 2Q" on June 9, 2015. "Revolver activity.xlsx"; "Onco360 Revolver Request 6-9-15.pdf" attached to the June 9, 2015 email "RE $7m funding.msg".

increases.  To the extent a pharmacy finances its forward-buy strategy through loans, the loan obligations may increase, but this is offset by an increase in earnings once the lower-cost inventory is sold.

16.     The documents made available to me indicate that OncoMed engaged in forward buying at least as early as mid-2015.[16]  Given the substantial growth in specialty pharmaceutical drug prices between 2015 and 2018,[17] a forward-buy strategy was likely to result in higher OncoMed profitability and earnings for the trailing twelve months ending November 30, 2016 and November 30, 2018.   In particular, internal OncoMed documents suggest that OncoMed experienced a positive incremental gain on investment in its inventory by forward buying.[18]

17.     In the context of the valuation calculation formula with respect to PCA's acquisition of OncoMed, a higher working capital loan amount may decrease the calculated valuation through a higher Net Debt, but also increase the calculated valuation through higher earnings (*i.e.*, trailing twelve-month EBITDA) resulting from the use of the working capital loan to allow for a forward-buy strategy.  To analyze the impact of restricting the working capital loan on the purchase price calculation for the First and Second Buyouts, one must consider both the

---

[16]   *See, e.g.*, "Onco360 Revolver Request 6-9-15.pdf" attached to the June 9, 2015 email "RE $7m funding.msg"; "Forward Buy Status Report_Cycle 2 2015.xlsx" attached to the July 9, 2015 email "FW Onco -Forward Buy Status Report_Cycle 2 2015.msg". According to "Forward Buy by Quarter.xlsx", OncoMed spent $23.5 million in 2016 and $31.8 million in 2017 to forward buy inventory. My review of "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx" suggests that OncoMed engaged in forward buying in 2018 as well.

[17]   *See, e.g.*, "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx"; "Fwd Buy_Onco_2017_review011117.xlsx" attached to the January 11, 2017 email "Price Increases.msg"; "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx".

[18]   *See, e.g.*, "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx" indicating that OncoMed gained $909,262 on inventory as a result of early 2016 price changes (for the drugs that OncoMed forward bought); "Fwd Buy_Onco_2017_review011117.xlsx" attached to the January 11, 2017 email "Price Increases.msg" indicating that OncoMed gained $803,318 on inventory that experienced price increases in January 2017 (for the drugs that OncoMed forward bought); and "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx" indicating that OncoMed gained $584,488 on inventory of oncological drugs that experienced price increases in December 2017 and January 2018.

impact of the lower loan on Net Debt as well as the impact of the lower loan on EBITDA through a reduced or no forward-buy strategy.

### A. A Forward-buy Strategy in the Presence of Price Increases Can Increase Profitability and Earnings

#### 1. A forward-buy strategy is a common business strategy employed by companies for the purpose of increasing profitability and earnings

18. Forward buying occurs when retailers purchase product during a particular period, hold it as inventory for some time, and then sell the product in later periods.[19]   For example, retailers may take advantage of the temporary price reductions offered by manufacturers to retailers for the purpose of stimulating sales and "stock up with extra goods, putting them into inventory for later sale."[20]  If retailers do not pass the temporary price discounts on to consumers,[21] they are able to earn a higher profit margin on the goods sold.   Similarly, if retailers expect manufacturers to increase prices, they may purchase large amounts of inventory today to increase future profits.[22]

19. According to a 2016 Deloitte publication, "[w]hile the overall rate of growth in total drug spend averaged in the low single digits, the rate of growth for specialty drugs was almost 20

---

[19]   *See, e.g.*, Desai, P.S., O. Koenigsberg, and D. Purohit, "Forward Buying by Retailers," *Journal of Marketing Research*, Vol. 47, 2010, pp. 90-102, at p. 90.

[20]   Lal, R., J.D.C. Little, and J.M. Villas-Boas, "A Theory of Forward Buying, Merchandising, and Trade Deals," *Marketing Science*, Vol. 15, No. 1, 1996, pp. 21-37, at p. 22.

[21]   Lal, R., J.D.C. Little, and J.M. Villas-Boas, "A Theory of Forward Buying, Merchandising, and Trade Deals," *Marketing Science*, Vol. 15, No. 1, 1996, pp. 21-37, at p. 21.

[22]   "Understanding and Evaluating Deal Considerations in the Specialty Pharmacy Sector: An Update for Private Equity Investors," Deloitte, 2016, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/mergers-acqisitions/us-ma-lshc-pei-briefs-specialty-pharmacy.pdf, at p. 2.

percent over the last eight years."[23]   Similarly, according to a 2019 AARP Public Policy Institute research report, the average annual percent change in retail prices for 97 widely used specialty drugs ranged from 7.0 percent to 9.6 percent over the period 2013 to 2017.[24]   In line with the reported increases in retail specialty drug prices, internal OncoMed documents similarly suggest that the annual pharmacy acquisition cost growth (or wholesale price growth) observed for many oncological specialty drugs sold by OncoMed was also substantial.[25]   Given the significant price increases observed for specialty drugs, it makes economic sense for specialty pharmacies and other market participants (*e.g.*, wholesalers) to engage in inventory management and forward buying. As one *Health Affairs* article noted:[26]

> We can expect drug wholesalers and distributors to react to [an anticipated price increase] by increasing their purchases to beat the price rise. This would allow them to buy low and then sell their inventory at higher prices later.  This is already a common practice as wholesalers and distributors do their best to anticipate increases.

---

[23]   "Understanding and Evaluating Deal Considerations in the Specialty Pharmacy Sector: An Update for Private Equity Investors," Deloitte, 2016, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/mergers-acqisitions/us-ma-lshc-pei-briefs-specialty-pharmacy.pdf, at p. 1.

[24]   Schondelmeyer, S.W., and L. Purvis, "Trends in Retail Prices of Specialty Prescription Drugs Widely Used by Older Americans: 2017 Year-End Update," AARP Public Policy Institute, June 2019, available at https://www.aarp.org/content/dam/aarp/ppi/2019/06/trends-in-retail-prices-of-specialty-prescription-drugs-year-end-update.doi.10.26419-2Fppi.00073.001.pdf, at pp. 1, 5.

[25]   *See, e.g.*, "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx" indicating that the annual price increase for Tarceva was 8 percent over the period 2013 to 2015 and the annual price increase for Imbruvica was 7 percent to 9 percent over the period 2014 to 2015. *See also*, Penington, R., and J.A. Stubbings, "Evaluation of Specialty Drug Price Trends Using Data from Retrospective Pharmacy Sales Transactions," *Journal of Managed Care and Specialty Pharmacy*, Vol. 22, No. 9, 2016, pp. 1010-1017, at p. 1013.

[26]   Spatz, I., "California Takes on Drug Pricing: Real Progress or Illusion?" Health Affairs, October 2, 2017, available at https://www.healthaffairs.org/do/10.1377/hblog20171002.062240/full/, accessed November 10, 2019.

20.     As cost of goods sold accounts for a large share of a specialty pharmacy's total expenditures, a pharmacy's profitability may be significantly influenced by a change in the pharmacy's drug acquisition costs.  For example, as Exhibit 1a demonstrates, a 1 percent reduction in OncoMed's cost of goods sold for the trailing twelve months ending November 30, 2016 and November 30, 2018 increases gross profit by about 16 to 17 percent, all else equal.  Exhibit 1b further shows that a 1 percent reduction in OncoMed's cost of goods sold similarly leads to a substantial increase in EBITDA, all else equal.  Thus, a seemingly small change in a pharmacy's cost of goods sold can have a substantial impact on its profitability.[27]

### 2.     *A simple example illustrating how a forward-buy strategy can increase profitability and earnings*

21.     In order to illustrate how forward buying can help increase gross profit and EBITDA, I consider a simple four-year model where a pharmacy sells 100 units of a certain drug in each of the four years.[28]  The pharmacy has a choice of whether to buy the units it sells in the same period (Scenario 1) or engage in forward buying (Scenario 2).[29]  In particular, under the forward-buy strategy in Scenario 2, the pharmacy purchases 10 percent more units in 2015 than it needs to sell in that year (*i.e.*, a pharmacy purchases 110 units and sells 100 units in that year), anticipating that the cost of acquiring those drugs will increase in 2016.  The 10 units purchased in 2015 in excess of immediate demand are stored in inventory and sold the next year allowing the pharmacy to avoid the higher cost of acquiring those units in 2016.[30]  The pharmacy purchases

---

[27]   *See also*, "Forward Buy Status Report_Cycle 2 2015.xlsx" attached to the July 9, 2015 email "FW Onco - Forward Buy Status Report_Cycle 2 2015.msg" suggesting that even a small change in price for two drugs provides a positive gain on investment from forward buying and that "It all helps!"

[28]   Exhibit 2.

[29]   Exhibit 2.

[30]   Exhibit 2.

100 units in 2016, and sells 100 units in 2016 (it sells the 10 units in inventory that were acquired in 2015 and 90 of the units purchased in 2016).  Although the pharmacy purchased and sold 100 units in 2016, it continues to have 10 units in inventory by the end of 2016 but those inventory units were now acquired at the 2016 price.[31]  These 10 units of inventory purchased at the 2016 price are then sold in 2017, and the process repeats.  Thus, the extra 10 units purchased in excess of immediate demand in 2015 allows the pharmacy to increase its profit margin on the 10 units sold in each of the subsequent years.[32]

22.     As Exhibit 2 shows, the forward-buy strategy in Scenario 2 results in an approximately 1 percent reduction in the total cost of goods sold in 2016, 2017, and 2018, and about a 14 percent to 39 percent increase in gross profit in each of the three years compared to the baseline Scenario 1, in which the pharmacy purchases and sells all the units in the same period.  Notably, although 2015 EBITDA remains unchanged between Scenario 1 and Scenario 2,[33] EBITDA increases by about 30 percent to 99 percent in subsequent years in Scenario 2.

23.     The simple example presented in Exhibit 2 illustrates how a specialty pharmacy can increase its profitability and earnings by avoiding some of the impact of higher costs from rising drug prices by purchasing products in excess of immediate demand in a certain period and

---

[31]   Exhibit 2.

[32]   Exhibit 2.

[33]   The revenue recognition principle of accounting states that "one should only record revenue when it has been earned, not when the related cash is collected." "Revenue Recognition Principle," Accounting Tools, November 28, 2018, available at https://www.accountingtools.com/articles/2017/5/15/the-revenue-recognition-principle, accessed November 11, 2019. Thus, any drugs purchased in excess of immediate demand and stored in inventory for sale in subsequent periods would not add any revenue to the current period.  Further, the expense recognition principle of accounting requires that expenses are recognized "in the same period as the revenues to which they relate." "Expense Recognition Principle," Accounting Tools, January 9, 2019, available at https://www.accountingtools.com/articles/expense-recognition-principle.html, accessed November 11, 2019. As such, the cost of drugs purchased but unsold are subtracted from the cost of goods sold before calculating gross profit and EBITDA.

storing them in inventory, rather than purchasing the products at higher prices later.  All else equal, the larger spread between the costs incurred and revenues received allows the pharmacy to improve its profit margin and thus EBITDA.

> *3.    OncoMed's decision to borrow additional working capital for the purpose of executing a forward-buy strategy had a positive impact on its profitability and EBITDA*

24.     As stated above, I understand that PCA advanced certain working capital to OncoMed between 2015 and 2017 for the purpose of executing the forward-buy strategy.[34]  My review of internal OncoMed documents suggests that OncoMed had a positive gain on investment from forward buying certain drugs.[35]  The evidence in this case suggests that in the presence of rising pharmaceutical costs, OncoMed's implementation of the forward-buy strategy allowed OncoMed to keep its cost of goods sold in 2016 and 2018 lower than it otherwise would have been had OncoMed not engaged in forward buying.  As a result, OncoMed's profitability and EBITDA for the twelve-month periods ending November 30, 2016 and November 30, 2018 were also higher as a result of the working capital loan used to fund the forward-buy strategy.

## B.    Calculation of PCA's But-for Purchase Price for the First and Second Buyouts

25.     I understand that one of the key components of the purchase price calculation at issue in this matter is the amount of "Net Debt" that entered the calculation of the December 7,

---

[34]    *See, e.g.*, "Revolver activity.xlsx"; "Onco360 Revolver Request 6-9-15.pdf" attached to the June 9, 2015 email "RE $7m funding.msg"; "Forward Buy by Quarter.xlsx".

[35]    *See, e.g.*, "Forward Buy Status Report_Cycle 2 2015.xlsx" attached to the July 9, 2015 email "FW Onco - Forward Buy Status Report_Cycle 2 2015.msg" indicating that gain on investment from forward buying two drugs that experienced price increases in mid-2015 was $25,846 and "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx" indicating that "incremental gain on investment" from price increases for oncological specialty products at the end of 2017 and beginning of 2018 was $584,488.

2016 purchase price of "30.5% Percentage Interests in [OncoMed] directly or indirectly owned by Kevah [sic] Askari" and "all of the Membership Interests [*i.e.*, 13.5 percent] directly or indirectly owned by Burt Zweigenhaft."[36]  Generally, the purchase price calculation entailed that a certain multiple of the trailing twelve-month EBITDA was to be reduced by the amount of Net Debt incurred by OncoMed, where the Net Debt was defined as "an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by [OncoMed] to [PCA] or its Affiliates under the Working Capital Loan … minus (iii) the amount of [OncoMed's] cash and cash equivalents."[37]  The "Working Capital Loan to PCA" used in the calculation of the December 7, 2016 purchase price was $28.6 million.[38]  However, Mr. Askari's Complaint alleges that the amount of working capital loan was not to exceed $10 million and that Net Debt could therefore not exceed $16.5 million.[39]

26.     First, I find that Mr. Askari is incorrect in assuming that a reduction of the working capital loan would have resulted in a substantial, positive December 7, 2016 valuation based on the agreed formula, and that, in fact, a reduction in the working capital loan likely would have had no impact on the First Buyout.  As I explain below, restricting the amount of working capital to $10 million per Mr. Askari's Complaint and making no other changes to the calculation of the purchase price for the First Buyout would have resulted in a but-for purchase price of $720,293 for all the "Membership Interests" purchased in the First Buyout (*i.e.*, both Mr. Askari's indirect 30.5 percent and Mr. Zweigenhaft's indirect 13.5 percent).  However, as stated above, this calculation is incorrect because it fails to account for the fact that the higher working capital loan amount increased OncoMed's earnings (*i.e.*, trailing twelve-month EBITDA) by funding its

---

[36]   ASKARI_0020748-751, at 748.

[37]   PC-ASK 046434-488, at 441, 444-445, 466.

[38]   ASKARI_0020748-751, at 751.

[39]   Mr. Askari's Complaint, at pp. 9, 20.

forward-buy strategy.  The correct calculation must adjust OncoMed's EBITDA for the trailing twelve months ending November 30, 2016 to account for the reduced funds for its forward-buy strategy and inability to take advantage of lower costs of sales.  I find that appropriately adjusting OncoMed's EBITDA for the trailing twelve months ending November 30, 2016 in accordance with a reduced working capital of $10 million results in a but-for purchase price for the First Buyout of -$1,113,036.

27.     Second, as illustrated using the simple example discussed in Section III.A.2, a reduction in the amount of working capital available for implementation of the forward-buy strategy would have also resulted in a reduction in trailing twelve-month EBITDA for the period ending November 30, 2018.  I therefore adjust the calculation of PCA's but-for purchase price for the Second Buyout to account for the loss of cost savings from forward buying.  My results suggest that the but-for purchase price for the Second Buyout by PCA would have decreased by at least $2,893,527 compared to the purchase price observed in the actual world.

28.     As a result, on net, the total amount that Mr. Askari would have received for the First and Second Buyouts in the but-for world would have been less than the total amount he received for the First and Second Buyouts in the actual world.

> 1.     *The purchase price for the interest in OncoMed in the First Buyout would have been negative had the working capital loan remained at $10 million*

29.     Based on my review of the December 7, 2016 letter detailing the calculation of the purchase price for the First Buyout, PCA's $1 payment to Mr. Askari and Mr. Zweigenhaft was a result of the negative enterprise valuation, which was performed in accordance with the Operating

Agreement.[40]  In order to determine how the valuation of the "30.5% Percentage Interests in [OncoMed] directly or indirectly owned by Kevah [sic] Askari" and "all of the Membership Interests [*i.e.*, 13.5 percent] directly or indirectly owned by Burt Zweigenhaft" (collectively, a 44 percent interest in OncoMed) would have differed in the but-for world, I first reduced the amount of working capital loan from $28.6 million to $10 million and recalculated the purchase price. Exhibit 4 demonstrates the results of this simple but-for analysis.  In particular, as Exhibit 4 shows, restricting the working capital loan to $10 million and keeping all of the other values used in the calculation constant results in a First-Buyout purchase price of $720,293.[41]

30.     I then estimate the impact of the reduced working capital loan on OncoMed's EBITDA for the trailing twelve months ending November 30, 2016.  My review of internal OncoMed documents suggests that the working capital loan first exceeded $10 million on June 10, 2015 when OncoMed received $7 million to "forward buy inventory for 2Q."[42]  In fact, the $28.6 million amount of working capital loan in the valuation calculation for the First Buyout reflects: $10 million drawn prior to June 10, 2015; $12.6 million drawn over the period June 10, 2015 to October 2015; and $6 million drawn over the period February 2016 to July 2016.[43]  Per Mr. Askari's Complaint, OncoMed would not have received the additional $12.6 million in working capital in 2015 and $6 million in working capital in 2016 in the but-for world.  Absent the additional working capital, OncoMed's profitability and earnings over the period December 2015 to November 2016 would have been lower than observed in the actual world.

---

[40]   ASKARI_0020748-751, at 751; PC-ASK 046434-488, at 466.

[41]   Exhibit 4.

[42]   "Revolver activity.xlsx"; "Onco360 Revolver Request 6-9-15.pdf" attached to the June 9, 2015 email "RE $7m funding.msg".

[43]   "Revolver activity.xlsx".

31.     Based on internal OncoMed documents, I estimate that OncoMed's average acquisition price for certain drugs included in its forward-buy strategy increased by 5.52 percent around the end of 2015 and beginning of 2016.[44]  Assuming that the entire additional 2015 working capital loan of $12.6 million funded the forward buying of pharmaceutical products,[45] this allowed OncoMed to purchase additional inventory prior to the estimated average price increase around the end of 2015 and beginning of 2016 and resulted in a cost savings of about $695,000.[46]  Absent the increase in the working capital loan beyond $10 million, OncoMed's total cost of goods sold for the trailing twelve months ending November 30, 2016 would have been higher by that same amount.  As shown in Exhibit 3, this increase in the cost of goods sold would have resulted in an equivalent decrease in the trailing twelve-month EBITDA for the period ending November 30, 2016.  Using the adjusted EBITDA and assuming the working capital loan would have remained at $10 million results in a but-for purchase price for the First Buyout of -$1,113,036.[47]

> 2.     *The purchase price for the interest in OncoMed in the Second Buyout would have been substantially lower had the working capital loan remained at $10 million*

32.     The $18.6 million in additional working capital (*i.e.*, $12.6 million over the period June 10, 2015 to October 2015, and $6 million over the period February 2016 to July 2016) allowed OncoMed to fund a forward-buy strategy that also increased its earnings after 2016.  In particular,

---

[44]   *See* Mortimer Backup; "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx".

[45]   I focus on just the $12.6 million in 2015 working capital loans with respect to the price increases in late 2015 and early 2016.  I note that the additional $6 million OncoMed borrowed over the period February 2016 to July 2016, would have funded forward buy purchases after the late 2015 and early 2016 price increases.  As a result, this additional working capital loan would have increased 2016 EBITDA only to the extent there were any price increases later in 2016. For simplicity I assume that the additional working capital did not have any impact on the 2016 EBITDA.

[46]   $12.6 million $\times$ 5.52% = $695,065.

[47]   Exhibit 4.

the strategy allowed OncoMed to purchase additional inventory in advance of drug price increases around the end of 2015 and beginning of 2016, around the end of 2016 and beginning of 2017, and around the end of 2017 and beginning of 2018, resulting in substantial cost savings for the trailing twelve-month period ending November 30, 2018.   Similar to the case of the First Buyout calculation, in the absence of the additional working capital and the forward-buy strategy it funded, OncoMed's costs would have been higher, resulting in lower earnings and a substantially lower valuation calculation for the Second Buyout.

33.     Based on internal OncoMed documents, I estimate that OncoMed's average acquisition price for certain drugs included in its forward-buy strategy increased by approximately 5.52 percent around the end of 2015 and beginning of 2016,[48] 6.66 percent around the end of 2016 and beginning of 2017,[49] and 7.60 percent around the end of 2017 and beginning of 2018.[50] Assuming $12.6 million of additional working capital was spent on forward buying in 2015 and $6 million of additional working capital was spent on forward buying in 2016,[51] and also assuming that cost savings from forward buying in one year were used to fund additional forward buying for subsequent years, the additional $18.6 million in working capital would have resulted in the cost savings in 2018 alone of about $1.6 million.[52]

---

[48]   *See* Mortimer Backup; "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx".

[49]   *See* Mortimer Backup; "Fwd Buy_Onco_2017_review011117.xlsx" attached to the January 11, 2017 email "Price Increases.msg"; "FB Inventory - as of 2.10.17.xlsx".

[50]   *See* Mortimer Backup; "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx".

[51]   In fact, according to "Forward Buy by Quarter.xlsx", OncoMed spent $23.5 million in 2016 to forward buy inventory.

[52]   The $12.6 million funding of forward buying in 2015 would have yielded about $1.1 million in cost savings in 2018: $12.6 million $\times$ [7.60% + 7.60%$\times$5.52% + 7.60%$\times$6.66% + 7.60%$\times$5.52%$\times$6.62%] = $1,077,705. The $6 million funding of forward buying in 2016 would have yielded about $486,000 in cost savings in 2018: $6 million $\times$ [7.60% + 7.60%$\times$6.66%] = $486,363. Thus, the total cost savings in 2018 from forward buying are estimated to be at approximately $1,564,068.

34.     As Exhibit 5 illustrates, an approximately $1.6 million increase in total cost of goods sold would have reduced the trailing twelve-months EBITDA for the period ending November 30, 2018 (prior to adjustment for fee recoupments made by Pharmacy Benefit Managers ("PBMs") and earnings attributable to CareMed) from $15,198,867 observed in the actual world to $13,634,798 in the but-for world.[53]  Assuming that direct and indirect remuneration ("DIR") fee recoupments made by PBMs and OncoMed earnings transfers to CareMed both remained unchanged in the but-for world, a lower EBITDA for the trailing twelve months ending November 30, 2018 would have resulted in the but-for purchase price of $15,112,811.[54]  This is approximately a 16.1 percent or a $2,893,527 reduction relative to the purchase price calculated using the actual EBITDA figure reported in OncoMed's profit and loss statement for the period ending November 30, 2018.[55]  That is, in the absence of the additional $18.6 million in working capital and the forward buying that the working capital loan funded, OncoMed's costs of goods sold would have been higher and the valuation for the Second Buyout would have been lower.

3.     *The total amount that Mr. Askari would have received in the but-for world would have been less than the total amount received by Mr. Askari in the First and Second Buyouts in the actual world*

35.     The total amount proffered by PCA to Mr. Askari for his 49 percent interest in OncoMed following PCA's purchase of the 37.5 percent interest in OncoMed on October 10, 2013[56] was approximately $18,854,499.[57]  My analysis of the evidence in this case suggests that

---

[53]   Exhibit 5.

[54]   Exhibits 6 and 7.

[55]   Exhibit 7. Note that the calculated but-for purchase price of $15,112,811 is about $3.7 million less than the actual PCA's calculation of $18,854,499.

[56]   PC-ASK 010089-156, at 089, 097; PC-ASK 046434-488, at 435.

[57]   January 29, 2019 Letter from Pharmacy Corporation of America to Kaveh Askari and Burt Zweigenhaft, at p. 2.

but-for the advancement of certain working capital by PCA to OncoMed, the total amount that Mr. Askari would have received for his interest in OncoMed specialty pharmacy in the but-for world would have been lower, approximately $15,112,811.

Signed on the 18th day of November, 2019.

_____

Richard A. Mortimer, Ph.D.

**APPENDIX A**

**RICHARD A. MORTIMER, PH.D.**
**Principal**

Phone: 617 425 8180                                                             111 Huntington Avenue
Fax: 617 425 8001                                                                                14th Floor
richard.mortimer@analysisgroup.com                                    Boston, MA 02199

## EDUCATION

Ph.D.          Department of Economics, University of California, Berkeley
               *Concentration: Industrial Organization and International Economics*

B.A.           Economics, Johns Hopkins University

## EMPLOYMENT

2001–Present   Analysis Group, Inc.

2000           University of California, Los Angeles (UCLA)
               *Lecturer*

1997–2000      University of California, Berkeley and UCLA
               *Teaching Assistant* and *Research Assistant*

1993–1995      Ernst & Young, LLP
               *Consultant/Senior Consultant, Tax Analysis & Economics Group*

## PRESENTATIONS & SPEAKING ENGAGEMENTS

- **"Biosimilar Litigation: Navigating Patent Dance Trends and Developments,"** panelist, *The Knowledge Group* (January 24, 2019)
- **"Biosimilars in the Antitrust Spotlight,"** panelist, *IP Chat Channel* (October 4, 2018)
- **"The BPCIA Patent Dance,"** panelist, *The Knowledge Group* (June 28, 2018)
- **"The Nuts and Bolts of Reverse Payments,"** discussant, *ABA Section of Antitrust Law, Intellectual Property* (October 24, 2017)
- **"Economic Considerations for Biosimilar Litigation,"** discussant, *Food Drug Law Institute,* Annual Conference (May 5, 2017)
- **"Reverse Payment Settlements: What Lies Ahead?"** panelist, *The Knowledge Group* (September 13, 2016)

- **"Product Hopping Cases: Where Are We and Where Are We Headed?"** discussant, *ABA Section of Antitrust Law* (December 11, 2015)
- **"Paragraph IV Patent Challenges: Are You Prepared for Product Targeting?"** panelist, *The Knowledge Group* (March 23, 2015)

## ARTICLES & PUBLICATIONS

### Journals

- **"Cardiac Arrhythmia Detection Outcomes Among Patients Monitored with the Zio Patch System: A Systematic Literature Review,"** with Mihran Yenikomshian, John Jarvis, Cody Patton, Christopher Yee, Howard Birnbaum, and Mark Topash, *Current Medical Research and Opinion*, 35:10 (April 2019)
- **"Updated Trends in US Brand-Name and Generic Drug Competition,"** with Henry Grabowski, Genia Long, and Ani Boyo, *Journal of Medical Economics*, 19:9 (April 2016)
- **"Evolving Provider Payment Models and Patient Access to Innovative Medical Technology,"** with Genia Long and Geoffrey Sanzenbacher, *Journal of Medical Economics*, 17:12 (December 2014)
- **"Biosimilars,"** with Henry Grabowski and Genia Long, *Encyclopedia of Health Economics Volume 1*, editor Anthony J. Culyer (2014)
- **"Recent Trends in Brand Name and Generic Drug Competition,"** with Henry Grabowski and Genia Long, *Journal of Medical Economics*, 17:3 (March 2014)
- **"Evolving Brand-Name and Generic Drug Competition May Warrant A Revision Of The Hatch-Waxman Act,"** with Henry Grabowski, Margaret Kyle, Genia Long, and Noam Kirson, *Health Affairs*, 30:11 (November 2011)
- **"Implementation of the Biosimilar Pathway: Economic and Policy Issues,"** with Henry Grabowski and Genia Long, *Seton Hall Law Review,* 41:2 (2011)
- **"The Effects of Capacity on Sales under Alternative Vertical Contracts,"** with Ioannis Ioannou and Julie Holland Mortimer, *Journal of Industrial Economics*, 59:1 (March 2011)
- **"Data Exclusivity Periods for Biologics: Did Congress Get it Right?"** with Henry Grabowski and Genia Long, *Nature Reviews: Drug Discovery,* 10:1 (January 2011).
- **"Authorized Generic Drugs, Price Competition, and Consumer Welfare,"** with Ernst R. Berndt, Ashoke Bhattacharjya, Andrew Parece, and Edward Tuttle, *Health Affairs*, 26:3 (May/June 2007)

### Other

- **"The Rise of Biosimilars and the Future of Healthcare Intellectual Property,"** with Brian Ellman, *IAM*, Issue 92 (November/December 2018), available at: https://www.iam-media.com/law-policy/rise-biosimilars-and-future-healthcare-intellectual-property

- **"The Economics of Biosimilar Drugs and New Considerations in Intellectual Property and Antitrust Litigation,"** with Brian Ellman, *Public Domain,* ABA Section of Antitrust Law Intellectual Property Committee Newsletter (July 2018)

- **"Will "Biosimilar" Medications Reduce the Costs of Biologic Drugs?"** with Christian Frois and Alan White, *Scientific American,* Guest Blog (March 9, 2017)

- **"The Potential For Litigation In New Era Of Biosimilars,"** with Christian Frois and Alan White, *Law 360* (September 20, 2016)

- **"Can The Life Sciences Industry Bank On Biosimilars?"** with Paul Greenberg and Tammy Sisitsky, *Law 360* (April 13, 2016)

- **"Correlation Or Cause: Brand-Name Drug Prescription Rates,"** with Paul Greenberg and Tammy Sisitsky, *Law 360* (March 23, 2016)

- **"Recent Average Price Trends for Implantable Medical Devices, 2007-2011,"** with Genia Long and Geoffrey Sanzenbacher, *mimeo* (September 2013), available at: https://www.advamed.org/resource-center/recent-average-price-trends-implantable-medical-devices-2007-2011-0

- **"Data Exclusivity Periods and Next Generation Improvements to Innovator Biologics: Key Issues,"** with Henry Grabowski, Iain Cockburn, and Genia Long, *Duke University Department of Economics Working Paper*, No. 2009-5 (April 29, 2009), available at: http://public.econ.duke.edu/Papers/PDF/DWPaper2009-05.pdf

- **"Data Exclusivity Periods for Biologics: Updating Prior Analyses and Responding to Critiques,"** with Henry Grabowski and Genia Long, *Duke University Department of Economics Working Paper*, No. 2008-10 (December 22, 2008), available at: http://public.econ.duke.edu/Papers/PDF/Data_Exclusivity_Periods_for_Biologics.pdf

- **"The Effect on Federal Spending of Legislation Creating a Regulatory Framework for Follow-on Biologics: Key Issues and Assumptions,"** with Henry Grabowski, Iain Cockburn, Genia Long, and Scott Johnson, *Duke University Department of Economics Working Paper*, No. 2007-9 (August 2007), available at: http://public.econ.duke.edu/Papers/PDF/0907_H_Grabowski_I_Cockburn_G_Long_et_al_Effect_on_Federal_Spending_of_Follow_on_Biologics.pdf

- **"Do Authorized Generic Drugs Deter Paragraph IV Certifications? Recent Evidence,"** with Ernst R. Berndt and Andrew Parece, *mimeo* (April 2007), available at: https://www.analysisgroup.com/globalassets/content/insights/publishing/phrma_authorized_generic_entry.pdf

- ***Investment and Cooperation Among Internet Backbone Firms***, University of California, Berkeley Ph.D. thesis

### Referee

- *Health Affairs*, *Journal of Health Economics*, *Journal of Industrial Economics*, *Journal of Regulatory Economics*, *Review of Economics and Statistics*

## EXPERT TESTIMONY IN PAST FOUR YEARS

- ***Pharmacy Corporation of America/Askari Consolidated Litigation***
  *United States District Court for the District of Delaware*
  Served as a testifying expert on behalf of Pharmacy Corporation of America. Testified on the distribution patterns for certain pharmaceuticals.

  – Expert Report, filed November 6, 2019

- ***Carolyn Moya, et al. v. Healthport Technologies, LLC, et al.***
  *State of Wisconsin Circuit Court, Milwaukee County*
  Served as a testifying expert on behalf of Healthport Technologies. Testified on economic damages in litigation involving allegations of improper billing for patient medical records.

  – Expert Report, filed January 11, 2019

- ***Mylan Inc. & Subsidiaries v. Commissioner of Internal Revenue***
  *United States Tax Court*
  Served as a testifying expert on behalf of the IRS. Testified on economic incentives facing generic drug manufacturers in the FDA drug approval process and related intellectual property litigation.

  – Expert Report, filed October 9, 2018
  – Expert Rebuttal Report, filed November 2, 2018
  – Deposition Testimony, November 12, 2018
  – Trial Testimony, December 4, 2018

- ***United States of America, et al. v. Solvay S.A., et al.***
  *United States District Court for the Southern District of Texas*
  Served as a testifying expert on behalf of Solvay S.A in litigation involving allegations of improper promotion of the drugs Aceon, AndroGel, and Luvox. Submitted an expert report and a declaration addressing issues related to causation and damages, and was deposed.

  – Expert Report, filed March 12, 2015
  – Deposition Testimony, April 10, 2015
  – Declaration, filed November 16, 2015

## SELECTED ADDITIONAL CONSULTING EXPERIENCE

- **Government investigations of pharmaceutical and medical device companies**
  *Multiple United States Attorney Offices*
  Served as an expert witness on behalf of pharmaceutical and medical device companies in settlement presentations to government investigators on issues related to liability and damages in False Claims Act and Anti-Kickback Statute cases.

  Presented analyses to government investigators and mediators related to questions of liability, causation, and damages for:

  - Alleged improper promotion and kickback payments for pharmacy dispensed drugs
  - Alleged improper promotion, improper billing, and kickback payments for physician administered drugs
  - Alleged improper promotion and kickback payments for implantable medical devices
  - Alleged kickback payments and improper billing for an injectable medical device

- **Antitrust litigation related to pharmaceuticals and generic entry**
  Supported expert testimony on behalf of pharmaceutical manufacturers in multiple cases related to claims that entry of generic versions of brand name drugs were improperly delayed. Addressed questions of class certification, market definition, liability, and damages.

- **Contract disputes related to pharmaceuticals**
  Supported expert testimony on behalf of pharmaceutical manufacturers in several cases related to claims that a company failed to meet its contractual obligations with respect to either the production or promotion and commercialization of a pharmaceutical product.

- **Pharmaceutical patent infringement litigation**
  Supported counsel in mediation by calculating damages estimates related to patent infringement in the production of a biologic drug.  Supported expert testimony regarding motions for preliminary injunction against biosimilar entry for brand biologic therapies.

- **Valuation disputes related to pharmaceutical manufacturer acquisitions**
  Supported expert testimony in litigation and arbitration on disputes related to the valuation of generic and brand drug manufacturers in acquisitions.

- **False advertising**
  Supported expert testimony on behalf of manufacturers in cases related to claims that the manufacturer falsely or misleadingly advertised certain characteristics of their products (e.g., labeling the product package "all natural"). Addressed questions of class certification, causation, and damages.

- **New Mexico Oncology And Hematology Consultants, Ltd v. Presbyterian Healthcare Services and Presbyterian Network, Inc.**
  Supported expert testimony and assisted in economic analysis on behalf of New Mexico

Oncology and Hematology Consultants (NMOHC) in litigation associated with Presbyterian Healthcare Services's decision to stop reimbursing for drugs administered by NMOHC and require NMOHC patients to receive their medications from Presbyterian associated hospitals.

- ***MasterCard multiple litigations***
  Supported expert testimony and assisted in economic analysis on behalf of MasterCard in government and consumer litigations focused on the pricing of credit card services. Assisted in the design and analysis of network effects and pass-through issues. Assisted in the analysis of foreign currency conversion pricing.

- ***Microsoft multiple litigations***
  Supported expert testimony in evaluating damages associated with alleged anticompetitive pricing and profitability related to Office and Windows software. Supported market survey design and implementation for allegations related to anticompetitive bundling of Internet browsers and media players with platform software. Assisted counsel in all aspects of opposing expert deposition and trial preparation.

- ***Pat Cason-Merenda, et al. v. Detroit Medical Center, et al.***
  Supported an expert in the analysis of class certification issues relating to allegations of wage fixing.

- ***NPM Adjustment Proceeding Under the Tobacco Master Settlement Agreement Between the Settling States and the Participating Manufacturers***
  *Arbitration Proceeding Before Professor Daniel McFadden and the Brattle Group*
  Supported expert witnesses in an analysis of the extent to which the 1998 Master Settlement Agreement contributed to the market share loss for participating manufacturers.

- ***Pharmaceutical pricing studies***
  Developed market surveys and demand models to evaluate optimal price responses for a number of pharmaceutical drugs distributed by multiple pharmaceutical companies.

- ***Pharmaceutical and medical device policy papers***
  Collaborated with multiple academics on various policy papers related to potential legislation involving both small-molecule drugs and biologics. These papers addressed questions of:

  – The impact of authorized generic entry on incentives to generics to challenge patents and the impact on long-run generic prices and shares
  – The potential cost savings to the federal government from passage of legislation developing an accelerated pathway for biosimilar entry
  – The appropriate data exclusivity periods for biologics
  – The potential impact of payment reform measures proposed in PPACA on medical device adoption and incentives for future innovation

# APPENDIX B

## MATERIALS CONSIDERED

### Court Documents

Second Amended and Supplemental Complaint, *Pharmacy Corporation of America/Askari Consolidated Litigation*, In the United States District Court for the District of Delaware, C.A. No. 16-1123 RGA, February 14, 2019.

The PCA Litigants' Objections and Responses to the Onco360 Litigants' Second Set of Interrogatories, *Pharmacy Corporation of America/Askari Consolidated Litigation*, United States District Court, District of Delaware, C.A. No. 16-1123 RGA, September 18, 2019.

The Onco360 Litigants' Objections and Responses to the PCA Litigants' Second Set of Interrogatories, *Pharmacy Corporation of America/Askari Consolidated Litigation*, In the United States District Court for the District of Delaware, C.A. No. 16-1123 RGA, October 18, 2019.


### Case Documents

2015 Q1 Price Change_Recover Opportunity.xlsx (attached to the April 9, 2015 email FW 2015 Q1 Price Change_Recover Opportunity.xlsx.msg)

ASKARI_0020748-751

Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx

Copy of DIOHschedule_6 3 15.xlsx (attached to the June 4, 2015 email FW DIOH file.msg)

FB Inventory - as of 2.10.17.xlsx

Forward Buy by Quarter.xlsx

FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx

Forward Buy Status Report_Cycle 2 2015.xlsx (attached to the July 9, 2015 email FW Onco - Forward Buy Status Report_Cycle 2 2015.msg)

FW 2015 Q1 Price Change_Recover Opportunity.xlsx.msg (April 9, 2015 email)

FW DIOH file.msg (June 4, 2015 email)

FW Onco -Forward Buy Status Report_Cycle 2 2015.msg (July 9, 2015 email)

Fwd Buy_Onco_2016_Cycle 2_revised - updated.xlsx

Fwd Buy_Onco_2017_MASTER_Non-FB Gains.xlsx (attached to the January 11, 2017 email "Price Increases.msg")

Fwd Buy_Onco_2017_review011117.xlsx (attached to the January 11, 2017 email "Price Increases.msg")

Fwd Buy_Onco_2017_TeamReview - update 1.5.16.xlsx

January 29, 2019 Letter from Pharmacy Corporation of America to Kaveh Askari and Burt Zweigenhaft

Onco360 2017 2H Projected Inventory Increases 20170525.xlsx

Onco360 Revolver Request 6-9-15.pdf (attached to the June 9, 2015 email "RE $7m funding.msg")

PC-ASK 010089-156

PC-ASK 026939-7022

PC-ASK 046434-488

PC-ASK 053532

PC-ASK 053536

Price Increases.msg (January 11, 2017 email)

Price Increases.msg (attached to the January 11, 2017 email "Price Increases.msg")

Price Increases.msg (January 16, 2018 email)

RE $7m funding.msg (June 9, 2015 email)

Re Price increases.msg (January 6, 2016 email)

Revolver activity.xlsx


**Academic Publications**

Desai, P.S., O. Koenigsberg, and D. Purohit, "Forward Buying by Retailers," *Journal of Marketing Research*, Vol. 47, 2010, pp. 90-102.

Lal, R., J.D.C. Little, and J.M. Villas-Boas, "A Theory of Forward Buying, Merchandising, and Trade Deals," *Marketing Science*, Vol. 15, No. 1, 1996, pp. 21-37.

Penington, R., and J.A. Stubbings, "Evaluation of Specialty Drug Price Trends Using Data from Retrospective Pharmacy Sales Transactions," *Journal of Managed Care and Specialty Pharmacy*, Vol. 22, No. 9, 2016, pp. 1010-1017.


**Publicly Available Documents**

"Expense Recognition Principle," Accounting Tools, January 9, 2019, available at https://www.accountingtools.com/articles/expense-recognition-principle.html, accessed November 11, 2019.

"Revenue Recognition Principle," Accounting Tools, November 28, 2018, available at https://www.accountingtools.com/articles/2017/5/15/the-revenue-recognition-principle, accessed November 11, 2019.

Schondelmeyer, S.W., and L. Purvis, "Trends in Retail Prices of Specialty Prescription Drugs Widely Used by Older Americans: 2017 Year-End Update," AARP Public Policy Institute, June 2019, available at https://www.aarp.org/content/dam/aarp/ppi/2019/06/trends-in-retail-prices-of-specialty-prescription-drugs-year-end-update.doi.10.26419-2Fppi.00073.001.pdf.

Spatz, I., "California Takes on Drug Pricing: Real Progress or Illusion?" Health Affairs, October 2, 2017, available at https://www.healthaffairs.org/do/10.1377/hblog20171002.062240/full/, accessed November 10, 2019.

"Understanding and Evaluating Deal Considerations in the Specialty Pharmacy Sector: An Update for Private Equity Investors," Deloitte, 2016, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/mergers-acqisitions/us-ma-lshc-pei-briefs-specialty-pharmacy.pdf.



**Exhibit 1a**
**Recalculated Gross Profit Based on 1% Reduction in Cost of Goods Sold**
**2016 and 2018**

**Note:**
[1] Gross Profit is recalculated after Total Costs of Goods Sold are reduced by 1% in each month of the 12-month period, and holding all other inputs constant.

**Sources:**
[A] PC-ASK 053532.
[B] PC-ASK 053536.



**Exhibit 1b**
**Recalculated EBITDA based on 1% Reduction in Cost of Goods Sold**
**2016 and 2018**

**Note:**
[1] EBITDA is recalculated after Total Costs of Goods Sold are reduced by 1% in each month of the 12-month period, and holding all other inputs constant.

**Sources:**
[A] PC-ASK 053532.
[B] PC-ASK 053536.

**Exhibit 2**
**Impact of Forward-buy Strategy on Profitability**
**Illustrative Example**

| | | Scenario 1: No forward buying | | | | Scenario 2: Forward buy 10 units in 2015 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 | 2018 | 2015 | 2016 | 2017 | 2018 |
| [A] | Units sold | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| [B] | Average price per unit | 5,739 | 6,782 | 7,825 | 8,868 | 5,739 | 6,782 | 7,825 | 8,868 |
| [A]*[B]=[C] | Revenue | 573,900 | 678,200 | 782,500 | 886,800 | 573,900 | 678,200 | 782,500 | 886,800 |
| | Cost of goods sold: | | | | | | | | |
| [D] | Units purchased | 100 | 100 | 100 | 100 | 110 | 100 | 100 | 100 |
| [E] | Cost of goods per unit purchased | 5,720 | 6,564 | 7,408 | 8,252 | 5,720 | 6,564 | 7,408 | 8,252 |
| [D]*[E]=[F] | Cost of goods | 572,000 | 656,400 | 740,800 | 825,200 | 629,200 | 656,400 | 740,800 | 825,200 |
| [G] | Change in inventory[1] | - | - | - | - | (57,200) | (8,440) | (8,440) | (8,440) |
| [F]+[G]=[H] | Total cost of goods sold | 572,000 | 656,400 | 740,800 | 825,200 | 572,000 | 647,960 | 732,360 | 816,760 |
| | *% change in cost of goods sold relative to Scenario 1* | | | | | | *-1.29%* | *-1.14%* | *-1.02%* |
| [C]-[H]=[I] | Gross profit | 1,900 | 21,800 | 41,700 | 61,600 | 1,900 | 30,240 | 50,140 | 70,040 |
| | *% change in gross profit relative to Scenario 1* | | | | | | *38.7%* | *20.2%* | *13.7%* |
| | Expenses: | | | | | | | | |
| [J] | Operating and non-operating expenses per unit | 332 | 332 | 332 | 332 | 332 | 332 | 332 | 332 |
| [A]*[J]=[K] | Operating and non-operating expenses | 33,200 | 33,200 | 33,200 | 33,200 | 33,200 | 33,200 | 33,200 | 33,200 |
| [I]-[K]=[L] | EBITDA | (31,300) | (11,400) | 8,500 | 28,400 | (31,300) | (2,960) | 16,940 | 36,840 |
| | *% change in EBITDA relative to Scenario 1* | | | | | | *74.0%* | *99.3%* | *29.7%* |

**Note:**

[1] Under Scenario 2, the change in inventory in 2015 is equal to the cost of 10 units purchased and added to inventory in that year. As these units are not sold in 2015, the cost associated with the purchase is subtracted from the cost of goods to arrive at the cost of goods sold in 2015. The cost associated with the purchase of these 10 units is added to the cost of goods in 2016 because these 10 units are assumed to be sold in 2016. As a result, 10 units of the 100 units purchased in 2016 are unsold and are assumed to be added to inventory in 2016. The cost associated with the purchase of these 10 units in 2016 is subtracted from the cost of goods in 2016 because these 10 units are assumed to be unsold in 2016. The change in inventory in 2016 reflects the net cost associated with unsold 2016 units added to inventory and sold 2015 units removed from inventory. The change in inventory in 2017 and 2018 is calculated using the same methodology.

**Exhibit 3**

**Calculation of 2016 But-for OncoMed EBITDA**

**Assuming a Working Capital Loan of $10 Million and Reduced Forward Buy of Inventory**

| | EBITDA for Total Trailing 12 Months Ending November 30, 2016 | |
| --- | --- | --- |
| | Actual Based on 2016 P&L | But-for Assuming $10 Million Working Capital and Reduced Forward Buy of Inventory |
| Total Revenue[1] | $            399,442,012 | $            399,442,012 |
| Total Cost of Goods Sold[2] | $            377,781,505 | $            378,476,570 |
| Gross Profit[3] | $              21,660,507 | $              20,965,442 |
| Total Operating Expense | $              19,599,539 | $              19,599,539 |
| Adjusted EBITDA | $                2,060,968 | $                1,365,903 |
| Total Non-operating Expense | $                   214,292 | $                   214,292 |
| EBITDA[4] | $                1,846,675 | $                1,151,610 |

**Notes:**

[1] Total Revenue is assumed to be the same in the actual and but-for worlds.

[2] Total cost of goods sold in the but-for world is adjusted to account for the loss of cost savings from the forward-buy strategy.  The loss of cost savings is calculated by multiplying the average increase in drug prices from 2015 to 2016 by the additional loan amount of $12.6 million that OncoMed borrowed over the period June 10, 2015 to October 22, 2015.

[3] Gross profit is calculated as total revenue minus total cost of goods sold.

[4] The trailing 12-month EBITDA per 2016 P&L is slightly higher than the trailing 12-month EBITDA shown in December 7, 2016 letter from Pharmacy Corporation of America to Mr. Askari and Mr. Zweigenhaft (*i.e.*, $1,846,053). *See* ASKARI_0020748-751, at 751.

**Sources:**

[A] PC-ASK 053532.

[B] PC-ASK 053536.

[C] "Revolver activity.xlsx".

[D] "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx".

[E] ASKARI_0020748-751.

**Exhibit 4**
**Calculation of 2016 But-for OncoMed Purchase Price**

| | Actual | But-for | |
| --- | --- | --- | --- |
| | PCA Calculation per December 7, 2016 Letter | PCA Calculation Assuming a Working Capital Loan of $10 Million | PCA Calculation Assuming a Working Capital Loan of $10 Million and Resulting Lower EBITDA |
| Trailing 12 Months EBITDA Ending 11/30/2016 | $ 1,846,053 | $ 1,846,053 | $ 1,151,610 |
| Multiplier[1] | 6 | 6 | 6 |
| Valuation before Net Debt Adjustment | $ 11,076,318 | $ 11,076,318 | $ 6,909,662 |
| | | | |
| Less: Net Debt of the Company | | | |
| Term Loan to PCA | $ 6,500,000 | $ 6,500,000 | $ 6,500,000 |
| Working Capital Loan to PCA | $ 28,600,000 | $ 10,000,000 | 10,000,000 |
| Intercompany Receivable to Onco | $ (2,999,552) | $ (2,999,552) | (2,999,552) |
| Less: Cash | $ 4,061,159 | $ 4,061,159 | 4,061,159 |
| | $ 28,039,289 | $ 9,439,289 | $ 9,439,289 |
| | | | |
| Valuation | $ (16,962,971) | $ 1,637,029 | $ (2,529,627) |
| | | | |
| Percentage Interests of OncoMed Being Purchased | | | |
| Askari Interest | 30.5% | 30.5% | 30.5% |
| Zweigenhaft Interest | 13.5% | 13.5% | 13.5% |
| Total | 44.0% | 44.0% | 44.0% |
| | | | |
| Purchase Price | $ (7,463,707) | $ 720,293 | $ (1,113,036) |

**Note:**

[1] Multiplier for OncoMed was determined using trailing 12 quarters of OncoMed EBITDA. *See* PC-ASK 046434-488, at 444-445. Multiplier is assumed to be the same in the actual and but-for worlds.

**Sources:**

[A] ASKARI_0020748-751.
[B] PC-ASK 046434-488.

**Exhibit 5**
**Calculation of 2018 But-for OncoMed EBITDA**
**Assuming a Working Capital Loan of $10 Million and Reduced Forward Buy of Inventory**

| | EBITDA for Total Trailing 12 Months Ending November 30, 2018 | |
| --- | --- | --- |
| | Actual Based on 2018 P&L | But-for Assuming $10 Million Working Capital and Reduced Forward Buy of Inventory |
| Total Revenue[1] | $ 741,319,130 | $ 741,319,130 |
| Total Cost of Goods Sold[2] | $ 697,592,303 | $ 699,156,371 |
| Gross Profit[3] | $ 43,726,828 | $ 42,162,759 |
| Total Operating Expense | $ 28,241,366 | $ 28,241,366 |
| Adjusted EBITDA | $ 15,485,461 | $ 13,921,393 |
| Total Non-operating Expense | $ 286,595 | $ 286,595 |
| EBITDA | $ 15,198,867 | $ 13,634,798 |

**Notes:**

[1] Total Revenue is assumed to be the same in the actual and but-for worlds.

[2] Total cost of goods sold in the but-for world is adjusted to account for the loss of cost savings from the forward-buy strategy.  The loss of cost savings is calculated as the sum of (i) the additional loan amount of $12.6 million that OncoMed borrowed over the period June 10, 2015 to October 22, 2015 multiplied by $[(1 + p_1)(1 + p_2)p_3]$ where $p_1$, $p_2$, and $p_3$ reflect the estimated 2015-2016, 2016-2017, and 2017-2018 average drug price increases, respectively, and (ii) the additional loan amount of $6 million that OncoMed borrowed over the period February 5, 2016 to July 21, 2016 multiplied by $[(1+p_2)p_3]$ where $p_2$ and $p_3$ reflect the estimated 2016-2017 and 2017-2018 average drug price increases, respectively.

[3] Gross profit is calculated as total revenue minus total cost of goods sold.

**Sources:**

[A] PC-ASK 053532.

[B] PC-ASK 053536.

[C] "Revolver activity.xlsx".

[D] "Copy of Fwd Buy_Onco_2016_Cycle 2_revised (003).xlsx".

[E] "Fwd Buy_Onco_2017_review011117.xlsx".

[F] "FB Inventory - as of 2.10.17.xlsx".

[G] "FORWARD BUY STATUS REPORT - 2018 CYCLE 1.xlsx".

**Exhibit 6**
**Calculation of 2018 Total But-for OncoMed EBITDA Adjusted for CareMed Purchase**

| | Actual | | | | | | | But-for | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | PCA Calculation Based on 2018 P&L Adjusted for Reduced Forward Buy of Inventory and Resulting Lower EBITDA | | |
| | PCA Calculation per January 29, 2019 Letter | | | | PCA Calculation Based on 2018 P&L | | | | | |
| | OncoMed | CareMed LDD | Total Adjusted EBITDA | | OncoMed | CareMed LDD | Total Adjusted EBITDA | OncoMed | CareMed LDD | Total Adjusted EBITDA |
| Trailing 12 Months EBITDA without DIR | $  15,657,332 | | | | $  15,198,867 | | | $  13,634,798 | | |
| DIR[1] | $  1,873,181 | | | | $  1,873,181 | | | $  1,873,181 | | |
| EBITDA Adjusted for DIR | $  13,784,151 | $  135,093 | | | $  13,325,686 | $  135,093 | | $  11,761,617 | $  135,093 | |
| CareMed LDD Transfers | $  (883,216) | $  883,216 | | | $  (883,216) | $  883,216 | | $  (883,216) | $  883,216 | |
| CareMed Other Transfers | $  (1,337,345) | | | | $  (1,337,345) | | | $  (1,337,345) | | |
| EBITDA Adjusted for CareMed | $  11,563,590 | $  1,018,309 | $  12,581,899 | | $  11,105,125 | $  1,018,309 | $  12,123,434 | $  9,541,056 | $  1,018,309 | $  10,559,365 |

**Note:**
[1] Direct and Indirect Remuneration ("DIR") fee recoupments made by Pharmacy Benefit Managers in the but-for world are assumed to be equal to those observed in the actual world.

**Sources:**
[A] January 29, 2019 Letter from Pharmacy Corporation of America to Kaveh Askari and Burt Zweigenhaft.
[B] PC-ASK 053532.
[C] PC-ASK 053536.

**Exhibit 7**
**Calculation of 2018 But-for OncoMed Purchase Price**

| | Actual | | | | | | But-for | | |
|---|---|---|---|---|---|---|---|---|---|
| | PCA Calculation per January 29, 2019 Letter | | | PCA Calculation Based on 2018 P&L | | | PCA Calculation Based on 2018 P&L Adjusted for Reduced Forward Buy of Inventory and Resulting Lower EBITDA | | |
| | OncoMed | CareMed LDD | Total Adjusted EBITDA | OncoMed | CareMed LDD | Total Adjusted EBITDA | OncoMed | CareMed LDD | Total Adjusted EBITDA |
| Trailing 12 Months EBITDA Ending 11/30/2018[1] | $ 11,563,590 | $ 1,018,309 | $ 12,581,899 | $ 11,105,125 | $ 1,018,309 | $ 12,123,434 | $ 9,541,056 | $ 1,018,309 | $ 10,559,365 |
| Multiplier[2] | 10.0 | 8.2 | - | 10.0 | 8.2 | - | 10.0 | 8.2 | - |
| Valuation before Net Debt Adjustment | $115,635,899 | $ 8,299,221 | $123,935,120 | $111,051,245 | $ 8,299,221 | $119,350,466 | $ 95,410,558 | $ 8,299,221 | $103,709,779 |
| Outstanding Debt | $(11,472,409) | $(10,546,500) | $(22,018,909) | $(11,472,409) | $(10,546,500) | $(22,018,909) | $(11,472,409) | $(10,546,500) | $(22,018,909) |
| Valuation | $104,163,490 | $ (2,247,279) | $101,916,211 | $ 99,578,836 | $ (2,247,279) | $ 97,331,557 | $ 83,938,149 | $ (2,247,279) | $ 81,690,870 |
| Percentage Interests of OncoMed Being Purchased | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% |
| Purchase Price | $ 19,270,246 | $ (415,747) | $ 18,854,499 | $ 18,422,085 | $ (415,747) | $ 18,006,338 | $ 15,528,558 | $ (415,747) | $ 15,112,811 |

*Difference between Actual 2018 P&L and But-for:*     $ 2,893,527
*Percent Reduction in But-for Purchase Price:*     *16.1%*

**Notes:**

[1] OncoMed EBITDA adjusted to account for CareMed transfers and DIR.

[2] Multiplier for OncoMed was determined using trailing 12 quarters of OncoMed EBITDA. *See* PC-ASK 046434-488, at 444-445. Multiplier for CareMed was based on the "valuation multiplier of EBITDA originally used by [OncoMed] or its Affiliates in connection with the purchase price paid for the acquisition of such business." *See* PC-ASK 046434-488, at 466. These multipliers are assumed to be the same in the actual and but-for worlds.

**Sources:**

[A] January 29, 2019 Letter from Pharmacy Corporation of America to Kaveh Askari and Burt Zweigenhaft.

[B] PC-ASK 053532.

[C] PC-ASK 053536.

[D] PC-ASK 046434-488.