IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PHARMACY CORPORATION OF AMERICA/ASKARI CONSOLIDATED LITIGATION | Civil Action No. 16-1123-RGA<br><br>CONSOLIDATED |

MEMORANDUM OPINION

Jeffrey S. Goddess, COOCH & TAYLOR P.A., Wilmington, DE; Brian C. Dunning, DUNNING RIEVMAN & DAVIES LLP, New York, NY; James Sawyer, DUNNING RIEVMAN & DAVIES LLP, Jericho, NY;

 Attorneys for Kaveh Askari, Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc. and Onco360 Holdings 3, Inc.

Brett D. Fallon, MORRIS JAMES LLP, Wilmington, DE; Christopher G. Kelly, Stosh Silivos, HOLLAND & KNIGHT LLP, New York, NY; Jeremy M. Sternberg, HOLLAND & KNIGHT LLP, Boston, MA;

 Attorneys for Pharmacy Corporation of America, Greg Weishar, Paul Jardina, and David Froesel

April 23, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court is a motion for partial summary judgment filed by Plaintiffs Kaveh Askari, Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. (collectively, "Plaintiffs"). (D.I. 153). The Court has considered the parties' briefing. (D.I. 154, 158, 163).

**I.   BACKGROUND**

Two related cases have been consolidated under the above case number. (D.I. 40).[1] The first was filed by Pharmacy Corporation of America ("PCA" or Defendant) against Plaintiff Askari, claiming a breach of a contractual non-compete provision in the Membership Interest Purchase Agreement of October 13, 2013. (D.I. 1). The second was filed by Plaintiffs seeking a declaratory judgment and claiming breach of contract under the Operating Agreement. (No. 17-870, D.I. 1). After consolidation, Plaintiffs filed a Second Amended Complaint. (D.I. 110). Plaintiffs' motion for partial summary judgment relates to the claims in Plaintiffs' Second Amended Complaint. (*See* D.I. 154 at 2-3).

The meaning of the Major Decisions clause of the Operating Agreement (§ 5.8) is at issue in Plaintiffs' partial summary judgment motion. (*Id.* at 3-4). Section 5.8 of the Operating Agreement reads:

> Actions Requiring Consent of Members.  The Members shall have no right to participate in the management of the Company.  All rights of Members pursuant to the Act are hereby disclaimed.  Notwithstanding the foregoing or anything in this Agreement to the contrary, no action shall be taken, sum expended, decision made or obligation incurred with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"), unless such Major Decision has been approved by the Members holding at least 75% of the Percentage Interests.  The Major Decisions are:

---

[1] All citations to docket items refer to Civil Action No. 16-1123 unless otherwise indicated.

>   (a)  causing the issuance of any additional Membership Interest or Equity Security to any Person;
>   (b)  causing (A) the sale, pledge, lease, or other disposition of all or any substantial portion of the assets of the Company or Subsidiaries (other than sales of inventory in the ordinary course of business), or (B) the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement);
>   (c)  enter into any Related-Party Transaction that is not specifically authorized pursuant to Section 5.9;
>   (d)  any amendment to this Section 5.8 of the Agreement; and
>   (e)  agreeing or committing, or causing any Subsidiary, to do any of the foregoing.

(D.I. 152, Ex. 2 at 21-22).

The meaning of the Loan Agreement is also at issue. (D.I. 154 at 3-4). In relevant part, the Loan Agreement reads:

>   WHEREAS, in connection with the Purchase Transaction, [Specialty] desires to enter into a financing transaction with [PCA] pursuant to which [PCA] will commit, subject to the terms and conditions set forth in this Agreement, to (i) make a term loan to [Specialty] in the amount of $6,500,000.00 (the "Term Loan") and (ii) make advances to [Specialty] up to the aggregate principal amount of $10,00,000.00 [*sic*] (the "Working Capital Loan", and together with the Term Loan, the "Loans").
>   WHEREAS, [Specialty] ha[s] agreed to secure all of its obligations under the Loans by granting to [PCA] a security interest in and lien upon all of its existing and after-acquired personal and real property.

(D.I. 155, Ex. 4 at 2). The Loan Agreement has numerous defined terms, including, "'Working Capital Loan Commitment' means $10,000,000," "'Working Capital Loan Limit' means the Working Capital Loan Commitment," and "'Working Capital Loan' has the meaning ascribed to it in the recitals." (*Id.* at A-17).

There were two amendments to the Loan Agreement. The first, dated June 5, 2015, reads, "All instances and references to the amount of the Working Capital Loan in the Loan Agreement shall be changed from $10,000,000 to $30,000,000," and the second, dated October 4, 2016, using the same verbiage, increased the amount to $64,000,000. (D.I. 152, Exs. 5 & 6).

2

The actual amount advanced pursuant to these increases at any given time is not stated in the briefing, although PCA states that it was never more than $28,600,000 before the First Call and $43,600,000 before the Second Call. (D.I. 158 at 7 n.8).[2]

The significance of the Working Capital Loans is that the amounts owing from PCA to Plaintiffs at the First Call and the Second Call was determined by a formula, which in relevant part had three variables: "trailing twelve (12) months of EBITDA," the "Valuation Multiplier," and the "Net Debt of the Company." The formula was to multiply the first two variables and then subtract the third. (D.I. 152, Ex. 2, § 9.2). The "Net Debt" of the Company was itself the sum of $6,500,000 plus "the amount of debt owed by the Company to [PCA] under the Working Capital Loan (as defined in the Loan Documents (as defined in the Purchase Agreement))"[3] minus cash and cash equivalents. (*Id*., § 1.1(b) at 7).[4]

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

---

[2] I see Defendants' expert using $28,600,000 in his calculations relating to the First Call. (D.I. 184-17 at 40 of 89; *see also* D.I. 154 at 10 n.5). I do not see $43,600,000 being used in relation to the Second Call. Instead, I see $22,018,909, referred to as "Outstanding Debt." (*Id*. at 43 of 89).

[3] The Membership Interest Purchase Agreement defines "Loan Documents" to mean "that certain loan and security agreement" (D.I. 152, Ex. 3 at 5), meaning the "Loan Agreement."

[4] Thus, if the Working Capital Loan were increased but the capital was not put to work and simply became cash on Specialty's books, it would not seem to have any effect on Net Debt since the increase in the Working Capital Loan would be offset by the increase in cash.

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The Operating Agreement provides that it is governed by Delaware law. (D.I. 152, Ex. 2, § 13.3). "In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.,* 'subject to only one reasonable interpretation.'"

4

*Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). "When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'" *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

### III. DISCUSSION

Plaintiffs "move for partial summary judgment on the threshold question of the meaning of key sections of Specialty's operating agreement relating to [Defendant's] options to purchase Specialty membership interests from [Plaintiffs] over time." (D.I. 154 at 1). Plaintiffs argue that, "under the clear and unambiguous language of the Operating Agreement and Loan Agreement," Defendant should not have increased the Working Capital Loan above $10,000,000 without the consent of 75% of the holders of Specialty membership interests. (*Id.* at 10). Because Defendant did not get consent of 75% of the membership interests to increase the Working Capital Loan, Plaintiffs ask that I rule that, "when calculating the purchase price for the First Call Right, [Defendant] could not use a Working Capital Loan amount higher than $10,000,000." (*Id.*).

Plaintiffs assert that, under the clear and unambiguous language of § 5.8 of the Operating Agreement, increasing the Working Capital Loan limit was a Major Decision. (*Id.* at 13). Section 5.8(b)(B) of the Operating Agreement states that a Major Decision includes "the granting

5

or incurrence of any lien, . . . security interest or other similar encumbrance on all or any substantial portion of the assets of the Company." (D.I. 152, Ex. 2 at 21). A Major Decision requires consent of at least 75% of the interest holders. (*Id.*). Plaintiffs interpret the language of § 5.8 to include as Major Decisions "[i]ncreases of the Working Capital Loan Limit from $10,000,000 to $64,000,000," which "increased the amount of the security interest and lien on Specialty's assets." (D.I. 163 at 2). Plaintiffs therefore conclude that "in order to increase the amount of a secured loan such as the Working Capital Loan, 75% of Specialty's membership interests had to agree to do so." (D.I. 154 at 15). It is undisputed that there was no such consent. (D.I. 184, ¶ 28).

I do not agree with Plaintiffs that the language of the Operating Agreement is unambiguous. I am not convinced that Plaintiffs' reading of the language of § 5.8 of the Operating Agreement is the only reasonable reading of the language. Section 5.8 instructs that Major Decisions include "the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement)." (D.I. 152, Ex. 2 at 21). Did the two loan amendments do any of these things? It is not clear to me that they did.

First, the relevant language suggests that Major Decisions are limited to the creation of encumbrances on a substantial portion of Specialty's assets. If that is the case, the amendments did not change anything. First, the Loan Agreement clearly states that Defendant was granted a "security interest in and lien upon all of [Specialty's] existing and after-acquired personal and real property." (D.I. 155, Ex. 4 at 2). Thus, while increases in the Working Capital Loan would increase the amount that was owed by Specialty to PCA, the two loan amendments do not

"grant" or "incur" a lien or security interest. PCA already had a lien or security interest in everything Specialty had. It may not be entirely analogous, but if I took out a revolving line of credit and pledged my home as security, would I be granting or incurring an encumbrance every time I made another draw on the line of credit? It is not clear to me that I would.

Second, the language of neither amendment to the Loan Agreement suggests that the increases to the Working Capital Loan "granted" or "incurred" an encumbrance. The language of the First Amendment instructs that, "All instances and references to the amount of the Working Capital Loan in the Loan Agreement shall be changed from $10,000,000 to $30,000,000, included any such analogous change for references to such amount in 'Alpha' format." (D.I. 155, Ex. 10 at 2). The Second Amendment contains the same language, but changes the amounts to be "from $30,000,000 to $64,000,000." (D.I. 155, Ex. 11 at 2). These Amendments simply substitute one number for another, and do not grant, incur, or otherwise create an encumbrance upon Specialty's assets.

Third, Defendants suggest a different interpretation of the disputed language, which, essentially, is that the $10,000,000 was not an upper limit or cap, but that it was contractual commitment to make up to $10,000,000 available. In other words, the agreement was a promise by PCA to make millions of dollars available to grow the business, not a promise to limit PCA's loans to Specialty. Defendants imply, and it seems reasonable to me as a general principle, that the more capital made available to Specialty, the greater the opportunity was for Specialty to grow, with generally more upside for Plaintiffs when the time came for the First and Second Calls.

I therefore do not understand the language of the Operating Agreement to unambiguously mean that the amendments to the Loan Agreement that increased the Working Capital Loan

7

beyond $10,000,000 were Major Decisions requiring the consent of 75% of interest holders.[5] As such, I cannot make any pretrial ruling in Plaintiffs' favor and I cannot rule as a matter of law that "when calculating the purchase price for the First Call Right, [Defendant] could not use a Working Capital Loan amount higher than $10,000,000." (D.I. 154 at 10).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (D.I. 153) is DENIED. An accompanying order will issue.

---

[5] Because the language of the Operating Agreement is unclear, at trial I will consider parol evidence to understand the intent of the parties. *See Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991).

8