IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PHARMACY CORPORATION OF AMERICA/ASKARI CONSOLIDATED LITIGATION | Civil Action No. 16-1123-RGA<br><br>CONSOLIDATED |

## TRIAL OPINION

Jeffrey S. Cianciulli, WEIR & PARTNERS LLP, Wilmington, DE; Walter Weir, Jr., Steven E. Angstreich, Amy R. Brandt, Andrew Park WEIR & PARTNERS LLP, Philadelphia, PA; James Sawyer, Jericho, NY;

> Attorneys for Kaveh Askari, Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc.

Brett D. Fallon, MORRIS JAMES LLP, Wilmington, DE; Christopher G. Kelly, Stosh Silivos, HOLLAND & KNIGHT LLP, New York, NY; Jeremy M. Sternberg, HOLLAND & KNIGHT LLP, Boston, MA;

> Attorneys for Pharmacy Corporation of America

September 8, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

This case is the consolidation of two related lawsuits.  In one, Plaintiffs Kaveh Askari and Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. ("the Onco360 holding companies") bring suit against Defendant Pharmacy Corporation of America ("PCA").  In the other, PCA brings suit against Askari individually.  The Court held a three-day virtual bench trial on July 6-8, 2020.  (D.I. 218, 219, 220).  I have considered the parties' post-trial briefing.  (D.I. 217, 221, 222).  This opinion constitutes my findings of fact and conclusions of law.

# I.     BACKGROUND

In 1991 Plaintiff Askari owned and operated a retail pharmacy in Brooklyn.  (D.I. 218 at 22:7-11).  Askari opened his second retail pharmacy, Manhasset Park Pharmacy, in 1998.  (*Id.* at 22:12-20).  Askari began his specialty pharmacy company, which went by the corporate name of Sina Drug Corp., in 2002.  (*Id.* at 23:8-11).  It was located in the basement of Manhasset Park Pharmacy.  (*Id.* at 23:15-18).  It did business as "OncoMed Pharmaceutical Services" (D.I. 110 at ¶ 17).  OncoMed focused on oncology drugs.  (D.I. 218 at 23:12-22).  Burt Zweigenhaft joined OncoMed in 2006.  (*Id.* at 23:23-24:2).  Zweigenhaft obtained a minority ownership interest.  In late 2012 and early 2013, Askari and Zweigenhaft began to negotiate with PharMerica for the sale of OncoMed.  (*Id.* at 25:2-7).  Askari, Zweigenhaft, and the Onco360 holding companies entered into the Membership Interest Purchase Agreement ("MIPA") with PCA.  (D.I. 1-3, hereinafter "MIPA").  The MIPA, dated October 10, 2013, provided that PCA would purchase 37.5% of the membership interests in OncoMed (which then became "OncoMed Specialty," hereinafter "Specialty") from the Onco360 holding companies for $7.8 million.  (MIPA at 1, 9; D.I. 218 at 157:7-11).

Section 7.2(a) of the MIPA contains a restrictive covenant, which reads:

> Restrictive Covenants. (a) To assure that the Buyer will realize the benefits of the transactions contemplated hereby, and as part of the value to be received by the Buyer in connection with such transactions, for a period of five (5) years from and after the closing date (the "Non-Compete Period"), none of the Selling Shareholders nor the Sellers shall own, manage, operate or control, or otherwise become involved in, whether as an officer, director, employee, investor, partner, stockholder, trustee, consultant, agent, representative, broker, promoter, or otherwise, in the United States of America, any business that competes with the Business (the "Competitive Business"); provided, however, that (i) the foregoing is not intended to prohibit or restrict the ownership, directly or indirectly by any of the Selling Shareholders or the Sellers, of up to 2% of the equity interests in any Competitive Business, (ii) no owner of 2% or less of the outstanding equity interests of any entity shall be deemed to engage, solely by reason thereof, in its business, (iii) Kaveh Askari may engage in the practice of pharmacy pursuant to the New York Education Law as long as he does not engage in a Competitive Business; and (iv) ownership of a retail pharmacy by Kaveh Askari shall not be deemed a violation of this paragraph.

(MIPA § 7.2(a)).

The parties also entered into the Operating Agreement, dated December 6, 2013.  (D.I. 155-3, hereinafter "OA").  The Operating Agreement sets out PCA's purchase rights for the remainder of the shares in Specialty.  Askari and Zweigenhaft owned 62.5% after the 2013 closing.  (OA at 1).  Thirty-six months after entering into the Operating Agreement, PCA had the right to purchase up to 30.5% of the membership interests owned directly or indirectly by Askari and 13.5% owned directly or indirectly by Zweigenhaft (the "First Call").[1]  (OA § 9.1(a)).  Sixty months after entering into the Operating Agreement, PCA had the obligation to purchase all remaining membership interests within 60 days (the "Second Call").  (OA § 9.1(b)).  The purchase price at each call was to be determined by a formula set out in § 9.2(a):

> Determination of Purchase Price. (a) The purchase price for the Membership Interest purchased pursuant to the provisions of Section 9.1(a), 9.1(b), or 9.1(c) shall be an amount equal to (A) (i) the product of (x) the trailing twelve

---

[1] The 13.5% represented all of Zweigenhaft's remaining shares.  (D.I. 218 at 28:11-20).  The 30.5% would leave Askari with 18.5% of the shares.  (*Id.* at 52:3-5).

(12) months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net Debt of
the Company, less (iii) the purchase price for any acquisition of assets, business or
Person by the Company, unless such amount is included in the calculation of Net
Debt, multiplied by (B) the Percentage Interests of the Company being purchased.

(OA § 9.2(a)).

Section 1.1 of the Operating Agreement defines "Net Debt" as "an amount equal to (i)

$6.5 million plus (ii) the amount of debt owed by [Specialty] to [PCA] or its Affiliates under the

Working Capital Loan (as defined in the Loan Documents (as defined in the Purchase

Agreement)) minus (iii) the amount of the [Specialty's] cash and cash equivalents."  (OA § 1.1).

The Operating Agreement gave control of Specialty to a PCA-appointed board, and it

allowed Plaintiff and Zweigenhaft to attend board meetings as non-voting observers.  (OA § 5.1).

Section 5.8 of the Operating Agreement provides that any action that constitutes a "Major

Decision" must be approved by at least 75% of the membership interests.  (OA § 5.8).  Section

5.8 reads:

> Actions Requiring Consent of Members.  The Members shall have no right
> to participate in the management of the Company.  All rights of Members pursuant
> to the Act are hereby disclaimed.  Notwithstanding the foregoing or anything in this
> Agreement to the contrary, no action shall be taken, sum expended, decision made
> or obligation incurred with respect to a matter within the scope of any of the major
> decisions enumerated below (the "Major Decisions"), unless such Major Decision
> has been approved by the Members holding at least 75% of the Percentage Interests.
> The Major Decisions are:
> (a)  causing the issuance of any additional Membership Interest or Equity
> Security to any Person;
> (b)  causing (A) the sale, pledge, lease, or other disposition of all or any
> substantial portion of the assets of the Company or Subsidiaries (other than sales of
> inventory in the ordinary course of business), or (B) the granting or incurrence of
> any lien, mortgage, charge, pledge, security interest or other similar encumbrance
> on all or any substantial portion of the assets of the Company or Subsidiaries, except
> as contemplated by the Loan Documents (as defined in the Purchase Agreement);
> (c)  enter into any Related-Party Transaction that is not specifically
> authorized pursuant to Section 5.9;
> (d)  any amendment to this Section 5.8 of the Agreement; and
> (e)  agreeing or committing, or causing any Subsidiary, to do any of the
> foregoing.

(OA § 5.8).

Section 5.9 of the Operating Agreement defines Related-Party Transactions.  Section 5.9

reads:

> Related Party Transactions. Any lease, contract or agreement or any other transaction or arrangement involving payments or remuneration between the Company and any Member or an Affiliate of a Member (a "Related-Party Transaction") must be disclosed to the Board of Managers and each Board Observer and receive approval of the Board of Managers.  The Company is specifically authorized to: (i) engage in any transaction that involves a Member or an Affiliate of a Member providing services, equipment or supplies to the Company in exchange for consideration for such services, equipment or supplies that is no greater than an amount the Company would pay to obtain such services, equipment or supplies from a Third Party, as reasonably determined by the Board of Managers; (ii) to participate in any of the joint purchasing arrangements to which any of the members or their Affiliates are a party; (iii) to engage the PharMerica Member or any of its Affiliates for the activities set forth on the Shared Services Agreement substantially in the form attached hereto as Exhibit B; and (iv) to obtain debt financing from an Affiliate of the PharMerica Member on terms that are equivalent to those available to such Affiliate of the PharMerica Member in an arm's-length transaction with a Third Party providing debt financing to such Affiliate of the PharMerica Member.

(OA § 5.9).  The Operating Agreement defines PCA as the "PharMerica Member."  (OA

§ 1.1).

The parties also entered into a Loan Agreement, dated December 6, 2013.  (D.I. 155-4,

hereinafter "LA").  In relevant part, the Loan Agreement reads:

> WHEREAS, in connection with the Purchase Transaction, [Specialty] desires to enter into a financing transaction with [PCA] pursuant to which [PCA] will commit, subject to the terms and conditions set forth in this Agreement, to (i) make a term loan to [Specialty] in the amount of $6,500,000.00 (the "Term Loan") and (ii) make advances to [Specialty] up to the aggregate principal amount of $10,00,000.00 [sic] (the "Working Capital Loan", and together with the Term Loan, the "Loans").

> WHEREAS, [Specialty] ha[s] agreed to secure all of its obligations under the Loans by granting to [PCA] a security interest in and lien upon all of its existing and after-acquired personal and real property.

4

(LA at 1).  The Loan Agreement defines "Working Capital Loan Limit" to mean the "Working

Capital Loan Commitment."  (LA at A-17).

When the deal closed in December 2013, the Working Capital Loan was set at

$10,000,000 per the Loan Agreement.  Specialty thereafter drew down on this loan periodically

until it reached a loan balance of $10,000,000 as of June 5, 2015.  (D.I. 219 at 485:16-24).  The

Loan Agreement was amended on June 5, 2015 to increase the Working Capital Loan from

$10,000,000 to $30,000,000.  (D.I. 155-10 at § 1.1).  Specially continued to draw down

incrementally on the loan, and the Loan Agreement was amended a second time on October 4,

2016 to increase the Working Capital Loan from $30,000,000 to $64,000,000.  (D.I. 219 at

485:25-487:4; D.I. 155-11 at § 1.1).

Askari was advised of both increases to the Working Capital Loan.  (D.I. 218 at 35:2-

36:22; 90:15-94:14).  In regard to the first increase, Askari's response was to ask what the

business reason for the increase was.  (*Id*. at 91:22-92:10).  Askari testified that he "objected" to

the increase (*id.* at 92:11-15), but to the extent that could be interpreted to mean something more

than he asked a question about it, I reject the testimony as lacking credibility considering that it

is completely unsupported by any documentary or other corroborating evidence.

PCA exercised its First Call right on December 7, 2016 to purchase 30.5% of the

membership interests owned by Askari, and all remaining interests owned by Zweigenhaft.  (D.I.

155-9).  At that time, the Working Capital Loan balance was $28,600,000.  (D.I. 219 at 486:3-5).

Net Debt was thus calculated to be $28,039,289, and the purchase price was - $7,463,707.  (D.I.

155-9 at 5).  Because the purchase price was calculated to be a negative number, PCA tendered

$1 for the purchased interests at the First Call.  (*Id.* at 1).  PCA exercised its Second Call right in

January 2019 to purchase all remaining membership interests owned by Askari.  (D.I. 162-7).  At

the time of the Second Call, the Working Capital Loan balance was about $12,079,000.  (D.I. 219 at 507:16-19).

Askari and Zweigenhaft were paid $7,800,000 for 37.5% of the membership interests at the closing in December 2013.  (MIPA at 9).  Despite the fact that Askari was offered only $1 for his shares at the First Call, the purchase price for his remaining shares was $18,854,499 at the Second Call.  (D.I. 162-7 at 3).  Thus, Askari's overall return for the 49% of shares that he had retained after the December 2013 closing was $18,854,500.  Thus, the return on the retained shares was nearly twice that of the return on the shares sold at closing.

The instant suit is a consolidation of two related cases.  PCA filed the first against Askari, claiming a breach of the restrictive covenant of the MIPA.  (D.I. 1).  Askari and the Onco360 holding companies filed the second seeking a declaratory judgment and claiming breach of contract under the Operating Agreement.  (No. 17-870, D.I. 1).  After consolidation, Askari and the Onco360 holding companies filed a Second Amended and Supplemental Complaint.  (D.I. 110).

## II.  LEGAL STANDARD

"Delaware follows the objective theory of contracts," which means that "a contract's construction should be that which would be understood by an objective, reasonable third party." *MBIA Insurance Corp. v. Royal Indemnity. Co.*, 426 F.3d 204, 210 (3d Cir. 2005); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

"When the [contract] provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity."  *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).  "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide

than a knowledge of the simple facts on which, from the nature of language in general, its

meaning depends.'"  *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.*,

616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App.

1983)).

 "In construing an ambiguous contractual provision, a court may consider evidence of

prior agreements and communications of the parties as well as trade usage or course of dealing."

*Eagle Industries,* 702 A.2d at 1233; *see Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del.

1991).  "[T]he contracting parties' course of conduct may [also] be considered as evidence of

their intended meaning of an ambiguous contractual term."  *AT&T Corp. v. Lillis*, 970 A.2d 166,

172 (Del. 2009).

 "Because it is hornbook law that (when no fiduciary relationship exists) the party alleging

a breach of contract bears the burden of proving the elements of a breach of contract, the burden

of proving the meaning of ambiguous terms in the contract is on the party alleging the breach."

*Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 102 (3d Cir. 2001)

(substantially cleaned up).  "[T]he party seeking judicial enforcement of [its] interpretation of an

ambiguous contract . . . bear[s] the burden of proof."  *Lillis v. AT&T Corp.*, 2008 WL 2811153,

at *4 (Del. Ch. July 21, 2008).

 "A duty of good faith and fair dealing is implied in every contract."  *Connelly v. State

Farm Mutual Automobile Ins. Co.*, 135 A.3d 1271, 1274 (Del. 2016).  "The implied covenant of

good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle

developments or contractual gaps that the asserting party pleads neither party anticipated."

*Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).  Only when the party "asserting the implied

covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the

fruits of the bargain" will the Court imply contract terms.  *Id.* at 1126.  "General allegations of bad faith conduct are not sufficient.  Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract."  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

## III.   DISCUSSION

### A.  Plaintiffs' Claims

Plaintiffs' complaint (D.I 110) details six counts.  The remaining claims[2] of Counts I and II allege that Defendant breached the Operating Agreement in exercising the First Call because: (1) the purchase price was incorrectly calculated because of a "Net Debt" input that exceeded the $16,500,000 limit (effectively) set by the Operating Agreement and Loan Agreement; and (2) the purchase price was incorrectly calculated because EBITDA did not include "revenues derived from shared services."  As a basis for the first theory, the allegations are that "Net Debt" could not be greater than $16,500,000 because the Operating Agreement (in conjunction with the Loan Agreement) prohibited such a "Major Decision" without consent of 75% of the membership interests, and there was no such consent.  (D.I. 110 at ¶¶ 79-99).

Counts III and IV relate to the Second Call and allege that Defendant breached the Operating Agreement because (1) the First Call breach means that the First Call is null and void, and therefore the Second Call is also null and void, meaning that Askari and Zweigenhaft continue to own 62.5% of the membership interest in Specialty; or, in the alternative, (2) the First Call breach means that Defendant had to purchase 62.5% of the membership interests at the Second Call.  These Counts also claim that the purchase price was incorrectly calculated because

---

[2] Plaintiffs abandoned the claim that Defendant breached the Operating Agreement by failing to purchase a valid percentage of membership interests.  (D.I. 196 at 2 n.1).

"revenues derived from shared services" were not included in the EBITDA calculation.  (*Id.* at ¶¶ 100-09)

Count V involved a breach of contract claim against three individual Defendants.  (*Id.* at ¶¶ 110-20).  I granted summary judgment in favor of those Defendants.  (D.I. 194).

Count VI is a claim of breach of the covenant of good faith and fair dealing based on the increase of the Working Capital Loan.  (D.I. 110 at ¶¶ 121-28).

Defendant filed a motion *in limine* which raised a dispute between the parties about the scope of issues for trial as exceeding Plaintiffs' complaint.  (D.I. 184-18).  In resolving that motion, I identified two contract issues in the complaint for trial.  (D.I. 196).  The first was whether the increases of the Working Capital Loan were "Major Decisions" within the meaning of the Operating Agreement.  (*Id.* at 3).  The second was whether "revenues derived from shared services" were incorrectly calculated in the purchase price.  (*Id.*).  Plaintiff included in the Proposed Pretrial Order various allegations relating to adjustments to EBITDA based on events in 2013 and 2014, inclusion of non-operating expenses, other EBITDA errors, issues about an Intercompany Receivable, issues about related-party transactions, Board of Managers' meetings without notice, and an abandoned Business Plan.  (D.I. 184 at ¶¶ 60-64, 73-78).  I did not see how any "of [those] asserted factual issues [were] relevant to the actual disputed factual and legal issues as framed by the complaint" and thus "excluded [them] from the trial as irrelevant to the disputed issues."  (D.I. 196 at 4).  Plaintiffs filed a motion for reargument (D.I. 197), which I denied.  (D.I. 211).

1.  *Are increases of the Working Capital Loan "Major Decisions" within the meaning of the Operating Agreement?*

a.  Section 5.8(b)

The Operating Agreement defines Major Decisions in § 5.8.  At summary judgment, Plaintiffs argued that increasing the Working Capital Loan was a Major Decision under the clear and unambiguous language of § 5.8(b)(B) because it "obviously increased the amount of the security interest and lien on Specialty's assets." (D.I. 163 at 2).  I, however, determined that the language of § 5.8 was not clear and unambiguous because it was not apparent that either of the loan amendments "grant[ed] or incurre[d] . . . any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement)."  (D.I. 192 at 6; OA § 5.8(b)(B)).

Plaintiffs argue that § 5.8 was intended to "protect the sellers from dilution by PCA in a buyout," as the sellers were no longer managing Specialty.  (D.I. 217 at 6; D.I. 222 at 1).  Thus, Plaintiffs contend that the Working Capital Loan could not be raised higher than $10,000,000, as set out in the Loan Agreement.  (D.I. 217 at 6).  Plaintiffs therefore conclude that § 5.8 must be interpreted to "prohibit the very dilutive practices employed by PCA."  (*Id.* at 7).  Plaintiffs also assert that the language of § 5.8 is far broader than Defendant's reading of the provision.  (*Id.* at 9).  Plaintiffs argue that the language "no action shall be taken, sum expended, decision made or obligation incurred with respect to a matter within the scope of any of the major decisions enumerated" expands the meaning of Major Decisions beyond those expressly enumerated. (*Id.*).  Plaintiffs further argue that because the language of § 5.8(b)(B) refers to "any" lien or security interest, it does not apply only to "new" ones.  (*Id.* at 10).  Plaintiffs assert that, when the Working Capital Loan was increased, it also increased the amount of PCA's lien on Specialty's assets, and thus each increase was a Major Decision.  (D.I. 222 at 2-3).

Defendant provides an alternative understanding of the provision. Defendant argues that the loan amendments merely increased the amount that was owed by Specialty to Defendant. (D.I. 221 at 6). Thus, Defendant asserts that, because the "increases [were] 'within the scope of the original security interest and Lien,'" they did not grant or incur a lien or other security interest. (*Id.* at 6-7). Defendant contends that the loan amendments merely "altered the borrowing limit under the [Working Capital Loan], but everything else, including the previously granted security interest, explicitly remained unchanged." (D.I. 221 at 7; *see* D.I. 155-10 at § 2.1, D.I. 155-11 at § 2.1).

Defendant also argues that $10,000,000 Working Capital Loan as set out in the Loan Agreement was "merely a reflection of [Defendant's financial] commitment" to Specialty, rather than being an absolute cap.[3] (D.I. 221 at 8). Mr. Weishar, PCA's CEO during the relevant period, testified at trial that Defendant was concerned that Askari and Zweigenhaft would "think[] [Defendant] had an open checkbook." (D.I. 219 at 400:12-24). Mr. Weishar also testified by deposition that that Defendant was "always capable of providing more capital as [Specialty] needed it." (*Id.* at 260:14-15). The Working Capital Loan "was only limited by what [Defendant was] willing to provide." (*Id.* at 260:11-12). Ms. Rose, Specialty's controller, testified that the increases in the Working Capital Loan provided capital that was used to "support the growth" of Specialty. (*Id.* at 481:20-21, 482:23-24). Defendant's expert, Dr. Mortimer, testified that increasing the loan so that Specialty could implement an extensive "forward-buy strategy" benefitted Specialty and Plaintiffs by increasing Specialty's profitability

---

[3] The Loan Agreement's language is that "[PCA] will *commit* . . . to . . . (ii) make advances to [Specialty] up to the aggregate principal amount of $10,00,000.00 [sic]." (emphasis added).

and thus Plaintiffs' buyout price at the Second Call by approximately $2,500,000 to $2,900,000. (D.I. 220 at 587:13-21; 590:3-6).

While one of the purposes of § 5.8 was to protect the interests of the sellers, it does not follow that Plaintiffs' interpretation of § 5.8(b)(B) is correct.  Plaintiffs have not met their burden of proving the meaning of the ambiguous language of § 5.8(b)(B).  Plaintiffs broad reading of § 5.8 is counterintuitive.  The provision's language—"The Major Decisions are:"—clearly states that the Major Decisions must be within the bounds of the enumerated actions, not beyond those bounds.  Further, in arguing that the language of § 5.8(b)(B) is not limited to "new" security interests, Plaintiffs do not explain how their understanding of "granting" or "incurring" a lien or security interest, as expressed in the provision, applies to the loan amendments.  Similarly, Plaintiffs' argument that the increase in the Working Capital Loan increased the lien on Specialty's assets does not address how the loan increase "grants" or "incurs" a lien within the meaning of the provision.  There is also no language in the loan amendments themselves that suggests that they grant or incur an encumbrance, and Plaintiffs do not argue otherwise.

Based on the record before me, Plaintiffs have not proven that the increases in the Working Capital Loan were Major Decisions within the scope of § 5.8(b)(B).  If anything, the record suggests the opposite.  First, the amendments to the Loan Agreement explicitly state that only the amount of the loan in the Loan Agreement is to change, and that otherwise "the provisions of the Loan Agreement shall remain in full force and effect with no amendment or modification thereto other than as set forth herein."  (D.I. 155-10 at § 1.1, § 2.1; D.I. 155-11 at § 1.1, § 2.1).  The Loan Agreement granted Defendant "a security interest in and lien upon all of [Specialty's] existing and after-acquired personal and real property," and the amendments seemingly continued to be secured by that same encumbrance.  (LA at 1).  Second, the testimony

of Defendant's witnesses supports the notion that the intent of the Working Capital Loan was to allow Defendant to limit its commitment to loan money to Specialty to $10,000,000, not to prevent it from lending more than $10,000,000 to Specialty.  Generally speaking, the more money PCA was willing to put into Specialty, the greater the opportunity for profit and a bigger payoff for Plaintiffs at the time of the First and Second Calls. But if for some reason Specialty had become a money pit, PCA's exposure was limited by contract.  Third, the parties' conduct at the time of the first Working Capital Loan amendment is consistent with Defendant's interpretation, not Plaintiffs'.  Defendant matter-of-factly advised Askari of the amendment. Askari did not raise legal or any other objections to it, although he did want to know the business reasons for it.  And, when he asked for the business reasons, Defendant provided it – to fund the forward buy strategy.  The parties' conduct during and immediately after the time of the first Working Capital Loan amendment was that nothing out of the ordinary had taken place, and that supports Defendant's reading of § 5.8(b).

Thus, I do not find that the Working Capital Loan amendments breached subsection (b) of the Major Decision provision.

b.   Section 5.8(c)

Section 5.8(c) of the Operating Agreement defines as a Major Decision "enter[ing] into any Related-Party Transaction that is not specifically authorized pursuant to Section 5.9." Plaintiffs argue that the increases in the Working Capital Loan were Related-Party Transactions that were not specifically authorized under § 5.9 and therefore were Major Decisions under § 5.8(c).  (D.I. 217 at 10).  I am not sure why Plaintiffs do so.  After considering the allegations in Plaintiffs' complaint and reviewing the pretrial order to resolve a motion *in limine*, I explicitly excluded from the trial "issues about related-party transactions" as irrelevant "to the actual

13

disputed factual and legal issues as framed by the complaint." (D.I. 196 at 4). Plaintiffs moved

for reargument on that decision, broadly asserting that the paragraphs of the proposed pretrial

order I excluded were related to the improper increase of the Working Capital Loan. (D.I. 198 at

5). Plaintiffs did not argue then, as they do now, that "the entirety of § 5.8 is at the heart of this

case" and that their complaint sufficiently put Defendant on notice that they were alleging breach

of § 5.8(c). (D.I. 222 at 3-5). It is unfair to Defendants that Plaintiffs continue to advance a

theory of breach of § 5.8(c) after I precluded it from trial.

       Even if I had not excluded the issue of related-party transactions from trial, Plaintiffs

have not proven that the increases in the Working Capital Loan caused Specialty to "enter into

any Related-Party Transaction." Plaintiffs' argument that the increases to the Working Capital

Loans were unauthorized Related-Party Transactions is merely a conclusory recitation of the

language of § 5.8(c) and § 5.9. (*See* D.I. 217 at 2, 10; D.I. 222 at 3). Plaintiffs offer no

argument as to the plausibility of their interpretation. (*See id.*). As previously expressed, I do

not understand the amendments to the Loan Agreement to do anything other than increase the

amount of the Working Capital Loan. This means that the increases to the Working Capital

Loan merely amended the Loan Agreement that Specialty had previously entered into with

Defendant, but the increases did not themselves cause Specialty to "enter" into an agreement or

other transaction.

       Therefore, even if related-party transactions were still at issue in the instant case,

Plaintiffs have not met their burden of proving that increases to the Working Capital Loan were

Major Decisions under § 5.8(c). Thus, Plaintiffs have not proven that Defendant breached

§ 5.8(c) by increasing the Working Capital Loan without approval of 75% of the membership

interests. Plaintiffs therefore have not proven that the purchase price was incorrect for including

a Net Debt that was higher than the $6,500,000 Term Loan plus the original $10,000,000

Working Capital Loan.

> 2.    *Was the purchase price incorrectly calculated because EBITDA did not include "revenues derived from shared services"?*

Plaintiffs argue that Defendant incorrectly calculated the purchase price at the First Call

because EBITDA did not include revenues derived from services shared between Specialty and

Defendant.  (D.I. 217 at 2, 5, 7).  At trial, however, Plaintiffs did not offer anything useful to

prove their case on shared services.  (*See* D.I. 220 at 629:8-13).  Plaintiffs' post-trial briefing

similarly expresses only their conclusory claim that EBITDA was miscalculated for failing to

include shared services revenue, but does not show how or why that is.  (*See* D.I. 217 at 2-7).

While it was not PCA's burden to do so, PCA called Ms. Rose, the company's controller and a

very credible and convincing witness, who testified at trial that the shared services revenue was

properly included in EBITDA and that those calculations were subject to both internal and

external auditing for accuracy.  (D.I. 219 at 500:16-501:6, 503:7-20, 504:21-505:11, 519:25-

520:11; D.I. 220 at 552:2-7).  Thus, Plaintiffs have not met their burden of showing that revenues

derived from shared services were improperly excluded from the EBITDA calculation.

> 3.    *Did Defendant breach the Operating Agreement?*

Plaintiffs have not proven by a preponderance of the evidence that Defendant breached

the Operating Agreement by calculating an incorrect purchase price at the First Call.  Because

Plaintiffs have not proven that Defendant breached the Operating Agreement in calculating the

purchase price at the First Call, Plaintiffs have not shown that the First Call was null and void.

Therefore, Plaintiffs have not shown that the Second Call was null and void or that the purchase

price and membership interest percentages were improperly calculated at the Second Call.

Plaintiffs thus have not met their burden of proving that the Second Call breached the Operating Agreement.

4.      *Did Defendant breach the implied covenant of food faith and fair dealing?*

Plaintiffs claim that Defendant breached the implied covenant of good faith and fair dealing by increasing the Working Capital Loan to drive down the purchase price at the First Call.  (D.I. 110 at ¶ 126; D.I. 217 at 15).  Plaintiffs argue against Defendant's contention that the reason why Defendant increased the Working Capital Loan was to benefit Specialty (and consequently both Plaintiffs and PCA) by increasing operating capital and implementing a forward-buy strategy.  (D.I. 217 at 15-16).  Other than the fact that the purchase price at the First Call was calculated to be negative number (with the result that PCA offered Plaintiffs $1 for their First Call shares), Plaintiffs have not offered any evidence of Defendant's breach of an implied covenant or of any motivation to harm the business or cause losses or to do anything else that would negatively impact all of the owners of Specialty, not just Plaintiffs.

Furthermore, Plaintiffs do not specify what they believe the implied covenant was supposed to be.  To sufficiently allege a breach of an implied covenant, Plaintiffs "must allege a specific implied contractual obligation and allege how the violation of that obligation denied the [Plaintiffs] the fruits of the contract."  *Kuroda*, 971 A.2d at 888.  Generally alleging bad faith conduct is not enough.  *See id.*  Thus, Plaintiffs' failure to identify a specific implied obligation is alone sufficient to determine that Plaintiffs have not met their burden of proving that Defendant breached that unspecified implied covenant.

Plaintiffs' briefing suggests that an implied covenant in the Operating Agreement could be for Defendant to not purposefully "drive down the purchase price" at the First Call.  (D.I. 217

at 15).  Even if this were a properly pleaded implied covenant, Plaintiffs have not met their

burden of proving that Defendant breached it.

Contrary to Plaintiffs' assertion, the record reflects that Defendant did not act in bad faith

when increasing the Working Capital Loan.  Mr. Weishar testified, by deposition, that

"everything" Defendant "did was an attempt to drive EBITDA and the business" and that

Defendant increased the loan because it "felt more capital was needed to drive the earnings of the

company."  (D.I. 219 at 263:13-18; *see id.* at 265:22-266:3, 409:11-16).  Mr. Weishar also

testified at trial that the growth of Specialty "demanded certain amount of expenditures that were

requiring [Defendant] to increase the level of working capital," something he considered was

"totally in line with the transaction."  (*Id.* at 405:4-11).  Ms. Rose also testified that the increase

of the Working Capital Loan was "to support the growth of the business to increase [Specialty's]

inventory."  (*Id.* at 482:23-24).

Dr. Mortimer demonstrated how Defendant's actions of increasing the Working Capital

Loan to provide Specialty with more capital to implement a forward-buy strategy benefitted both

Specialty and Plaintiffs.  (D.I. 220 at 587:13-21).  Dr. Mortimer calculated Specialty's EBITDA

in a hypothetical world where Specialty did not have access to funds in excess of the original

$10,000,000 Working Capital Loan to implement a forward-buy strategy.  (*Id.* at 578:12-

580:22).  Dr. Mortimer determined that, had Specialty been unable to continue the forward-buy

strategy after reaching a Working Capital Loan drawdown balance of $10,000,000, Specialty's

EBITDA during the period leading up to the First Call would have been approximately $700,000

less than what it actually was.  (*Id.* at 580:16-581:20).  When the lower EBITDA is taken into

account with a Working Capital Loan capped at $10,000,000 the purchase price formula still

yields a negative value at the First Call.  (D.I. 221, Ex. A).  I am satisfied, and therefore find, that

17

had the Working Capital Loan never exceeded $10,000,000, the amount that would have been tendered to Plaintiffs at the First Call was the nominal $1 that was actually tendered.

Moreover, Dr. Mortimer testified that Specialty's borrowing under the increased Working Capital Loan substantially increased Plaintiffs' payout at the Second Call. (D.I. 220 at 587:13-21). This is because, as Dr. Mortimer testified, the forward buys have continuing benefits in future years. (D.I. 220 at 572:20-575:13; 586:5-18). Dr. Mortimer calculated that the forward-buy strategy that Specialty was able to implement because of the increased Working Capital Loan actually increased the purchase price at the Second Call by $2,893,527 over what it would have been had Specialty not borrowed in excess of $10,000,000. (*Id.* at 586:19-587:21; 590:3-6; D.I. 221, Ex. B).

Assuming that the implied covenant was for Defendant to not purposefully "drive down the purchase price," Defendant's increases to the Working Capital Loan were not a violation of that implied covenant. (D.I. 217 at 15). Defendant has shown that, while the increases may have resulted in a nominal payout at the First Call, they actually benefitted Plaintiffs substantially at the Second Call. Multiple witnesses testified that this business strategy was the reason for increasing the loan. Plaintiffs have shown little to counter that other than their frustration with the purchase price at the First Call. That is not enough to show that Defendant acted to purposefully decrease the purchase price. Plaintiffs therefore have not met their burden of proving that Defendant breached the implied covenant of good faith and fair dealing when it increased the Working Capital Loan above $10,000,000.

## B. Defendant's Claims

Defendant claims that Askari breached the restrictive covenant, § 7.2(a), of the MIPA. (D.I. 1 at ¶ 25-26; D.I. 221 at 18). The restrictive covenant prevents Askari, for five years after

the closing date, from engaging in any business that competes with Specialty in providing

"specialty pharmacy services . . . including the provision of oncology pharmaceuticals." (MIPA

at 1, § 7.2(a)). The restrictive covenant, however, specifically provides that Askari may "engage

in the practice of pharmacy . . . as long as he does not" engage in a business that competes with

Specialty by providing specialty pharmacy services, and that Askari may own a retail pharmacy.

(MIPA § 7.2(a)(iii)-(iv)).

      Defendant argues that Askari sold oncology drugs in competition with Defendant during

the non-compete period, thus violating the restrictive covenant. (D.I. 221 at 18). Defendant

asserts that Askari was covertly operating Alegria Pharmacy Services, a specialty pharmacy, to

deliver these oncology drugs, and had filled prescriptions for cancer medications with delivery

tickets bearing the Alegria name. (*Id.* at 19).

      At trial, Askari admitted to selling certain oncology drugs at his Manhasset Park retail

pharmacy after he left Specialty. (D.I. 218 at 126:8-127:25). Askari argues, however, that he

did not breach the restrictive covenant because his retail pharmacy business was specifically

carved out from the restrictive covenant. (D.I. 222 at 7-8). Askari contends that the oncology

drugs he sold though Manhasset Park Pharmacy are available to be sold through retail

pharmacies, and that Dr. Mortimer did not show otherwise. (*Id.* at 8).

      I agree that Defendant's evidence is not persuasive. While Defendant did establish that

Askari sold oncology drugs during the non-compete period, Defendant did not show that those

drugs were unavailable at retail pharmacies. Dr. Mortimer testified that "most of the drugs on

[the] list [of oncology drugs] comprising the bulk of sales by Mr. Askari are not *typically* sold

through a retail channel, through a retail pharmacy." (D.I. 220 at 591:6-8) (emphasis added).

Although Dr. Mortimer reviewed publicly available, nationwide datasets of drug sales and

availability, he could not conclude that the oncology drugs that Askari sold were unavailable through retail pharmacies.  (*Id.* at 600:8-12, 601:1-6).

It seems to me that the drugs at issue could have been sold by Askari at his Manhasset Park retail pharmacy in its capacity as a retail pharmacy.  Further, the fact that some prescriptions for oncology drugs were filled on a delivery ticket bearing a name other than "Manhasset Park Pharmacy" is unpersuasive of the assertion that Askari was secretly running a specialty pharmacy.  Thus, Defendant has not shown that Askari breached the restrictive covenant in § 7.2(a) of the MIPA.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs have failed to meet their burden of showing that Defendant breached the Operating Agreement at either the First or Second Call.  Plaintiffs have also failed to meet their burden of showing that Defendant breached the implied covenant of good faith and fair dealing.  Defendant has failed to meet its burden of showing that Askari has breached the restrictive covenant in § 7.2(a) of the MIPA.

The parties are directed to jointly submit an agreed-upon form of final judgment within one week.